**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

# FINRA CASE NO. 09-006655

RICHARD R. ARISPE, JIMMY A. BURKE, PEGGY E. BURKE, TODD B. BURKE, JOSE J. COLLADO, ADELA CHRISTINE COLLADO, CHARLES K. COLVIN, C&C ERECTION, INC., NANCY GORDON, SUSAN W. HACKNEY, DON H. JONES, SUZANN S. JONES, WILLIAM A. RHODES, JR., DAWN SCHUESSLER, KENNETH W. SEARS, KENNETH W. SEARS, JR., REINE M. SEARS, DANIEL J. SEARS, KENNETH W. SEARS, III, JUDY STRICKLAND, ELIZABETH STEIN, AND SHANA L. STEIN,

Claimants,

v.

MORGAN KEEGAN & CO., INC.,

Respondent.

## SECOND AMENDED STATEMENT OF CLAIMS

### I.    OVERVIEW

1.      This suit arises out of a fraudulent scheme that induced Richard R. Arispe, Jimmy A. Burke, Peggy E. Burke, Todd B. Burke, Jose J. Collado, Adela Christine Collado, Charles K. Colvin, C&C Erection, Inc., Nancy Gordon, Susan W. Hackney, Don H. Jones, Suzann S. Jones, William A. Rhodes, Jr., Dawn Schuessler, Kenneth W. Sears, Kenneth W. Sears, Jr., Reine M. Sears, Daniel J. Sears, Kenneth W. Sears, III, Judy Strickland, Elizabeth Stein, and Shana Stein ("Claimants") to invest substantial retirement and trust funds into highly risky closed-end mutual funds managed and sold by Respondent Morgan Keegan & Co., Inc. ("Respondent") that purchased illiquid mortgage-backed loans and collateralized debt obligations. The funds at issue were the RMK High Income Fund, Inc., RMK Advantage Income Fund, Inc., RMK Multi-Sector High Income Fund, Inc., and RMK Strategic Income Fund, Inc. ("Funds"). The Funds were managed by Morgan Asset Management, Inc. ("Morgan Asset") under the direction of James C. Kelsoe, Jr. ("Kelsoe"), the Senior Portfolio Manager of the Funds. Morgan Asset is owned by



MK Holdings, Inc. and ultimately controlled by Respondent, a subsidiary of Regions Financial Corporation ("Regions"). Claimants are investors in these Funds.

2.     Respondent's fraudulent sales scheme involved not only the initial purchase of the Funds' shares, but also induced investors into agreeing to automatically "reinvest" accrued dividends. Hence, the stock purchases continued until Respondent's scheme was discovered and disclosed by Hyperion Brookfield Asset Management, Inc. ("Hyperion") when it recently purchased the Funds and conducted an audit of the Funds' assets. As the value of the Funds' assets declined with the collapse of the housing and credit markets, Morgan Asset with Respondent's knowing complicity, misleadingly and intentionally overvalued assets held by the Funds and used principal from the Funds to pay purported dividends to maintain the illusion that the investments were sound, making the funds essentially operate as a "Ponzi" scheme. In August 2008, Hyperion was employed by Respondent or its affiliates to value the Funds' mortgage-based security assets and the Funds were forced to take a substantial write-down in their net asset value ("NAV"). Hyperion eventually purchased the Funds and made a comprehensive review of their assets, finding (1) that many of the assets maintained by the Funds were systematically overvalued,[1] (2) that the Funds had for some time been paying dividends in excess of cash flow, causing them to liquidate assets to maintain a "dividend" level,[2] and (3) that a sustainable dividend yield on invested assets was substantially lower than the dividends promised by Respondent and its affiliates in selling the Funds. Representatives of Respondent assured investors, through their brokers and investment advisors, that the Funds

---

[1] For example, Hyperion described a transaction in which the Funds purchased a Collateralized Debt Obligation ("CDO") for $800,000 and immediately valued it at $4 million for purposes of calculating the Funds' NAV, causing the NAV of the funds to be overstated by millions of dollars on this transaction alone. The CDO was eventually sold after Hyperion took over, and the Funds took a substantial loss on the transaction.

