ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

BEFORE FINRA DISPUTE RESOLUTION

In the Matter of the Arbitration Between:

RICHARD R. ARISPE, JIMMY A. )
BURKE, PEGGY E. BURKE, TODD )
B. BURKE, JOSE J. COLLADO, )
ADELA CHRISTINE COLLADO, )
CHARLES K. COLVIN, C & C )
ERECTION, INC., NANCY GORDON, )
SUSAN W. HACKNEY, DON )
H. JONES, SUZANN S. JONES, )
WILLIAM A. RHODES, JR., DAWN )
SCHUESSLER, KENNETH W. SEARS, )
KENNETH W. SEARS, JR., REINE )
M. SEARS, DANIEL J. SEARS, )
KENNETH W. SEARS, III, JUDY )
STRICKLAND, ELIZABETH STEIN &)
SHANA L. STEIN, )
      Claimants )
v. ) FINRA CASE NO. 09-006655
 )
MORGAN KEEGAN & COMPANY, )
      Respondent.

ARBITRATION PROCEEDINGS

October 14, 2010

DAY 3

ARBITRATION PROCEEDINGS was taken in the above-styled and numbered cause on the 14th day of October, 2010, from 9:03 a.m. to 6:44 p.m., before Kelly Hanna, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Greenberg Traurig, 1000 Louisiana, Suite 1700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

HANNA & HANNA, INC.
(713) 840-8484



ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 777

1 expert witness yesterday who -- who, if I remember
2 correctly, had an analysis that said that at some point
3 in most of these Funds a big chunk was in the lower
4 tranches. Like I remember a number of close to
5 90 percent in some cases. Does that sound even
6 potentially that it was ever --
7     THE WITNESS: Well, now, I think that
8 question has got to be -- 90 percent of the Fund was not
9 in asset-backed or mortgage-backed securities, period.
10 Okay. So, 90 percent of the Fund couldn't have been in
11 the lower tranches. But if you take out that allocation
12 and say, well, there was, you know, somewhere around
13 two-thirds of the Fund was in asset backed or structured
14 finance product, then I would say it is probable that
15 90 percent was, in fact, in lower tranches. Counsel
16 refers to the lowest tranche, which is, meaning the very
17 bottom piece or the equity or residual piece, not
18 90 percent there, but if you take, you know, from the
19 mezzanine, you know, the middle to the bottom, yeah, I
20 would say, yeah, it was very probable that we owned -- a
21 very high majority of our holdings would have been on
22 purpose not in the senior pieces.
23     MR. FALLAS: So, to the extent that you --
24 to the extent of the structured securities in the
25 portfolio, to the extent of that -- the structured

Page 778

1 securities were contained in the portfolios, of those
2 you basically -- you tended to favor the lower tranches
3 for the structured part.
4     THE WITNESS: Yeah, we didn't purchase --
5 in fact, if I might elaborate on that, again, we're
6 talking about high yield funds. So, a senior bond
7 pricing at LIBOR plus 19 basis points, that doesn't fit.
8 So, we're going to be down the credit structure. Now,
9 we did own some pieces that were the seniormost pieces;
10 but they were from old deals that were distressed. So,
11 in fact, we owned some aircraft and credit card and
12 medical equipment receivables that were, at the time
13 that those bonds were issued in the late '90s or early
14 2000s, those were the senior pieces, but because the
15 deals themselves had gone through a great deal of
16 stress, we were able to buy those at cents on the
17 dollar. One that comes up in particular is aircraft
18 receivables. You know, after 9/11, those deals all went
19 through enormous stress and we owned the A tranches,
20 they would have been denoted as an A tranche, but they
21 were at 50 to 60 cents on the dollar. Again, they're
22 high yield situations.
23     MR. FALLAS: And it was also kind of
24 explained to us that in -- particularly in the lower
25 tranches and, you know -- you know, some of the lowest

Page 779

1 levels, that it's possible to -- before the entire trust
2 evolves, there are those lower pieces that basically
3 stop paying altogether and are essentially no good
4 anymore, worth pennies, and even though they may have a
5 nominal value, they essentially -- they've just gone
6 away. They've sort of, you know, stopped -- stopped
7 being meaningful. Is that even in the ballpark of the
8 way it works?
9     THE WITNESS: Well, yes, I think that,
10 generally speaking, that whenever you're looking at the
11 more subordinated pieces of a capital structure, you
12 certainly expect more risk at the bottom, right? And,
13 so, for example, let me give you an example. Take --
14 pick a bank of any sort, you know, name XYZ Bank, okay?
15 The very top of that capital structure is a certificate
16 of deposit. It has a government guarantee on it, for
17 that matter, right? But it has very low return, okay,
18 1 percent, maybe a half a percent. As you step down,
19 you could buy the senior debt of the bank operating
20 company. That would be secured by, you know, as you
21 step further down, you get subordinated debt and then
22 preferred stock and then common stock. The common stock
23 of a bank would be the first thing to stop paying in
24 stress, and we saw that, in fact, happen. So, the banks
25 discontinue their dividends, right? British Petroleum.

Page 780

1 It didn't quit paying their bonds, but it quit paying
2 its common stock.
3     So, the supposition that the more junior
4 pieces of a structure are subject to having the cash
5 flows interrupted first is true, yes.
6     MR. FALLAS: Okay. So, what was told to
7 us is, basically, if you're investing in, let's say the
8 third-to-the-bottom tranche, if -- if that particular
9 issue gets in trouble, then chances are very good that
10 you basically could lose your entire investment in that
11 since you had that third-to-the-last tranche, your
12 entire investment could be wiped out with a good chance.
13 Is that --
14     THE WITNESS: Well, in 2010, saying it's a
15 good chance is easy to say. There are -- over the time
16 that I've invested period of time, there are times when
17 a deal is stressed and then it recovers. Case in point
18 is manufactured housing. You know, mobile homes.
19 Stress, recover; bonds recover. So, it's not a
20 certainty that it's going to go one way or the other,
21 but it does have -- now, somewhat complicated, but the
22 very bottom pieces of -- or the bottom tranches of
23 structures are not necessarily and always more risky
24 than higher tranches. We are seeing that today whenever
25 we look at a deal that was structured back in '07 or

ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

STATE OF TEXAS

COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ARBITRATION HEARING

October 14, 2010

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 25th day of October, 2010.

*Kelly Hanna*
Digitally signed by Kelly Hanna
Date: 2010.10.25 09:40:39 -07:00
Reason: I am the author of this document
Location: Houston, TX

Kelly Hanna, CSR, RPR, CRR, CMRS
Texas CSR 1654
Expiration: 12/31/2011
Firm Registration No. 581
1225 North Loop West, Suite 327
Houston, Texas 77008
713.840.8484 - 713.626.1966
www.hannareporting.com