[2] By calling the periodic payments "dividends," Respondent, along with its affiliates, misleadingly suggested that the payments were distributions of earned income to shareholders when they were in fact principal repayments financed through the liquidation of the Funds' performing assets.

were safe and securely invested in instruments that would maintain value despite the decline in the value of similar instruments. Respondent and its affiliates represented that illiquid assets would be priced by a committee at "fair value" for purposes of calculating the Funds' NAV. Hence, investors were reassured when the NAV of the Funds was maintained during the onset of the financial crisis in the housing and credit markets. Respondent and its affiliates argued that the sale of the Funds' shares in the open market at a price in excess of the Funds' NAVs indicated that the Fund managers, and particularly Kelsoe, were making sound investment decisions and that the assets of the Funds were secure despite the turmoil occurring in the credit markets and housing sector. As a result, the investors like Claimants did not sell their shares and, as a result, lost most or all of their invested capital.

3.      As outlined below, Respondent and its affiliates not only made false representations in selling the Funds to the public and in their Prospectus and Registration Statements filed with the Securities and Exchange Commission, they also falsely reported asset values and made false representations regarding the Funds' earnings and dividends to (1) ensure that investors would not redeem their shares and (2) induce investors to reinvest declared dividends into shares of the Funds. Respondent's scheme operated as intended. Claimants in this case made purchases of shares from the Funds and lost most if not all of their initial investments.

4.      Claimants bring these claims against Respondent pursuant to (1) the Texas Securities Act, TEX REV. CIV. STAT. ANN. art. 581-33, *et seq.*, (2) the Texas anti-fraud statute, TEX. BUS. & COMM. CODE ANN. § 27.01, *et seq.*, (3) principles of common law fraud, and (4) Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated hereunder. Claimants purchased their shares of the funds in Texas and were solicited by Respondent's agents in Texas to make investments in the Funds. Claimants bring this action to

seek rescission of their investments, as well as the recovery of all other damages they have suffered.

## II.  PARTIES

5.    Claimant Richard R. Arispe ("Arispe") is an individual who resides in San Antonio, Bexar County, Texas. Through his individual account and/or his IRA, he was induced to invest approximately $35,000.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Arispe was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

6.    Claimant Jimmy A. Burke, along with his family members Claimants Peggy E. Burke and Todd B. Burke ("The Burkes"), are individuals who reside in Deer Park, Harris County, Texas. Through their individual accounts and/or their IRAs, The Burkes were induced collectively to invest approximately $470,998.00 in the Funds and have lost all or most of that investment as a result of the conduct complained of here. The Burkes were induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

7.    Claimants Jose J. Collado and his wife Adela Christine Collado ("The Collados") are individuals who reside in Miami, Florida. Through their individual accounts, their IRAs and/or their joint trust with right of survivorship maintained for their benefit, they collectively invested approximately $311,872.00 in the Funds and have lost all or most of that investment as a result of the conduct complained of here. The Collados were induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

8.    Claimant Charles K. Colvin is an individual residing in Bulverde, Texas, and his company, Claimant C&C Erection, Inc., is in San Antonio, Texas. Through his individual account and/or through his company, Colvin collectively invested approximately $90,809.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of

here. Colvin was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

9.       Claimant Nancy Gordon ("Gordon") is an individual who resides in Missouri City, Harris County, Texas. She was the executive assistant to Russell W. Stein who was a broker employed by Respondent at its Houston offices during all relevant times. Through her IRAs, she was induced to invest approximately $10,766.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Gordon was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

10.      Susan W. Hackney ("Hackney") is an individual who resides in Austin, Travis County, Texas. Through her IRA account, she was induced to invest approximately $144,039.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Hackney was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

11.      Claimants Don H. Jones and his wife Suzann S. Jones ("The Joneses") are individuals who reside in Brenham, Washington County, Texas. Through their individual accounts, their IRAs and/or their joint trust with right of survivorship maintained for their benefit, they collectively invested approximately $513,257.00 in the Funds and have lost all or most of that investment as a result of the conduct complained of here. The Joneses were induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

12.      Claimant William A. Rhodes, Jr. ("Rhodes") is an individual who resides in Houston, Harris County, Texas. Through his individual account and his IRA, he was induced to invest approximately $88,590.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Rhodes was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

13.     Claimant Dawn Schuessler ("Schuessler ") is an individual who resides in Houston, Harris County, Texas.     Schuessler was induced to invest through her IRA and individual account approximately $89,000.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Schuessler was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

14.     Claimant Kenneth W. Sears, along with his children Claimants Kenneth W. Sears, Jr. and Reine M. Sears and grandchildren Daniel J. Sears and Kenneth W. Sears, III reside in Louisiana, and each maintained individual retirement accounts (IRAs), Coverdell Education Savings Account, and collectively invested approximately $269,098.00 in the Funds and have lost all or most of that investment as a result of the conduct complained of here. Collectively, all of the foregoing related claimants are referred to as the "Sears Claimants." The Sears Claimants were induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

15.     Claimant Judy Strickland ("Strickland") is an individual residing in Fort Worth, Texas.     Strickland was induced to invest approximately $205,928.00 in the Funds and has lost all or most of that investment as a result of the conduct complained of here. Strickland was induced to invest in the Funds by agents of Respondent in Houston, Harris County, Texas.

16.     Claimants Elizabeth Stein and Shana L. Stein are related to Russell W. Stein, a broker formerly employed by Respondent in Houston, Harris County, Texas.     Most of the Claimants suing herein maintained brokerage accounts with Respondent managed by Russell W. Stein, who was the direct recipient of many of the misrepresentations outlined in this First Amended Statement of Claims and passed these misrepresentations along to his customers as expected by Respondent. Russell W. Stein did not know that the representations made to him by Kelsoe and others were false or misleading until Hyperion uncovered and revealed the fraud in August 2008. Through their accounts, Elizabeth Stein and Shana L. Stein collectively invested

several hundred thousand dollars in the Funds and have lost all or most of that investment as a result of the conduct complained of here.

17.    Respondent Morgan Keegan & Co., Inc. is a wholly-owned subsidiary of Regions. It is a full-service broker/dealer that purports to provide a full array of personalized investment services to its customers from over 400 offices in 19 states. Morgan Keegan & Co., Inc. provides investment advisory services to customers from offices in Houston, Harris County Texas, among others. Russell W. Stein ("Stein") was a broker who was employed by Respondent at its Houston offices during all relevant times. At the behest of and for the benefit of Respondent, Stein received and forwarded prospectuses for and information about the various Funds at issue here. Believing the Funds to be a safe means of obtaining a higher rate of return on invested capital based upon Respondent's representations to him, Stein advised many of his customers to invest in the Funds. Each of the Claimants herein was a customer of Stein at Morgan Keegan. Representations and reassurances about the safety and value of the Funds made by agents of Respondent to Stein were understood and expected by Respondent to be conveyed by Stein to customers of Respondent such as Claimants. Respondent is a member of the NASD with its principal offices in Memphis, Tennessee.

18.    The investor account agreements signed by Claimants and Respondent require that claims by investors against Respondent be arbitrated in this tribunal.

## III.    THE FUNDS

19.    In 1999, Respondent decided to issue shares in a series of closed-end and open-end investment funds. A "closed-end investment fund" is a collective investment vehicle that issues a limited number of shares for sale to the public. Shares of a closed-end fund are usually limited to those issued at the inception of the fund or issued to investors who elect to reinvest dividends from the fund in additional shares. They are normally not redeemable for cash or

securities from the issuer prior to liquidation. Shares of a closed-end fund may be acquired from the issuer at the inception of the fund or in trades on the public market from shareholders wishing to sell their shares. An open-end fund, on the other hand, is open to new investors throughout its life. It issues shares to new investors as it operates in return for cash investments, and existing shareholders can redeem their interest for cash at will. Unlike a closed-end fund, an open-end fund has a financial incentive to represent a high net asset value ("NAV") to the market in order to receive more for new shares issued by the fund and to prevent untimely redemptions by existing shareholders that would deplete the cash assets of the fund. This is significant because the Funds at issue were all created to follow a unitary investment philosophy and largely invested in the same instruments in largely the same ratios. For this reason, a decrease in the valuation of instruments in the closed-end funds would adversely affect the NAV, and hence the market value, of shares issued by Respondent to new investors in the open-end funds. Investors were not made aware that the valuation decisions made by Respondent regarding assets in the closed-end funds would have an effect on the value of newly-issued shares in open-end funds Respondent was marketing, and thus believed that the assets of the closed-end funds would be properly valued based on prevailing market conditions. As outlined below, however, subsequent events establish that the NAV of each of the closed-end funds at issue here was systematically misstated to prevent Respondent from taking a write-down on the value of assets held by the open-end funds.

20. The closed-end funds at issue in this case were denominated the RMK Advantage Income Fund, Inc., the RMK Multi-Sector High Income Fund, Inc., the RMK Strategic Income Fund, Inc. and the RMK High Income Fund, Inc. Shares of these Funds were registered with the Securities Exchange Commission ("SEC") on Form N-1A Registration Statements and Prospectuses were issued for each of the Funds.

SECOND AMENDED STATEMENT OF CLAIMS – PAGE 8

21. The Funds invested investor capital in risky new types of income securities, such as CDOs and CMOs that had not been tested by the market to determine their safety in adverse market conditions. Investors were not advised that a significant downturn in the housing market would likely have catastrophic effects on the value of the Funds. The investment of such a substantial amount of investor capital in such risky instruments was extraordinary. Other high-yield funds only invested a small portion of their capital in these instruments, wisely fearing the risk involved. Bloomberg News has reported that the Senior Portfolio Manager of the Funds, Kelsoe, was "intoxicated" with such securities. Bloomberg also has reported that an analyst at Morningstar, a widely-read rating analyst of mutual funds, stated that "a lot of mutual funds didn't even own much of this stuff," referring to mortgage-backed securities and derivatives. Morningstar noted that the Funds at issue here were a "real big exception" to this general rule.

22. The Funds have suffered unique and extraordinary losses as a result of the highly risky investment strategy adopted for the Funds by Kelsoe. For example, through November 2007, the RMK High Income Fund suffered losses to its NAV of almost 55% for the year to date. The intermediate Fund's NAV declined 43% and continued to decline through November 2007, closing the month down almost 50% from its value at the beginning of the calendar year. No other high income mutual fund suffered losses of this magnitude for the same period. Rather than invest the Funds' remaining assets conservatively as promised in the Prospectuses, Kelsoe, the Senior Portfolio Manager of the Funds, liquidated much of the Funds' more secure and performing debt securities and equities in order to purchase more and riskier debt instruments as the market fell, hoping to recoup the Funds' losses by making larger gambles. In effect, Kelsoe "doubled down" on the Funds' riskiest investments in the hope of recovering the losses previously sustained. As a result of Kelsoe's high-risk gambles, in 2008 the losses continued to

mount, and the value of an investment in the Funds made in 2003 or 2004 is now worth a small fraction of the amount originally invested.

23.     The losses in the Funds' NAV were caused by the Funds' concentration of assets in newly-created fixed-income securities that had extraordinary exposure to changes in the housing and credit markets. These investment vehicles had little or no history of being tested for safety under adverse market conditions and were unsuitable for investment of the types of funds that were being invested (retirement accounts, trust accounts and the like). As the housing and credit issues plaguing the markets developed in 2007 and 2008, the Funds' problems were concealed by a deliberate pattern of misrepresentations by Respondent and its affiliates regarding the NAV of the Funds' investments and assurances to investors that their investments were secure. Eventually, Hyperion was hired by Respondent and its affiliates to value the Funds' assets, resulting in two dramatic write-downs in the NAV of the Funds. Hyperion ultimately purchased the Funds and conducted a sweeping and thorough review of all of the Funds' assets. In a conference call held in August 2008, Hyperion disclosed that the Funds' assets were overvalued and would have to be written down substantially and that the dividends being paid could not be sustained. On this call, Hyperion also explained that payments denominated by Respondent as "dividends" were simply in effect principal repayments to investors, as Respondent had used the sale of the assets of the Funds to maintain an unrealistically high dividend payment to investors. Dividends were reduced by Hyperion to a level that could be sustained based on the income generated by the assets invested. The combined effect of a massive write-down in the NAV of the Funds and reduction of the dividend yield was catastrophic for the Funds' investors, as the value of the Funds in the market dropped substantially.

## IV. MISREPRESENTATIONS IN THE PROSPECTUS MATERIALS

24. The initial sales materials and the Prospectuses delivered to investors contained a series of misrepresentations and failed to include information necessary to make what was contained therein not misleading. By way of example only, the prospectus for the RMK High Income Fund, Inc. disclosed that the Funds would invest a part of its assets in certain illiquid securities (although it did not identify the CDOs and CMOs which made up a disproportionate share of the Funds' assets as illiquid), but represented that the fund would carefully establish the fair value of illiquid assets in calculating the Funds' NAV: "In the absence of market quotations, a committee appointed by the Board will price illiquid investments at fair value as determined in good faith." Registration Statement at 23. The representation that a "committee" would value the securities indicated that the judgment of a single individual would not place the shareholders at risk, but events have shown that Kelsoe unilaterally determined the value of the Funds' illiquid assets. For example, Kelsoe authorized the purchase of a CDO at $800,000 and valued it on the books of the Funds as a $4 million asset, stating he "knew what I could get for it," artificially inflating the NAV of the Funds affected. When it acquired management of the Funds, Hyperion was forced to write this asset down substantially, and ultimately sold it at a substantial loss. The offering material identified above also represented that illiquid securities would be carried on the Funds' books at their "fair value." But the valuation analysis by Hyperion proved this to be wrong, as illiquid assets were in fact carried on the books of the Funds at values well in excess of the fair value of the assets.

25. The Prospectus opened with the representation that "The Fund will seek to achieve its investment objectives by investing a majority of its total assets in a diversified portfolio of below investment-grade debt securities offering attractive yield and capital appreciation potential." The Prospectus explained that the Fund would invest "in a **broad array**

of below investment-grade securities." The Prospectus repeated these representations: "In managing the Funds' portfolio, the Advisor will employ an active management approach that will emphasize the flexibility to allocate assets across a **broad array of asset classes** and thereby provide the advantages of a widely diversified high-income portfolio." The Prospectus emphasized that by investing in a wide array of instruments, shareholders could expect to achieve a higher degree of safety: "The Advisor believes that the opportunity to acquire a diverse set of assets will contribute to higher total returns **and a more stable net asset value** for the Funds than would result from investing in a single sector of the debt market such as below investment grade corporate bonds." By these statements, investors were led to believe that they had obtained the relative security of a diversified investment portfolio in which risk is minimized through diversification. They were not told that adverse results in a single market sector could effectively destroy the value of their investment in the Funds. They were assured that they were not subject to such a risk. The investment strategy of the Funds as it turns out did indeed focus substantially on a single sector of the market. The Funds were invested heavily in the housing sector, purchasing substantial quantities of high-risk CDOs and CMOs whose value was tied to the housing market to a dangerously high degree. Under Kelsoe's management, the Funds concentrated far too much on such risky securities and thus suffered substantially more than its peer group when the housing market declined. The concentration of the Funds' investment in risky debt securities of this nature was unsuitable in light of the investment profile and needs of the majority of Fund investors like Claimants.

26.     The Funds described their strategy in unusual market conditions as follows: "In unusual market conditions, the Fund may temporarily invest more assets in investment grade securities, short-term debt and cash as a defensive tactic." This represented that in a period when the market for the higher-risk securities that made up the bulk of the Funds' assets was

languishing, investor funds would be placed in lower-risk instruments to protect the investors and avoid deterioration in the NAV of the Funds. When the "unusual market conditions" occurred, however, the Funds did not move the investors' money into investment-grade securities, cash or short term debt as Respondent and its affiliates had represented. Instead, Kelsoe "doubled down" on his risky portfolio, buying larger quantities of the risky debt instruments hoping to profit on a rebound in the market for such securities. Investors were never told that the Funds would move substantial investor assets into increasingly risky instruments in a time of market uncertainty.

27.     In outlining the risk factors affecting the NAV of the Fund, the Prospectus disclosed that "Both the net asset value and the market price of the Fund's common shares may be affected by such factors as leverage, dividends (which are in turn affected by expenses) and dividend stability, market supply and demand and interest rate movements." The Prospectus did not disclose that a downturn in the housing market could have a dramatic effect on the value of the Funds' assets, as was seen in 2007 and 2008. The reference to interest-rate risk was explained in detail in the Prospectus, which disclosed that the value of debt instruments generally tend to fall as interest rates rise. Hence, the only interest-rate risk disclosed was the general and well-understood risk that debt securities tend to decline in market value in a rising interest-rate environment. Investors were never told that an increase in interest rates would affect the housing market and could cause the market for CDOs and CMOs to become increasingly illiquid, causing the fair value of the Funds' holdings to plummet.

28.     With regard to municipal bonds, Respondent and its affiliates disclosed that "The secondary market for municipal securities, particularly below investment grade debt securities in which the Fund may invest, also tends to be less well-developed and less liquid than many other securities markets, which may adversely affect the Fund's ability to sell these securities from its

portfolio at attractive prices." No similar warning was given with regard to the markets for CDOs and CMOs, however. Hence, investors could conclude that the secondary market for such instruments was better-developed than the secondary market for high-yield municipal bonds and that the Funds would not have difficulty selling its portfolio of CDOs and CMOs if the need arose. As it turned out, however, the risk associated with CDOs and CMOs included the risk that the secondary market for the securities would become illiquid. As noted above, the Bloomberg analysis and Morningstar reports indicated in 2007, that most mutual funds limited their exposure to these instruments in order to protect their shareholders, but that the Funds' advisor was "intoxicated" with these instruments and invested the Funds' assets more heavily in them than other fund managers in similar funds.

## V.    MISREPRESENTATIONS IN SALES MATERIALS

29.    Respondent or its affiliates created quarterly brochures for each of the funds. The reports issued by Respondent for each of the Funds on March 31, 2007, contained misrepresentations regarding the asset-backed securities held by the various Funds. For example, Respondent's quarterly brochure of the High Income Fund reports that corporate bonds account for only 22.4% of the portfolio's holdings and preferred stock accounts for only 0.4% of the portfolio's holdings as of March 31, 2007. Thus, Respondent knew that the High Income Fund's holdings were not as reported on the SEC filings at the time Respondent was recommending the High Income Fund to its clients. Similar misrepresentations were made in the March 31, 2007 quarterly reports for the Strategic Income Fund, Advantage Income Fund, and the Multi-Sector High Income Fund.

30.    Once the shares of the Funds were issued, Respondent and its affiliates prepared and distributed to brokers sales materials touting the advantages of investing in the Funds. These sales materials contained misrepresentations that Respondent and its affiliates were aware of and

intended that brokers would pass on to their clients. For example, on June 30, 2007, at a time when the housing downturn was affecting the value of CDOs and CMOs substantially, the RMK Advantage High Income Fund distributed materials representing to existing and prospective investors that the Funds provided the "potential for lower NAV volatility than typical high-yield funds." In truth, however, the volatility in the assets held by the Funds was increasing substantially as time passed. Respondent and its affiliates' representations assured existing and potential investors that the NAV of the Funds was not at substantial risk due to market conditions affecting the value of CDOs and CMOs. Furthermore, at the time this representation was being made, Kelsoe, the Senior Portfolio Manger of the Funds, was liquidating the Funds' paying and higher-graded debt securities to purchase increasing quantities of higher-risk instruments in the hopes of recovering his losses if the market recovered. As a result, the risk profile of the Funds was increasing and the Funds' NAVs were becoming increasingly subject to a downturn in the market.

31. In a November 20, 2007 conference call with brokers attended by Stein, Kelsoe represented that the Funds were sound. Kelsoe represented, for example, that the earnings of the Funds exceeded the announced dividend rate of 10-11 cents per share. On November 30, 2007, Kelsoe released a "Shareholder Commentary" regarding the Funds. In it he stated: "The RMK Funds released, on 11/15, the dividends for the three coming months for each of the RMK closed-end funds. **Those figures are reasonably conservative, and at this time, are being covered with earned income.**" The representation that the dividend was covered with earned income was intended to reassure investors that they could expect dividend levels to remain steady in the future. Subsequent analysis of the portfolio by Hyperion disclosed that this representation was untrue. Hyperion told analysts in an August 2008 conference call that the Funds had been liquidating capital to make "dividend" payments because the Funds' earnings

SECOND AMENDED STATEMENT OF CLAIMS – PAGE 15

were inadequate and that the dividend rates set by Kelsoe were unsustainable. Hyperion was forced to reduce the dividend rate substantially when it acquired the Funds' management.

32.    In the same November 2007 conference call, Kelsoe represented that on a "worst case write off basis," the assets of the Funds could be liquidated for more than $4 per share. Hyperion's analysis, however, disclosed that many of the Funds' assets were grossly overvalued. Hyperion was required to take a substantial write-down of the Funds' assets when it took over management of the Funds. Hyperion almost immediately recommended two NAV write-downs totaling over $2 per share for each of the four Funds. In a letter to Charles Maxwell at Morgan Keegan, Stein wrote that "This meant that in Hyperion's professional opinion that even with the 'daily smoothing or gradual downward pricing of the securities' that we as a firm were doing prior to hiring Hyperion **had not kept the NAV daily pricing even in the same zip code of reality.**" In the same letter, Stein noted that "[I[t is obvious from looking at the performance in the March 31, 2008 Annual Report received last week with our proxy materials that **these 4 Kelsoe Funds were not managed in any way near the manner that we said they were being managed.**"

33.    In reliance on the assurances given by Kelsoe that the Funds were not suffering a significant decline in value and had a sustainable dividend in excess of 10 cents per share, Claimants did not liquidate their holdings in the Funds and continued to reinvest their dividends, increasing their exposure to the Funds' underlying problems monthly.

## VI.    IMPROPER PREFERENCE OF THE OPEN-END FUNDS

34.    As noted above, Kelsoe was responsible for managing both the closed-end Funds as well as the open-end funds that invested in many of the same instruments. The difference is that the open-end funds continued to sell shares to new investors and was subject to share redemption by shareholders wishing to escape the Funds. Hence, the financial interest of

Respondent and its affiliates lay in making sure that losses in the open-end funds were minimized. An analysis of the closed-end Funds' accounts appears to indicate that Respondent and its affiliates gave preferential treatment to the open-end funds in liquidating precarious positions. In late August 2007, Regions started putting monies into the open-end funds in order to support them and allowing ready redemption by the investors in those open-end funds.

35. In addition, Respondent and its affiliates began selling these risky securities held by the open-end funds to the closed-end Funds at above-market prices. All of these actions were taken by Respondent and its affiliates to support the price of the open-end funds and allow redemptions by the investors in the open-end funds, all to the detriment of investors like Claimants in the closed-end Funds. Hence, the investors in the closed-end funds were forced to wait while Respondent and its affiliates protected their own interests in the open-end funds in a declining and illiquid market. As advisor to the Funds, Respondent and its affiliates owed fiduciary duties to the Funds and their investors, which duties were breached by Respondent and its affiliates favoring the interests of the open-end funds at the expense of the closed-end funds.

## VII. IMPROPER VOTING OF SHARES AND PROXIES

36. In mid-2008, Respondent and its affiliates decided to sell management of the Funds to a third party in order to reduce its obligation to support the Funds with loans or capital to maintain the Funds' NAV. In order to sell management of the Funds, Respondent's affiliate, Regions, needed a majority vote of the Funds' shareholders, which required a quorum of shares be present at a special shareholders' meeting. Claimants decided not to vote in favor of the proposal and therefore did not submit proxies to the company. As the date of the special shareholders' meeting approached, Charles Maxwell, CEO of Respondent, called Stein and explained that there would not be a quorum present unless Claimants' shares were at least present for the meeting. Stein explained that Claimants did not desire to vote for the proposal,

but Maxwell requested that Stein secure a proxy from his clients so that the shares could be counted toward a quorum. Stein complied but expressly instructed Maxwell that the shares were not to be voted in favor of the proposal.

37. Claimants have subsequently confirmed that at the shareholder meeting, however, Maxwell authorized voting of the shares of many of Stein's clients and others in favor of the proposal despite the explicit instructions not to do so. In addition, Respondent fraudulently purported to vote, as "trustee," the shares of a large number of fully-vested, self-directed 401k accounts owned by some of the Claimants as well as others. By the fraudulent and improper voting of these shares in favor of the proposal, Respondent purportedly secured a vote in favor of the transfer of funds to Hyperion.

## VIII. CLAIMANTS' CLAIMS

### A. Texas Securities Act Violations

38. Claimants incorporate paragraphs 1-37 above as if fully set out herein. The shares of the Funds sold by Respondent to Claimants were "securities" within the meaning of TEX. REV. CIV. STAT. ANN. art. 581-33A, *et seq.*, (the "Texas Securities Act").

39. As outlined above, Respondent and its affiliates sold securities to Claimants by means of false statements of fact and by the failure to disclose information necessary to make what they did state not misleading. Pursuant to the Texas Securities Act, Claimants are entitled to rescission of their purchases of the Funds or to rescissionary damages as outlined in the statute.

40. Pursuant to the Act, Claimants are also entitled to recover reasonable and necessary attorneys' fees and costs of court.

### B. Statutory Fraud

41. Claimants incorporate paragraphs 1-40 above as if fully set out herein.

42.     As outlined above, Respondent and its affiliates made false statements of material fact to induce Claimants into entering into a contract to purchase shares in the Funds. These statements were relied on by Claimants in purchasing shares in the Funds. Respondent and its affiliates also made false promises to do an act (such as the promise to defensively invest to protect shareholder assets) with no intent to perform as promised for the purpose of inducing Claimants to enter into a contract to purchase shares in the Funds. Claimants relied on the false representations and promises in purchasing shares in the funds. Respondent and its affiliates had actual knowledge of the falsity of their representations.

43.     Respondent, along with its affiliates MK Holdings, Morgan Asset, Kelsoe, and Regions also had actual awareness of the fraudulent statements being made by each other to Claimants and, despite this awareness, failed to disclose the truth to Claimants. Respondent and its affiliates all benefited financially from the fraud perpetrated upon Claimants.

44.     Pursuant to TEX. BUS. & COMM. CODE ANN. §. 27.01, *et seq.*, Claimants are therefore entitled to recover their actual damages from Respondent, together with attorneys' fees, expert witness fees, deposition copy costs and costs of court. Because the violations were committed with actual awareness of the falsity of the representations, Claimants are also entitled to an award of exemplary damages

C.     **Common Law Fraud**

45.     Claimants incorporate by reference paragraphs 1-44 as if fully set out herein.

46.     As outlined above, the conduct of Respondent and its affiliates constitutes fraud under the common law of Texas. Respondent and its affiliates made false representations of fact with knowledge of their falsity or in reckless disregard of their truth or falsity. Respondent and its affiliates made these representations with the intent and expectation that Claimants would rely on the misrepresentations in making decisions regarding whether to invest in the Funds and

SECOND AMENDED STATEMENT OF CLAIMS – PAGE 19

whether to sell their shares for cash in the open market prior to the collapse of the Funds in 2008. Claimants did rely on the false representations made by Respondent and its affiliates to their substantial detriment.

47.     Claimants are therefore entitled to recover their actual damages proximately caused by the fraud of Respondent. Because Respondent acted fraudulently, and because (1), when viewed objectively, there was a substantial risk of extraordinary harm that could be expected to be caused to Claimants by Respondent's conduct and (2) Respondent had actual subjective awareness of the extraordinary degree of risk their conduct imposed and chose to act anyway in conscious disregard of the rights of others, Respondent is also liable to Claimants for exemplary damages.

**IX.     FINRA RULE 12204(b)(2)**

48.     Numerous putative class action claims have been filed against Respondent and others as a result of the fraud perpetrated by Respondent on investors. These actions have been consolidated for pretrial proceedings, but there has been no certification of any class by any court. **Pursuant to FINRA Rule 12204(b)(2), Claimants hereby provide notice that so long as their claims are arbitrated in this proceeding, they will not participate in the class actions against Respondent and will accept no benefits from any settlement of the class claims against Respondent.**

**X.     PRAYER**

Claimants therefore respectfully pray that upon trial of this action, they receive the following relief from Respondent:

1)   full rescission of each Claimants' purchases of shares in the Funds;

2)   all of Claimants' actual damages suffered, both general and special;

3) an award of exemplary or punitive damages in favor of Claimants in an amount to be determined by the Panel;

4) recovery of all of Claimants' attorneys' fees, expert witness fees, cost of court, and pre- and post- judgment interest as allowed by law;

5) assess all costs, expenses and forum fees of this litigation against Respondent; and

6) Claimants pray for such other relief to which they may show themselves entitled.

Respectfully submitted,

**DOBROWSKI L.L.P.**

By: Jamie Stewart Gillman

Paul J. Dobrowski
Texas Bar No. 05927100
Bruce B. Kemp
Texas Bar No. 11255100
Jeffrey C. Alexander
Texas Bar No. 00993300
Jamie Stewart Gillman
Texas Bar No. 24047345
4601 Washington Avenue, Suite 300
Houston, Texas 77007
Tel: (713) 659-2900
Fax: (713) 659-2908

**ATTORNEYS FOR CLAIMANTS**

## CERTIFICATE OF SERVICE

I hereby certify that I have served all parties with **SECOND AMENDED STATEMENT OF CLAIMS** on this 11th day of March, 2010, via e-mail, facsimile and overnight delivery to:

**Original and three copies to**:
Elizabeth A. Muldoon
55 West Monroe Street, Suite 2600
Chicago, Illinois 60603-5104

**One service copy to**:
Terry Weiss
**GREENBERG TRAURIG, L.L.P.**
The Forum
3290 Northside Parkway, Suite 400
Atlanta, Georgia 30327

Penelope Brobst Blackwell
**GREENBERG TRAURIG, L.L.P.**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

Jennifer Tomsen
**GREENBERG TRAURIG, L.L.P.**
1000 Louisiana, Suite 1700
Houston, Texas 77002


Jamie Stewart Gillman
Jamie Stewart Gillman