# Arbitrator Fallas Excerpts



# ARBITRATION PROCEEDINGS – DAY 2 – October 13, 2010
# ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 245

1      BEFORE FINRA DISPUTE RESOLUTION

2 In the Matter of the Arbitration Between:

3 RICHARD R. ARISPE, JIMMY A.  )
   BURKE, PEGGY E. BURKE, TODD  )
4 B. BURKE, JOSE J. COLLADO,    )
   ADELA CHRISTINE COLLADO,      )
5 CHARLES K. COLVIN, C & C       )
   ERECTION, INC., NANCY GORDON, )
6 SUSAN W. HACKNEY, DON H.       )
   JONES, SUZANN S. JONES,       )
7 WILLIAM A. RHODES, JR., DAWN   )
   SCHUESSLER, KENNETH W. SEARS, )
8 KENNETH W. SEARS, JR., REINE   )
   M. SEARS, DANIEL J. SEARS,    )
9 KENNETH W. SEARS, III, JUDY    )
   STRICKLAND, ELIZABETH STEIN &)
10 SHANA L. STEIN,               )
        Claimants              )
11 v.                          ) FINRA CASE NO. 09-006655
                                )
12 MORGAN KEEGAN & COMPANY,      )
        Respondent.            )
13

14            DAY 2

15       ARBITRATION PROCEEDINGS

16        October 13, 2010

17    ARBITRATION PROCEEDINGS was taken in the

18 above-styled and numbered cause on the 13th day of

19 October, 2010, from 8:58 a.m. to 5:36 p.m., before Kelly

20 Hanna, Certified Shorthand Reporter in and for the State

21 of Texas, reported by computerized stenotype machine at

22 the offices of Greenberg Traurig, 1000 Louisiana, Suite

23 1700, Houston, Texas, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.

---

Page 246

1        APPEARANCES
2
3 FOR CLAIMANTS:
4    Mr. Paul J. Dobrowski
     Mr. Bruce Kemp
5    Mr. Cody Stafford
     Dobrowski, LLP
6    4601 Washington Avenue, Suite 300
     Houston, Texas 77007
7    Telephone: 713.659.2900
     Fax: 713.659.2908
8    E-mail: pjd@doblaw.com
9 FOR RESPONDENTS:
10   Mr. Terry Weiss
     Mr. Steve Carlin
11   Ms. Jennifer Tomsen
     Ms. Penelope Brobst Blackwell
12   Greenberg Traurig
     The Forum
13   3290 Northside Parkway, Suite 400
     Atlanta, Georgia 30327
14   Telephone: 678.553.2100
     Fax: 678.553.2212
15   E-mail: weisstr@gtlaw.com
16 ALSO PRESENT:
17   Mr. Maurice Fallas, Arbitrator
     Mr. Raymond C. Kerr, Arbitrator
18   Mr. Thomas A. Martin, Arbitrator
     Mr. Tom Barnett, Morgan Keegan
19   Mr. Don Jones, Claimant
     Ms. Susan Hackney, Claimant
20   Mr. Steve Scales, Expert
     Mr. Kjell Ekdahl, Expert
21
22
23
24
25

---

Page 247

1            INDEX
2                    PAGE
3 Examination Continued by Mr. Carlin ............249
   Examination by Mr. Dobrowski ..................294
4 Cross-Examination by Mr. Weiss .................399
   ReDirect Examination by Mr. Dobrowski ..........492
5 ReCross-Examination by Mr. Weiss ...............499
   Further ReDirect Examination by Mr. Dobrowski ...511
6 Further ReCross-Examination by Mr. Weiss ........513
   Further ReCross-Examination by Mr. Weiss ........520
7 Court Reporter's Certificate ...................532
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 248

1            MR. KERR:  All right.  Good morning,

2 everybody.  This is the second day of hearing in the

3 Arispe, et al. versus Morgan Keegan & Company.  There

4 are some housekeeping issues, I understand.  So,

5 Ms. Blackwell.

6            MS. BLACKWELL:  One brief issue,

7 Mr. Chairperson.  We -- this case, as you know, was

8 originally consolidated into one case and then severed,

9 and when we severed it -- before we severed it, we had

10 entered into a confidentiality agreement to cover all

11 the documents produced by the parties to the extent they

12 were marked confidential.  The parties have agreed that

13 that confidentiality agreement will apply in this case

14 because most of the documents used in this case were

15 actually produced in that other case.  So, we just want

16 on the record that this agreement applies in this case,

17 assuming that the Panel is agreeable.

18            MR. KERR:  Certainly, we're agreeable.

19 This several-page confidentiality agreement does apply,

20 and do you want to make it an exhibit?

21            MS. BLACKWELL:  Yes, we probably should

22 make it an exhibit.

23            MR. CARLIN:  It would be our 194.

24            MR. DOBROWSKI:  Arbitrator's 2.

25            MS. BLACKWELL:  Yeah, Arbitrator's 2.

---

## ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
## ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 337

1  Slide 14 represents, because we're going to try and move
2  a little quicker?
3      A.  Sure.  Slides 14 through 18 are related.  On
4  Slide 14, I've reported as of March 31st, 2007, what
5  fraction of the portfolio is in asset-backed securities
6  or structured finance, I'll use those terms
7  interchangeably, and what percentage is in corporate
8  bonds.  And, so, if we just go down through the numbers,
9  for RHY, which is the Multi Sector High Income Fund,
10  it's 70 percent in structured finance, 21 percent in
11  corporate bonds.  For the High Income Fund, RMH, it's
12  65 percent in structured finance, 24 percent in
13  corporate bonds.  Strategic Income, it's 65 percent in
14  structured finance, 22 percent in corporate bonds.  And
15  for Advantage Income fund, 66 in structured finance, 22
16  in corporate bonds.  So, three times as much structured
17  finance as corporate bonds.
18      Q.  And those are the four closed-end funds, right,
19  sir?
20      A.  Yes.
21      Q.  And then what are Slides 15 through 18?
22      A.  Well, I've plotted over time the same two
23  items, the percent invested in structured finance, the
24  percent invested in corporate bonds.  The percent
25  invested in structured finance is in blue, the percent

Page 338

1  invested in corporate bonds in red and I have plotted
2  them from inception to the summer of 2008.  And the only
3  thing -- two things I would ask you to note when you
4  look at them, the structured finance is consistently 60
5  to 80 percent of the portfolio.  The corporate bonds,
6  consistently 10 to 25 percent of the portfolio, except
7  when you get to late 2007 you see the gap between those
8  two lines, the blue line and the red line narrowing.
9  The reason it's narrowing is not because the portfolio
10  is being repositioned, but these are percent of market
11  value.  So, if you start out with a portfolio that's
12  70 percent in structured finance and 20 percent in
13  corporate bonds and the structured finance loses roughly
14  5/7 of its value, drops in market value from what would
15  be 75 to 20, then you've got a portfolio that looks like
16  it's half structured finance, half corporate bonds and
17  that's essentially what's happening here towards the
18  end.  It's not that structured finance securities are
19  being sold and corporate bonds are being bought, it's
20  just that the market value of the structured finance
21  securities is plummeting to zero, as I'll show you.
22  And, so, the gap between these two lines narrow at the
23  end.
24      MR. FALLAS:  Excuse me.  I have a
25  question.

Page 339

1      MR. KERR:  Go ahead.
2      MR. FALLAS:  On Slide 10 -- not Slide
3  10 -- Slide 12, that blue line, that top blue line
4  that's the non-RMK Funds?
5      THE WITNESS:  Yes.
6      MR. FALLAS:  You said it's the other high
7  yield bond funds that don't include the RMK.
8      THE WITNESS:  Correct.
9      MR. FALLAS:  And there's 35 of them.
10      THE WITNESS:  Yes.
11      MR. FALLAS:  Which 35 -- you're saying all
12  35 of everything else that there was at that time?
13      THE WITNESS:  That's correct.
14      MR. DOBROWSKI:  Closed-end.
15      THE WITNESS:  Closed-end.
16      MR. DOBROWSKI:  Let's be clear.
17      THE WITNESS:  Yeah.  I'm comparing it to
18  closed-end high yield funds.  So, it's not open-end
19  funds.  Open-end funds that don't use leverage and have
20  other slight differences, there are hundreds of them,
21  but closed-end high yield funds, there are 35 of them
22  with data throughout this period, and I've got them
23  described in a little bit more fully in a footnote, I
24  think, to the paper that's in Tab 3, behind Tab 3, but
25  there are 35 funds.  Sounds like a small number, but if

Page 340

1  you actually go to the New York Stock Exchange or the
2  AMX where these things are listed, you can actually
3  verify that that's all there is.  I thought it was too
4  small a number when we first developed it, but that was
5  all that was identified in combination between Bloomberg
6  and Morningstar and so we went to the exchanges and
7  checked it and that's the right number, 35.
8      MR. FALLAS:  So, you're saying that's all
9  35 were identified as high yield closed-end.
10      THE WITNESS:  Correct.
11      MR. FALLAS:  Are the 35 listed anywhere?
12      THE WITNESS:  I'm not sure.  We have at
13  one point listed them in discovery.  I'm not sure in
14  this case or not.  I can provide you at the end of the
15  day a list of the tickers and the names, if you would
16  like, but there's 35 of them; and there's a footnote, I
17  think, that describes them a little bit more fully --
18  let me just identify that for you.  The discussion is on
19  Page 4 and 5 and 6.  I don't see a footnote describing
20  the Funds precisely.  Let me maybe at lunch get you a
21  list of the 35 funds, but there are 35 closed-end high
22  yield bond funds.  That's all there is.
23      Q.  (BY MR. DOBROWSKI)  And when you're talking
24  about the discussion on Pages 4, 5 and 6, you're
25  referring to Tab 3.

## ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
## ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 365

1 Kodiak, and I'll get to the one slide that I do want to
2 talk to you about. So, Slide 41 is the capital
3 structure; and you see that the funds invested in the
4 bottom two tranches, the one that is labeled E and
5 labeled in the -- described in the prospectus with the
6 label subordinated.
7       If you flip to Slide 42, 42 shows that the
8 Funds lost all of their investment in the E tranche by
9 the end of 2007, again, with no default. And if you --
10      MR. FALLAS: Excuse me. When you say "no
11 default," you just explained pretty much what that is,
12 but those lower tranches, once they've basically -- the
13 value has gone to zero, is it -- are they technically
14 still in existence?
15      THE WITNESS: They are.
16      MR. FALLAS: And they continue to be in
17 existence. They don't get wiped out. I mean, they
18 don't get eliminated.
19      THE WITNESS: In some securities -- in
20 some trusts they do. There's two ways they're dealt
21 with. One is, as the underlying trust assets are being
22 sold at realized losses, maybe repossessed homes or
23 aircrafts or there are realized losses in the underlying
24 assets, the face value of the bottom tranches start
25 being written down to zero. In -- in other cases, the

Page 366

1 face values don't get written down. And, in fact, if
2 you look at -- we're looking at Knollwood, but if you
3 flip back -- let me identify on the Kodiak page that we
4 were looking at Slide 37, if I could ask you to just look
5 at Slide 37, what's interesting is, rather than being
6 written down, the face values are actually being written
7 up. If you turn to Slide 37, if you, again, looking at
8 the top left-hand corner, RHY, the face value,
9 March 31st, 2008 increases from 3 million to $3,133,608
10 and the next month $3,185,273.
11      MR. FALLAS: Right.
12      THE WITNESS: What's happening there is,
13 when interest is not paid on that tranche, it's being
14 deferred and accumulated in the face value.
15      Now, what's interesting is, if you look at
16 the -- at the trustees' reports each month, you can see
17 that -- that those tranches at the bottom are going to
18 stop receiving cash flow months before they actually do
19 stop receiving cash flow, and as a result of that, the
20 market value of the security drops to zero because
21 people looking at it, sophisticated people looking at it
22 can see that that tranche is only going to get one or
23 two or three more monthly payments and in total that's
24 worth 2 or 3 percent of the face value of the note.
25 And, so, the market value drops to the value of that 2

Page 367

1 or 3 percent you're going to receive over the next
2 couple of months, even though it is still receiving this
3 month all of its promised principal and interest, you
4 can see that that cash is going to dry up in the next
5 quarter. Then when the cash flow does stop coming, it's
6 being deferred and accumulated as additional face value
7 in the notes, even though the cash flow has stopped
8 going to the tranches above, also. These tranches are
9 never going to receive cash flow. They're worth zero.
10 The tranches above them are seeing their cash flow stop
11 and yet they're still being reported with a face value
12 that's not only constant but increasing.
13      Q. (BY MR. DOBROWSKI) You mentioned the trustees'
14 reports indicating on a monthly basis what the cash flow
15 is like. Are those often referred to as remittance
16 reports?
17      A. Remittance reports, that's correct.
18      Q. Okay. And who were those made available to, to
19 your knowledge?
20      A. Well, primarily to the portfolio managers.
21      Q. Okay. Let's move back to --
22      A. I'm sorry. I don't think that --
23      Q. Were you finished?
24      MR. KERR: He has some more questions.
25      MR. DOBROWSKI: I'm sorry. Go ahead.

Page 368

1      MR. FALLAS: My question though, is: So,
2 when the cash flow stops, do those tranches technically
3 still exist and continue to exist or is a line crossed
4 through them and said these are gone, bye-bye?
5      THE WITNESS: No, they still exist.
6 They're in default, but they still exist until the trust
7 is unwound.
8      MR. FALLAS: And you say that they will
9 never receive cash flow.
10      THE WITNESS: That's correct.
11      MR. FALLAS: How do you know that?
12      THE WITNESS: Well, because if you look at
13 the remittance reports you've got -- essentially the
14 reason they're not getting cash flow is because the
15 trust's underlying assets have shrunk, they've
16 defaulted, the underlying assets have defaulted. And,
17 so, the value of the trust may have at one time been a
18 billion dollars. Now it's 900 million and then it's
19 800 million and then it's 700 million as a result of
20 realized losses on defaulted securities in the
21 underlying trust. Those securities, once they've
22 defaulted, and the losses have been realized, there's no
23 opportunity for money to come back into those
24 securities. It's -- to put it very sort of simply
25 colloquially, when people default on their mortgages and

## HANNA & HANNA, INC.
## (713) 840-8484

## ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
## ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 369

1 walk away, they don't a couple of years later when their
2 fortunes improve go back and decide to start paying on
3 that defaulted mortgage. That's wiped off the books.
4 That's not coming back. These securities, the
5 underlying trust is shrinking, so the market value is
6 declining, but more importantly, the cash flow coming
7 off of those poor securities has shrunk. And, so,
8 there's not enough money to pay any, but let's say the
9 tranche is down to C or D and at some point, as this
10 process continues, there's not enough money to pay D and
11 then there's not enough money to pay C and the trust
12 unwinds when there's not enough money to pay A and B.
13 We're so low in the capital structure at G, H and
14 Income, if it -- if it gets to that there's not enough
15 money to pay D and then things stabilize, it never
16 stabilizes to the point where money is starting to be
17 paid to E, F, G and H, they're never getting money
18 again.
19        MR. FALLAS: Okay. So, you're saying that
20 if it goes from -- if you take -- if you take the bottom
21 of the line and, you know, it starts, you know, the very
22 bottom stops getting cash flow and then, you know,
23 basically, let's say -- let's take it as 100 is at the
24 top and zero is at the bottom.
25        THE WITNESS: Yes.

Page 370

1        MR. FALLAS: So, you're saying it goes
2 from zero and then it rises from 1 to 7 to 25. So,
3 basically the bottom 25 percent has stopped.
4        THE WITNESS: Yes.
5        MR. FALLAS: And then it rises to 40.
6 You're saying it never goes in the other direction.
7 You're saying it always -- it will keep on shrinking
8 until -- until the top stops getting money?
9        THE WITNESS: Well, there have been
10 periods of time where the -- the securities were
11 different than these securities but similar in some
12 structuring or structural sense where the securities
13 could stop paying at, let's say, that 25 level and then
14 start back paying later, okay? But these securities,
15 what you could see in the remittance reports is that the
16 underlying assets were so bad -- we haven't talked about
17 what the underlying assets were in these trusts, but the
18 underlying assets were so bad that it was a wildfire
19 that was working from the bottom up through the capital
20 structure and -- and it was working at a phenomenal
21 pace. On some of these securities, you can see the
22 remittance reports running through a tranche in just two
23 or three months and then running through the tranche
24 above it in the next two or three months. These
25 securities were losing their value so rapidly they were

Page 371

1 never coming back. And the proof of that may not be in
2 my explanation of it to you, but it's in the market
3 prices. If you look at the market prices of the
4 securities we've just looked at, those securities have
5 dropped in value to a penny per dollar or sometimes a
6 hundredth of a penny per dollar. That tells you that
7 the market is saying these securities are never coming
8 back. They're never going to receive another dollar of
9 cash flow. That's why the market value -- after -- when
10 they're still receiving cash flow, the market value
11 drops to 2 or 3 percent, that's because they're going to
12 receive cash flow for one or two more months and
13 it's 2 or 3 percent of the face value. But after that
14 month or two the securities' value drops to zero and
15 that's because the market can determine, knows that
16 these securities are never coming back, never going to
17 receive another dollar.
18    Q.  (BY MR. DOBROWSKI) But, Dr. McCann, what
19 Mr. Fallas is asking us, as I hear it, is -- is that
20 even if the -- it gets to a point where, let's say, if
21 H, G, F and E stop payment but it's still being paid
22 through D, does it subsequently occur such that there
23 are additional Funds being paid so that those lower
24 tiers ultimately do get back some monies and based on
25 your review and analysis, what's the answer?

Page 372

1    A.  Well, theoretically, that's a possibility. The
2 **structure allows for a big influx of money to then**
3 **trickle down to the G and H tranches; but as a factual**
4 **matter, that wasn't possible in these securities, and**
5 **the market price reflects it. The fact that the market**
6 **says these things are worthless means that there's never**
7 **going to be money coming back down to these tranches.**
8        MR. FALLAS: Okay. One last question to
9 clear that up. This is basically a technical difference
10 that I'm making, okay? If the market price falls to a
11 fraction of a penny, market is saying, you know what, it
12 ain't going to happen, okay, the market could be wrong
13 theoretically, right?
14        THE WITNESS: I'm sorry, not about these
15 securities. It couldn't be wrong about these securities
16 just because of the structure of the trust. If you
17 think about it again, think of it as a pool of mortgages
18 and it's shrinking and there's no -- the pool, the size
19 of the trust is shrinking because people are defaulting
20 on their mortgages and walking away. And as they walk
21 away, there's less and less cash flow going out to the
22 tranches and so that H and G tranches have stopped
23 receiving cash flow because the trust assets have
24 shrunk. People have walked away from their debt.
25        Now, as a theoretical matter, as a

**ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010**
**ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY**

Page 373

1  technical matter, if they picked back up their mortgages
2  a couple years later and started paying them, that's
3  possible, but it just -- it doesn't happen, and it will
4  never happen with these securities.
5     Q.  (BY MR. DOBROWSKI) And has it happened with
6  these securities since 2007?
7     A.  No.  The bottom tranches in structured finance
8  deals have stabilized at about 4 cents on the dollar and
9  they're never -- never going to be higher than that.
10          The bottom tranches of the biggest deals
11  have stabilized at about 4 cents on the dollar.  The
12  other deals, securities are worthless.  These securities
13  have dropped to zero, and they haven't rebounded.
14          MR. DOBROWSKI:  Does that answer your
15  questions?
16          MR. FALLAS:  Yeah.
17          MR. DOBROWSKI:  Okay.  Tell me what you
18  would like me to do, Mr. Chair.
19          MR. KERR:  Well, how much longer do you
20  have with your direct?
21          MR. DOBROWSKI:  Well, I'm not going to be
22  finished in 5 minutes, I can tell you that.
23          MR. KERR:  Ten?
24          MR. DOBROWSKI:  No.
25          MR. KERR:  Okay.  All right.  Fair enough.

Page 374

1  Let's take lunch, then.  It's now about 10 after, I
2  guess.
3          MR. DOBROWSKI:  I've got 12:15.  So, 1:30?
4          MR. KERR:  Yeah.
5          MR. DOBROWSKI:  Yes, sir.
6          (Recess taken from 12:13 to 1:35.)
7          MR. KERR:  When we parted at noon, you
8  were in your direct examination.
9          MR. DOBROWSKI:  Yes, sir.  And hopefully
10  we'll knock this out in short order.
11          MR. KERR:  All right, sir.  Very good.
12  And I remind you that you're still under oath, sir.
13          THE WITNESS:  Yes.  Thank you.
14     Q.  (BY MR. DOBROWSKI) Let's turn to Slide 41,
15  Dr. McCann, and this relates to the Knollwood bonds that
16  were purchased by the four closed-end funds.  Can you
17  explain what Slide 41 represents, sir, briefly?
18     A.  I think this is where we left off.  I
19  identified Slide 41 as the capital structure for the
20  Knollwood trust, and Morgan Keegan Funds bought the E
21  and what was labeled as the subordinated tranche.
22          And then if we flip to Slide 42, this
23  reflected the losses in the E tranche.  The Funds lost
24  all $8 million invested in the E tranche.  And if you
25  flip to the next slide, Slide 43, you see they lost

Page 375

1  $14 million in what was labeled the subordinated
2  tranche.
3          And then we were turning to, I think,
4  Slide 44, 45 and 46 when we done.  I'm just going to
5  identify Slide 45 and 46 for you.  They're containing
6  excerpts, quoted language from the Knollwood prospectus
7  that tracks pretty much verbatim the quotes I showed you
8  from the Kodiak prospectus.  The first one, Slide 44,
9  defines default the same way the Kodiak prospectus did,
10  which is to say, so long as the most senior tranches are
11  receiving cash flows, the cash flows can stop to the
12  lower tranches and it's not an event of default.
13          And then if you flip to Slide 45, Slide 45
14  is the same as language we saw in the Kodiak deal that
15  talks about how cash flow gets diverted from the lower
16  tranches, like the ones that these Funds invested in to
17  the higher tranches, if the higher tranches get in any
18  jeopardy.
19          And the language I've quoted here on
20  default and cash flow diversion I've quoted from two
21  prospectuses.  I could show you the same language in a
22  hundred or 200 prospectuses.  This language is common
23  across the securities in these Funds.
24     Q.  What is the significance of Slide 46, which
25  you -- does this also -- Slide 46 come from the

Page 376

1  Knollwood prospectus?
2     A.  It does, yes.
3     Q.  And what's its significance, sir?
4     A.  Well, there's some talk about what was
5  disclosed and whether the risks of these Funds were
6  disclosed.  I excerpted this language verbatim.  I
7  boiled it down by just eliminating some sentences.  So,
8  I compressed three paragraphs from the prospectus for
9  the Knollwood security; and this language literally
10  would be the best description of the Funds I can imagine
11  or at least in one paragraph this slide would describe
12  the Funds, the RMK Funds perfectly.
13     Q.  Okay.  So, to make it quick, if you could just
14  have the Panel -- direct the Panel to read Slide 46 to
15  itself, I think that will move things along very
16  quickly.
17          MR. KERR:  All right.  We'll do a quick
18  study.
19          MR. DOBROWSKI:  Well, you can take as much
20  time as you want.
21     Q.  (BY MR. DOBROWSKI) Dr. McCann, can you briefly
22  now explain to the Panel what language in this
23  disclosure from the Knollwood is important compared with
24  the disclosures made by the four closed-end funds, sir?
25     A.  Sure.  Think about what this is saying in big

## ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
## ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 393

1  understood you to say.
2       THE WITNESS: Yes, no. What I'm saying
3  is --
4       MR. MARTIN: Okay. Where am I wrong?
5       THE WITNESS: Let me -- let's go to the
6  backup. I think it will help if we look at the Arispe
7  as an example in the large spiral-bound package. It's
8  the first tab. And if we go towards the end of that
9  first tab you will see the market adjusted Exhibit where
10  it's calculated. Let me suggest that we look at what
11  will be Page 35 and 36 of 54. Thirty-five and 36 of 54.
12       MR. MARTIN: Okay.
13       THE WITNESS: Now, the way this exhibit is
14  laid out, Exhibit 4, starting on Page 35, we have the
15  net investment is the amount that Mr. Arispe had
16  invested in the RMK Funds. You see it grows a little
17  bit in July of 2007. If we look, I think what we'd see
18  is that there was an additional purchase. So, there's
19  an opening purchase in the Fund and then an additional
20  purchase. And then later you see, if you go down to May
21  of 2008, you can see the number in that net investment
22  column declining a little bit. That's because there are
23  dividends that are being taken out of the portfolio --
24  that are being withdrawn as cash, not being reinvested.
25  Now, imagine that sort of pattern. You've got a

Page 394

1  purchase, a second larger purchase, dividends up to that
2  point in time are being reinvested, but then starting
3  later in -- in 2008, the dividends are not being
4  reinvested. Now, if you wanted to follow that same set
5  of cash flows in the alternative Fund, in the Vanguard
6  High Yield Fund, you would put the first $10,086 in the
7  Vanguard Fund. You would -- any -- any dividends that
8  were paid on the Vanguard Fund you would just reinvest
9  because you're not taking the money out of this
10  portfolio either. Then in July of 2007, you would
11  invest another $18,000 of new money into the Vanguard
12  Fund. And then starting in -- in April or May of 2008,
13  you would start withdrawing some money out of your
14  growing Vanguard portfolio. Now, your Vanguard
15  portfolio is growing because of the two purchases you
16  made and the reinvested dividends. But starting in May
17  of 2008, it looks like you would be taking out maybe $50
18  a month because that's what you're doing in the RMK
19  Fund. So, we'd start taking out $50 a month from the --
20  from the Vanguard portfolio or whatever would match the
21  cash flows on the same day.
22       Now, if you flip to the next page, if you
23  look at the net investment column, you see at the
24  bottom, July 31st, 2010, it says $26,474? That's how
25  much net, in your words, cash in, cash out Mr. Arispe

Page 395

1  has in, $26,474. The securities are worth $3,577.
2  That's the account value column. The difference between
3  those two numbers is the out-of-pocket loss. $26,000
4  have been paid net of all of withdrawals for units that
5  are currently worth $3,577. So, the out-of-pocket loss
6  is $22,897.
7       Now, the Vanguard portfolio that has
8  exactly the same inflows and outflows as these Morgan
9  Keegan Funds would be worth $33,303. That's in Column
10  4. That diversified portfolio column is the Vanguard
11  High Yield Corporate Bond Fund and it's got exactly the
12  same -- it's created with exactly the same two first
13  purchases and all of the same withdrawals that are made
14  from the RMK Funds.
15       So, the Vanguard portfolio would be worth
16  $33,303 when the RMK Funds are worth $3,577. The
17  difference between those two numbers is the $29,727 on
18  the far right. That's the market adjusted damages.
19  If -- if Mr. Arispe had been in the Vanguard Fund, he
20  would have $33,000 instead of $3,000. The difference is
21  $30,000 market adjusted damages.
22       MR. MARTIN: Thank you.
23       MR. DOBROWSKI: Now I pass the witness.
24       MR. KERR: Do you have any questions?
25       MR. FALLAS: Yeah.

Page 396

1       MR. KERR: Do you want to ask it now or
2  after the cross-examination?
3       MR. FALLAS: Right now. At least one.
4       MR. KERR: Okay.
5       MR. FALLAS: Okay. When you take into
6  account dividends, you're only talking about dividends
7  actually received and not reinvested, correct?
8       THE WITNESS: Not precisely. If you look
9  at the summary page, we actually list all of the
10  dividends. So, for Mr. Arispe, whether he reinvested
11  them or not, he received -- he received $9,000 of
12  dividends. The -- the clearest way to see it is on --
13  is on Page 12 of 54 and in the large spiral-bound
14  package, if I may, it's behind Tab 1, 12 of 54. This is
15  the bottom of an exhibit that's called a Profit and Loss
16  By Security. And you will see there that the column
17  that is headed "Purchases" totals $35,623.65. The sales
18  or held value at the end totals $3,808. The difference
19  between those two is the capital loss, the $31,815. The
20  dividend column adds up to $8,918. If you offset that
21  $8,918 against the $31,815, you get the $22,897 and
22  those are all the dividends, whether they're reinvested
23  or taken out. If they're reinvested, essentially that
24  dollar value goes in both the dividend column and the
25  purchases column, and you can see that, if you flip back

## HANNA & HANNA, INC.
## (713) 840-8484

**ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010**
**ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY**

Page 397

1  a few pages, you'll see examples where there's a
2  dividend that's reinvested, it shows up both as a
3  purchase -- an increase in the quantity held and a
4  dividend.
5           The confusion may have come when we were
6  talking about market adjusted damages because there,
7  there is a difference between dividends that are taken
8  out and dividends that are reinvested. With a market
9  adjusted damages calculation --
10          MR. FALLAS: I'm just saying, basically,
11  where you have proceeds, that's only money actually
12  coming, you know, into the investor's pocket, right?
13          THE WITNESS: I'm sorry. You're on Slide
14  69?
15          MR. FALLAS: Yes.
16          THE WITNESS: That's the proceeds from the
17  sale of units, and it would not include dividends that
18  are taken out in cash. So, that's -- over the course of
19  the account, you buy 125 units, some of it with initial
20  cash, some of it with reinvested dividends. The
21  proceeds number is what you got when you sold 125 units,
22  however they were acquired.
23          MR. FALLAS: What I'm asking about,
24  basically the money that the Fund paid out and then the
25  investor chose to buy more shares instead of spending

Page 398

1  it, where does that money show up?
2          THE WITNESS: Well, it's almost a wash
3  because it's showing up both in the purchases -- for
4  instance, if there's a $100 dividend, it's showing up as
5  a $100 dividend and it's showing up as $100 purchase of
6  units. And, so, it's, on that day, a wash. It does
7  affect the bottom line damage figure to the extent that
8  there are losses on those new purchases. So, if you
9  think about it as a wash on the first day because it's
10  showing up both in the dividend and in the purchases
11  column, then if the units are held and they lose $50,
12  then that $50 loss is showing up as a loss. So, it's
13  including losses on all purchases, including purchases
14  that are made with reinvested dividends. But the
15  dividend itself is showing up as an offset, the hundred
16  dollars, in my example.
17          MR. FALLAS: Okay.
18          MR. KERR: All right. You may cross.
19          MR. WEISS: Thank you.
20          MR. KERR: Okay, Mr. Weiss, just for my
21  record, I didn't get your first name.
22          MR. WEISS: Oh, that's okay. It's Terry,
23  T-E-R-R-Y. And it's W-E-I-S-S, is the last name.
24          MR. KERR: Please proceed.
25

Page 399

1           CROSS-EXAMINATION
2  Q. (BY MR. WEISS) Good afternoon, Dr. McCann, good
3  to see you again.
4  A. Good to see you. Thank you.
5  Q. Since you've done this once or twice times,
6  many times, you know the drill. I'm going to ask you a
7  number of questions and if at any time you don't
8  understand my question, by all means, let me know and
9  I'll be happy to rephrase the question to ensure that
10  you and I are on the same page.
11          I'm going to follow up where we just
12  left -- left off with some of the questions about this
13  profit and loss that was prepared. First of all, did
14  you physically prepare this report, or did someone or
15  ones individuals in your shop do so?
16  A. Oh, individuals in my shop. People entered the
17  data, created the exhibits, printed out the paper and
18  assembled it.
19  Q. Did you personally actually go back over the
20  account statements and the data that was input and
21  ensure that it was accurately done and -- and
22  otherwise -- yeah, confirmed that it was done properly?
23  A. Well, some. I reviewed some of the account
24  statements and some of the analysis, but this is
25  something that we've done thousands of times, and I

Page 400

1  don't recall when the last time an actual error was
2  pointed out in anything that my office has done. If
3  it's been a year, it's been five years. So, I feel
4  pretty confident, although we're all human, that these
5  exhibits are created accurately.
6  Q. Okay. You said you reviewed some. What
7  percent of the -- we've got a fairly big book here.
8  What percent of the total collection of account
9  statements did you actually review and data that was
10  input?
11  A. I don't know. Something less than 20 percent,
12  maybe 10 percent.
13  Q. Okay. Now, following up on some of the
14  questions that were just asked by the -- by the Panel,
15  first of all, just so I understand the analysis here,
16  your P&L numbers, profit and loss numbers, run through
17  June, July of 2010; is that correct?
18  A. Yes.
19  Q. And, again, just so we're all familiar with the
20  facts, when was it that Mr. Stein left Morgan Keegan and
21  joined his new firm, Raymond James?
22  A. I don't recall.
23  Q. March of 2008? Does that sound about right to
24  you?
25  A. That may be right. I just don't recall, as I

**HANNA & HANNA, INC.**
**(713) 840-8484**

**ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010**
**ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY**

---

Page 437

1 Dr. McCann, that the prospectus and the SAI for the
2 closed-end funds advised that the investments involve a
3 high degree of risk?
4     **A.  At least in part some language like that.**
5     Q.  And isn't it true that the prospectus and SAIs
6 indicate that the Funds could invest a majority of their
7 assets in below-investment-grade bonds?
8     **A.  Yes.**
9     Q.  And isn't it true that under the Funds'
10 policies that the Funds could invest up to 100 percent
11 in below-investment-grade bonds?
12     **A.  I believe that's correct.**
13     Q.  And isn't it true under the policy --
14         MR. FALLAS:  Excuse me.
15         MR. KERR:  Do you have a question?
16         MR. FALLAS:  No, I just wanted to -- could
17 you -- what was your question again?
18         MR. WEISS:  My question was -- you can
19 read it back, if you want, so I don't mess it up.
20         (The record was read as requested.)
21         MR. KERR:  And that's in the context of
22 what is in the prospectus, what you said.
23         THE WITNESS:  Correct.
24         MR. FALLAS:  Okay.  So, let me -- so, to
25 rephrase what you just said, it's allowable for the Fund

---

Page 438

1 to invest all of its assets in below-investment-grade?
2 Is that what that means?
3         THE WITNESS:  I think that there's no
4 limit, in the same sense that there's no limit the Fund
5 could invest 100 percent in municipal bonds.  There's
6 no -- my recollection is there's no limit that says you
7 can only invest 80 percent in below-investment-grade
8 corporate bonds.  So, I think I was just agreeing with
9 Mr. Weiss, that the prospectus allowed the Fund to
10 invest up to 80 -- up to 100 percent in
11 below-investment-grade bonds or municipal bonds or a
12 whole lot of different things.
13     Q.  (BY MR. WEISS) Well, I'm going to follow up on
14 what you just said, Dr. McCann, and maybe we can take a
15 short break, if the Panel wishes, after this back and
16 forth.  But just going to the front page of the
17 prospectus of the very beginning of Tab 6, under
18 investment strategy, it says right there, "The Fund will
19 seek to achieve its investment objectives by investing a
20 majority of its assets in a diversified portfolio of
21 below-investment-grade securities offering attractive
22 yields and capital appreciation potential," right?
23     **A.  That's what that sentence says.**
24     Q.  And, Dr. McCann, if the Fund, to follow up on
25 your point, invested 100 percent in municipal bonds,

---

Page 439

1 that would be inconsistent with that investment strategy
2 as stated on the front cover of the prospectus; isn't
3 that true?
4     **A.  I don't see why.  The Birmingham municipalities**
5 **bonds would certainly have some capital appreciation**
6 **potential.  Municipal bonds can have both income and**
7 **capital appreciation potential.**
8         MR. WEISS:  We're at a good breaking
9 point, if the Panel wishes.
10         MR. KERR:  Yeah, I think it's time for
11 one.
12         MR. WEISS:  Okay.  Thank you, sir.
13         (Recess taken from 3:05 to 3:19.)
14         MR. KERR:  Before we start with your
15 additional questions, a couple of things.  The Panel was
16 talking amongst ourselves and don't anybody read
17 anything into this, but it's a fact that in your damages
18 model or presentation there's one element that's not on
19 the same page.  It's not in a one-page summary and
20 that's the out-of-pockets, so to speak.
21         MR. DOBROWSKI:  Yes, sir.
22         MR. KERR:  The out-of-pockets are
23 scattered through a lot of pages in McCann No. 1.  We
24 would just like for y'all informally -- you can agree
25 on, yeah, that's the number that is presented there,

---

Page 440

1 just put that on one page for us.
2         MR. WEISS:  I think, actually, our, if I'm
3 not mistaken, our P&L does that.
4         MR. KERR:  Okay.  Just so long as it's in
5 one place.  Not that that number necessarily means
6 anything, but it's just that's the missing element at
7 least in your analysis on the one -- on the same page.
8         MR. WEISS:  We'll take care of it.  Either
9 we will or together counsel will, to make life easier.
10         MR. KERR:  Right.  We're not saying that
11 we agree with those numbers either.
12         MR. WEISS:  I understand.
13         MR. KERR:  That's just to put the analysis
14 together on one page.
15         MR. WEISS:  Less is more.
16         MR. KERR:  There you go.  I wish I had
17 said that.
18         MR. WEISS:  You probably have.
19         MR. KERR:  I have.  And on that subject
20 how much -- I know we must finish him today.
21         MR. WEISS:  Correct, and as quickly as
22 possible.
23         MR. KERR:  Yeah, and so how much more do
24 you have?
25         MR. WEISS:  We were just talking about

---

**HANNA & HANNA, INC.**
**(713) 840-8484**

### ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
### ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 513

1      FURTHER RECROSS-EXAMINATION
2      Q.  (BY MR. WEISS) Dr. McCann, you are assuming,
3   are you not, sir, in your analysis that the number of
4   securities that are being internally priced by Morgan
5   Keegan remains constant during the entire year of 2007?
6      A.  No.
7      Q.  You're aware, sir, are you not, that by October
8   of 2007, in fact, the number of securities that were
9   being internally priced by Morgan Keegan had dropped to
10   just a handful, are you not, sir?
11      A.  I'd have to go back and look at the filings.
12   We're just using the notations that you have on the --
13   on the -- on the filings. So, whatever that number is,
14   it is.
15      Q.  And aren't you aware, sir, that by October of
16   2007, Hyperion took over the full pricing of securities
17   of internally-priced securities?
18      A.  Yes, and that explains a great deal of the
19   losses, yes.
20      Q.  And, in fact, Dr. McCann, that by that point in
21   time, the number of internally-priced securities that --
22   strike that -- the number of -- of internally-priced
23   securities that were being priced by Morgan Keegan was
24   less than 30; isn't it true, sir?
25      A.  Yes, that would be true, I think. I didn't

Page 514

1   understand what you were referring to was after the
2   period where Hyperion took over the valuations and wrote
3   down substantially all these securities that Morgan
4   Keegan had been internally pricing. It's true, after
5   they did that, there weren't many securities still being
6   priced by Morgan Keegan.
7      MR. WEISS: Those are all the questions I
8   have.
9      MR. KERR: All right. Do you have any
10   more?
11      MR. DOBROWSKI: No, sir.
12      MR. KERR: Very good. Do my colleagues
13   have any questions to ask this witness?
14      MR. MARTIN: No.
15      MR. KERR: Do you have any questions?
16      MR. FALLAS: Dr. McCann, with respect to
17   all of the other high yield bond funds, closed-end, the
18   ones that were not Morgan Keegan, you had some
19   discussion earlier about how these Funds in the
20   prospectus listed all the different types of securities
21   that they could potentially invest in, and you felt
22   like -- you felt like they were responsible for really
23   talking about what they primarily invest in and they
24   shouldn't really -- they should make very little use of
25   the ones that they really don't use, but -- but are on

Page 515

1   the list?
2      THE WITNESS: Yes.
3      MR. FALLAS: Do you know if any of those
4   other Funds did similar things in their prospectus?
5      THE WITNESS: No, I don't.
6      MR. FALLAS: So, you wouldn't be able to
7   say one way or the other?
8      THE WITNESS: Not without looking at the
9   prospectuses, whether they had a clear statement about
10   what their principal strategy was, as opposed to a long
11   list of securities they may invest in.
12      MR. FALLAS: Okay. And then with regard
13   to the SEC document --
14      THE WITNESS: Yes.
15      MR. FALLAS: -- the big one, the title of
16   it is used "Final Rule: Registration Form Used by
17   Open-end Management Investment Companies." I take this
18   to mean that it applies to open-end funds, basically.
19   Just open-end funds. Is that -- would you say a similar
20   thing?
21      THE WITNESS: Yes, it's a slightly
22   different form for the closed-end fund. I forget what
23   it's called. It's essentially identical, but you're
24   right, this is referring to open-end funds. I have seen
25   a similar document -- what I said on direct was I

Page 516

1   haven't seen this adopting release. What I saw was the
2   form and the instructions to the form that Mr. Dobrowski
3   referred me to starting after the first 71 pages, that's
4   the document that I had seen before, and I've seen that
5   same document for the closed-end funds and it says
6   substantially the same thing.
7      MR. FALLAS: Okay. So, there is a
8   corresponding one for closed-end funds.
9      THE WITNESS: Yes.
10      MR. FALLAS: And the language that he
11   wanted us to look at is basically the same language.
12      THE WITNESS: Yes. Maybe I'll provide it
13   to Mr. Dobrowski and he might share it with you, but,
14   yes, there's a similar document for closed-end funds.
15      MR. FALLAS: Just to reinforce, you don't
16   know at this point one way or the other whether some of
17   those similar funds in the same category, you know, had
18   the same kind of listing on their prospectus about their
19   securities?
20      THE WITNESS: That's correct.
21      MR. FALLAS: I'm not sure who to ask this
22   question to, but since you're an expert in various
23   areas, I guess you could probably answer it. This
24   particular arbitration is directed at Morgan Keegan &
25   Company, Incorporated, right?

**ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010**
**ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY**

Page 517

1    THE WITNESS: Yes.
2         MR. FALLAS: Did I understand correctly
3    that there are other sections that have been separated
4    out that are directed towards the other entities, like
5    Morgan Asset Management, things like that?
6         THE WITNESS: By "other sections," I'm not
7    sure I know what you mean.
8         MR. FALLAS: Have they separated -- are
9    there separate -- have they separated out -- do they
10   have separate hearings set up for this same --
11        THE WITNESS: I'm sorry. I don't know the
12   answer to that.
13        MR. KERR: There's no way to know -- he's
14   an expert here in this case and what other cases might
15   be --
16        THE WITNESS: I'm not involved in
17   litigation directly involving Regions or Morgan Asset
18   Management. So, I just don't know about any other
19   litigation.
20        MR. DOBROWSKI: And the claims that we
21   seek are here against Morgan Keegan, in their capacity
22   as a defendant, for fraud. So, any other entity is
23   frankly irrelevant to this proceeding.
24        MR. CARLIN: We'll talk about that in
25   closing argument.

Page 518

1         MR. WEISS: I think we take a different
2    view in part because these very same Claimants have sued
3    for the identical investments, losses, et cetera -- same
4    claims, same everything.
5         MR. DOBROWSKI: That's irrelevant -- I'm
6    sorry.
7         MR. KERR: Go ahead. Let him finish.
8         MR. DOBROWSKI: Yes, sir. I'll shut up.
9         MR. WEISS: This has nothing to do with
10   Dr. McCann, but these very same Claimants have made the
11   same claims against Morgan Asset Management and other
12   affiliates under the big Regions umbrella.
13        MR. DOBROWSKI: It's a fraud claim.
14        MR. FALLAS: One second. One second.
15        MR. KERR: Sir, I have a question for you.
16   I was just curious. What was it that caused you to go
17   back and look at these internally priced -- the basic
18   material upon which your analysis was based on the
19   percentage of these securities that were internally
20   priced between the hearing of Garrett and this hearing
21   to come up with your difference in opinions?
22        THE WITNESS: Yes, it was questioning from
23   Mr. Weiss, actually. Believe it or not. We were here a
24   couple months ago and Mr. Weiss was asking me about
25   the -- the internally-priced securities and the losses

Page 519

1    due to structured finance securities, and he was saying,
2    as he did again today, that in order to be included,
3    there had to be securities that were held adjoining
4    quarter ends. And, so, a security that was bought and
5    sold within the quarter or bought in one quarter and
6    sold the next quarter wouldn't be included. There's
7    very little of that in these Funds, but he's right about
8    that.
9         And, so, I went back to the office after
10   the Garrett hearing and talked through with my staff
11   again about how this calculation was done. And that's
12   what prompted it. The very next week I testified in
13   another Morgan Keegan case here in Houston, I think, and
14   I reported that while the exhibit we turned over in the
15   20-day exchange said 73 or 74 percent, we had missed
16   some securities and the right number was actually
17   higher. It was 82 percent.
18        So, it was actually questioning from
19   Mr. Weiss that prompted me to go back and look at it.
20        MR. KERR: All right. That's the only
21   question I had.
22        MR. WEISS: Can I just very quickly follow
23   up with -- with one question that was just asked about
24   this document that deals with open-end funds?
25        MR. KERR: All right.

Page 520

1         FURTHER RECROSS-EXAMINATION
2    Q.   (BY MR. WEISS) Dr. McCann, would you please --
3    this is 294, the big thick registration form used by
4    open-end fund management and if you would, please, turn
5    to -- and it may be several documents put together, so
6    I'll do the best I can to direct you, but it's 18 of 56,
7    and it's in that same final version that Mr. Dobrowski
8    asked about, and it has an Item 5 that says
9    "Management's Discussion of Fund Performance." Did you
10   find it? That Item 5 is in the middle of the page.
11   A.   Yes.
12   Q.   Okay. If you will look under the risk section
13   of (c), it says, does it not, Dr. McCann, again, this is
14   for open-end funds, we know, that the obligation is to
15   "Disclose the principal risks of investing in the Fund,
16   including the risks to which the Fund's particular
17   portfolio as a whole is expected to be subject and the
18   circumstances reasonably likely to affect adversely the
19   Fund's net asset value, yield or total return."
20        Do you see that?
21   A.   I'm sorry. I don't.
22   Q.   Right above Item 5?
23   A.   Oh, I'm sorry. I was looking below. Yes.
24   Q.   Right above Item 5, right, Dr. McCann?
25   A.   Yes.

## ARBITRATION PROCEEDINGS - DAY 2 - October 13, 2010
## ARISPE, ET AL VS. MORGAN KEEGAN, & COMPANY

Page 529

1  Mr. Chairman.
2        MR. KERR:  Okay.  Good.
3        MR. DOBROWSKI:  Mr. Chair, if the Panel
4  wants to start earlier tomorrow or go later tomorrow
5  night, we're certainly willing to do it.  We've had --
6  one of our Panelists is not comfortable coming early.  I
7  think we could stay late without a bunch of issues.
8  We're happy to do it.
9        MR. KERR:  And, you know, I have done this
10  before in some FINRA cases.  I mean, if we don't finish
11  Friday, the gang is all here, we can come back Saturday
12  morning.  I'd give up my tennis game.
13        MR. DOBROWSKI:  If I had one -- it works
14  for us.  Frankly, that's what we did in the last one, is
15  we finished the evidence and then came back for closing.
16        MR. KERR:  Yes, and that's a good way to
17  do it.
18        MR. MARTIN:  That will not work for me.  I
19  have two board meetings on Saturday.
20        MR. DOBROWSKI:  Or any time the next week.
21        MR. KERR:  Yeah, we could find the time
22  for closing argument, sure.
23        MR. DOBROWSKI:  I think we did 50 minutes
24  last time each, 55 or 60 minutes each, Terry, for
25  closing last time?

Page 530

1        MR. WEISS:  That's a Carlin question.
2        MR. CARLIN:  Yeah, I assume it's going to
3  be an hour each.
4        MR. KERR:  We can pick that up next week.
5        MR. CARLIN:  We're going to have to talk
6  scheduling because unfortunately we can talk about when
7  that might be doable.  I'm in Atlanta from Wednesday
8  through Friday of next week.
9        MR. KERR:  This is not your last Morgan
10  Keegan --
11        MR. CARLIN:  Actually, that's not a Morgan
12  Keegan matter.  It's not my only client.  It's not my
13  only case.  I've got a two-week jury trial in November
14  on something that has nothing to do with securities.  It
15  has to do with disintegrating air conditioners.
16        MR. DOBROWSKI:  We will bend to Mr. Carlin
17  and the Panel's will.
18        MR. CARLIN:  We want to get it done, but
19  we'll talk about that scheduling when we get to that.
20        MR. KERR:  Okay.  We're just going to be
21  mindful of our time.
22        MR. DOBROWSKI:  Yes, sir.
23        MR. KERR:  We're adjourned.  See you at
24  9:00 in the morning.
25        MR. DOBROWSKI:  Thank you.

Page 531

1        (Proceedings recessed at 5:36 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 532

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4              REPORTER'S CERTIFICATE
5              ARBITRATION HEARING
6              October 13, 2010
7
8      I, the undersigned Certified Shorthand Reporter in
9  and for the State of Texas, certify that the facts
10  stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney or
12  counsel for, related to, nor employed by any parties to
13  the action in which this testimony is taken and,
14  further, that I am not a relative or employee of any
15  counsel employed by the parties hereto or financially
16  interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18  office on this the _____ day of _____,
19  _____.
20              _Kelly Hanna_
              Kelly Hanna, CSR, RPR, CRR, CMRS
21              Texas CSR 1654
              Expiration: 12/31/2011
22              Firm Registration No. 581
              1225 North Loop West
23              Suite 327
              Houston, Texas 77008
24              713.840.8484 - 713.626.1966
              www.hannareporting.com
25

## ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

---

Page 533

1            BEFORE FINRA DISPUTE RESOLUTION

2 In the Matter of the Arbitration Between:

3 RICHARD R. ARISPE, JIMMY A.    )
    BURKE, PEGGY E. BURKE, TODD   )
4 B. BURKE, JOSE J. COLLADO,      )
    ADELA CHRISTINE COLLADO,      )
5 CHARLES K. COLVIN, C & C        )
    ERECTION, INC., NANCY GORDON, )
6 SUSAN W. HACKNEY, DON           )
    H. JONES, SUZANN S. JONES,    )
7 WILLIAM A. RHODES, JR., DAWN    )
    SCHUESSLER, KENNETH W. SEARS, )
8 KENNETH W. SEARS, JR., REINE    )
    M. SEARS, DANIEL J. SEARS,    )
9 KENNETH W. SEARS, III, JUDY     )
    STRICKLAND, ELIZABETH STEIN &amp;)
10 SHANA L. STEIN,                )
            Claimants            )
11 v.                            ) FINRA CASE NO. 09-006655
                                  )
12 MORGAN KEEGAN & COMPANY,       )
            Respondent.          )
13

14          ARBITRATION PROCEEDINGS

15              October 14, 2010

16                   DAY 3

17     ARBITRATION PROCEEDINGS was taken in the

18 above-styled and numbered cause on the 14th day of

19 October, 2010, from 9:03 a.m. to 6.44 p.m., before Kelly

20 Hanna, Certified Shorthand Reporter in and for the State

21 of Texas, reported by computerized stenotype machine at

22 the offices of Greenberg Traurig, 1000 Louisiana, Suite

23 1700, Houston, Texas, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.

---

Page 534

1              APPEARANCES
2
3 FOR CLAIMANTS:
4     Mr. Paul J. Dobrowski
      Mr. Bruce Kemp
5     Mr. Cody Stafford
      Dobrowski, LLP
6     4602 Washington Avenue, Suite 300
      Houston, Texas 77007
7     Telephone: 713.659.2900
      Fax:  713.659.2908
8     E-mail: pdobrowski@doblaw.com
9 FOR RESPONDENTS:
10    Mr. Steve Carlin
      Mr. Terry R. Weiss
11    Ms. Jennifer Tomsen
      Ms. Penelope Brobst Blackwell
12    Greenberg Traurig
      The Forum
13    3290 Northside Parkway
      Atlanta, Georgia 30327
14    Telephone: 678.553.2100
      Fax:  678.553.2212
15    E-mail: weisslr@gtlaw.com
16 FOR JAMES C. KELSOE, JR.:
17    Mr. Peter J. Anderson
      Sutherland Asbill & Brennan
18    999 Peachtree Street, NE
      Atlanta, Georgia 30309-3996
19    Telephone: 404.853.8000
      Fax:  404.853.8806
20    E-mail: Peter.anderson@sutherland.com
21 ALSO PRESENT:
22    Mr. Maurice Fallas, Arbitrator
      Mr. Raymond C. Kerr, Arbitrator
23    Mr. Thomas A. Marlin, Arbitrator
      Mr. Tom Barnett, Morgan Keegan
24    Mr. Don Jones, Claimant
      Mr. Steve Scales, Expert
25    Mr. Kjell Ekdahl, Expert

---

Page 535

1                    INDEX

2                             PAGE

3 JAMES KELSOE, JR.

4  Direct Examination by Mr. Dobrowski ............537
   Cross-Examination by Mr. Weiss ................661

5 ReDirect Examination by Mr. Dobrowski ..........751
   ReCross-Examination by Mr. Weiss ...............761

6 Further ReDirect Examination by Mr. Dobrowski ...764

7 CHARLES MAXWELL

8  Direct Examination by Mr. Dobrowski .............791
   Cross-Examination by Mr. Carlin ................836

9 Re-Cross Examination by Mr. Carlin .............862
   Further ReDirect Examination by Mr. Dobrowski ...864

10 Court Reporter's Certificate ....................866
   Examination by Mr. Dobrowski ....................858
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 536

1              MR. KERR:  All right.  Back on the record,

2 please.  Good morning, everybody.  This is our third

3 morning of hearings in the Arispe, et al versus Morgan

4 Keegan & Company.

5          Is there any housekeeping issue or

6 anything that has come up before we start with the

7 testimony of the next witness?

8              MR. DOBROWSKI:  Not as far as we're

9 concerned.  Mr. Anderson is the personal counsel for

10 Mr. Kelsoe.

11              MR. ANDERSON:  Mr. Chairman, my name is

12 Peter Anderson.  I'm with the Sutherland firm, and I

13 represent Mr. Kelsoe individually.

14              MR. KERR:  Splendid.

15              MR. ANDERSON:  Thank you.

16              MR. KERR:  Happy to have you here.

17          So, would you call your next witness,

18 please.

19              MR. DOBROWSKI:  Yes, Claimants call as an

20 adverse witness, Mr. James Kelsoe.

21              MR. KERR:  Mr. Kelsoe, would you raise

22 your right hand, please, sir.  Do you swear or affirm

23 that the testimony you're about to give in this

24 proceeding will be the truth, the whole truth and

25 nothing but the truth so help you God?

---

ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 621

1  A. Well, that would presume that markets didn't
2 deteriorate further --
3  Q. Understood.
4  A. -- from March -- but yes. The statement was
5 made in the context of the fact that markets had been
6 very -- credit markets had been very tight, meaning very
7 low yields available for 2005 and 2006. 2006, in
8 particular, the prices were very high on debt
9 securities, meaning the yields that were available were
10 very low and the -- the crack in the market that
11 occurred in the first quarter was meant -- meant to
12 communicate here that those are opportunities that we
13 felt like were -- had not been available for us for
14 several years.
15  Q. And what you and your staff were telling people
16 was that this had created a great buying opportunity,
17 right?
18  A. For us to buy assets for the Fund, yes.
19  Q. But also for the shareholders to buy into the
20 Funds?
21  A. Well, now, I didn't say that here. I don't
22 think that's --
23  Q. I'm asking you, in this time period, what you
24 were telling -- you and your staff were telling
25 financial advisors and shareholders was that it was a

Page 622

1 great opportunity to buy into the Fund, right?
2  A. I don't think that's what -- what's in print
3 here.
4  Q. I understand that, sir. I'm asking you
5 separate from that, in this time frame, the
6 March/April 2007 time frame, you were telling -- you and
7 your staff were telling Morgan Keegan financial advisors
8 and shareholders it was a great buying opportunity to
9 buy into these four closed-end funds, true?
10  MR. WEISS: Mr. Chairman, I think this has
11 been asked and answered now twice.
12  MR. KERR: He hasn't answered it. Sorry.
13  Did you understand the question?
14  THE WITNESS: I think I understand now.
15 The question is separate from what was in print here.
16 It's a separate question. And the question was: Did we
17 recommend people buy -- buy the Funds in March of '07.
18  MR. KERR: Right.
19  A. That is not my recollection that we did so. It
20 was not my method or my -- it was not a practice to
21 recommend to customers to buy or sell.
22  Q. (BY MR. DOBROWSKI) Could you look at
23 Exhibit 82.
24  MR. DOBROWSKI: And we'll be in this --
25 this volume for a while, Gentlemen.

Page 623

1  A. Eighty-two?
2  Q. (BY MR. DOBROWSKI) Eighty-two. Who is Courtney
3 Hines?
4  A. Courtney was a young lady who worked for me
5 in -- in our offices and was in charge of marketing and
6 communications.
7  Q. And do you see in this e-mail she's writing
8 about the closed-end high yield funds?
9  MR. WEISS: Can we have some foundation on
10 this document, Mr. Chairman? Because it doesn't appear
11 that he's copied on it or anything.
12  MR. KERR: He said that Courtney Hines
13 works for him.
14  MR. WEISS: No, I understand that, but if
15 he's going to ask any questions about this document, I
16 think that there needs to be some foundation laid.
17  Q. (BY MR. DOBROWSKI) Did Ms. Hines work for you?
18  MR. WEISS: That's fine.
19  A. Yes.
20  Q. (BY MR. DOBROWSKI) All right, sir. And do you
21 see in here that Ms. Hines makes the recommendation it
22 has created a great buying opportunity?
23  MR. ANDERSON: Makes the recommendation?
24 That's not what it says.
25  Q. (BY MR. DOBROWSKI) She says "But either way, it

Page 624

1 has created a great buying opportunity."
2  Do you see that, sir?
3  A. I do.
4  Q. All right. My question to you is -- is that
5 did you share Ms. Hines' view, that it was a great
6 buying opportunity to buy into the four closed-end funds
7 in March of 2007?
8  MR. ANDERSON: I'm going to have to
9 object, Mr. Chairman, on behalf of my witness. That's
10 not what this document says, and I think it's
11 misleading.
12  MR. KERR: I agree with you. I sustain
13 your objection. What it says is "Either way, it has
14 created a great buying opportunity," but does not
15 necessarily say it's with the Funds. It may be a buying
16 opportunity for the investments.
17  Q. (BY MR. DOBROWSKI) Well, let's look at the
18 bottom e-mail. Matthew Weber, closed-end funds --
19  MR. FALLAS: Whoa, whoa, whoa, excuse me.
20 Who is Matthew Weber?
21  Q. (BY MR. DOBROWSKI) Who is Matthew Weber?
22  A. I don't know.
23  Q. Okay. Mr. Weber writes to Ms. Hines and asks
24 "Courtney, do you know why there is such weakness in the
25 four closed-end funds?" Right? Do you see that?

ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 625

1    A. I do.
2    Q. Okay. And she writes back "Jim and I are not
3  really sure."
4       Do you see that?
5    A. I do.
6    Q. All right. And she writes "It could be the
7  scare in subprime or market volatility across the board,
8  but either way, it has created a great buying
9  opportunity. The income these Funds generate is as
10 solid as ever." Right?
11   A. That's what it says, yes.
12   Q. All right, sir. And did you share that view?
13   A. I don't know where that came from. I didn't
14 write that. I didn't make that communication with
15 Mrs. Hines nor Mr. Weber.
16      MR. KERR: The question is, on March the
17 6th, 2007, did you share that view, that it was a great
18 buying opportunity for the Funds? It was just a "yes"
19 or "no."
20      THE WITNESS: I don't know.
21   Q. (BY MR. DOBROWSKI) Okay. Could you look at
22 Exhibit 83? This is a series -- this is an e-mail
23 between Bruce White and Courtney Hines dated March 8,
24 2007, and do you see Mr. White is an associate vice
25 president with Morgan Keegan & Company?

Page 626

1    A. Yes.
2    Q. Okay. And he's talking -- asking Ms. Hines for
3  a commentary or talking points about the RMA's
4  decreases. Do you see that, sir?
5    A. Yes, I see an e-mail from -- from Bruce White
6  to Courtney.
7    Q. And Ms. Hines writes back "Bruce, there is
8  nothing specific that Jim or I can point to that caused
9  the selloff at the beginning of the week. It could have
10 been the subprime scare or the fact that equities,
11 corporates and the asset-backed sector have all been
12 down. But the income on these Funds is better now than
13 in 2006, earning more than we are paying out at this
14 point. If anything, this is a good time to buy."
15      Were you talking to your staff,
16 specifically Ms. Hines, about whether or not it was a
17 good time to buy into these Funds in March of 2007?
18   A. No, I don't recall that.
19   Q. All right. Could we have Exhibit 93?
20   A. I'm at 93, yes.
21   Q. Yes, sir. This is a conference call with you
22 on April 4 of 2007, right, sir?
23   A. Yes.
24   Q. And if you look at Page -- may I direct your
25 attention to Page 9?

Page 627

1    A. Okay.
2    Q. I'll represent to you that starting at Line 3,
3  that is your testimony -- or your statement -- not
4  testimony. Excuse me.
5    A. I'm sorry.
6    Q. You said at that time on April of 2007 "I was
7  involved in purchasing more of the Fund at substantially
8  higher prices than we are at today because I still
9  believe this is one of the better products to generate a
10 10 percent consistent return. So, I do have a caveat
11 that this would be a good place to get involved,
12 although I can't tell you that there is not going to be
13 more volatility to the downside or even to the upside,"
14 right?
15   A. I see it, yes.
16   Q. Does that refresh your recollection now, sir,
17 that in April of 2007, you were advising Morgan Keegan
18 financial analysts and advisors to invest in these
19 Morgan Keegan closed-end funds?
20   A. I don't dispute that I said that.
21   Q. All right, sir.
22   A. But I don't recall recommending or advising
23 buy-or-sell recommendations to advisors.
24   Q. I understand, sir, but you understand this
25 conference call was with Morgan Keegan financial

Page 628

1  advisors, right, sir?
2    A. Yes.
3    Q. Okay. Fair enough. And you made that
4  statement, right, sir?
5    A. Yes.
6    Q. All right. Let's turn to Exhibit 107-A.
7    A. 107-A?
8    Q. Yes, sir.
9    A. Yes.
10   Q. And this is a series of e-mails regarding a
11 Bloomberg article in July of 2007. Do you remember the
12 Bloomberg article, sir? 107-A.
13   A. Okay.
14   Q. Do you remember this Bloomberg article,
15 Mr. Kelsoe?
16   A. Yes.
17   Q. Okay. And in this you acknowledge an
18 intoxication similar to what lured many stock fund
19 managers in 1999 when the Internet and technology shares
20 were headed for a collapse, and the intoxication you
21 were talking about was subprime mortgages and
22 asset-backed securities, true, sir?
23   A. I have been asked about this article on many
24 occasions.
25   Q. I know you have.

HANNA & HANNA, INC.
(713) 840-8484

**ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 653

1    MR. KERR: I thought you said while you
2  were running the Fund.
3         MR. DOBROWSKI: I'll make it clear.
4    Q. (BY MR. DOBROWSKI) As of the end of the time
5  you stopped as portfolio manager, sir, what was the
6  magnitude of the loss suffered by the Morgan Keegan
7  closed-end funds versus their benchmark?
8         MR. WEISS: But, again, I think you have
9  to have a starting point, too, in order to measure.
10        MR. KERR: Yeah, I mean, to calculate the
11 loss, you start somewhere.
12        MR. WEISS: Are you saying the whole time?
13   Q. (BY MR. DOBROWSKI) Compared to the Fund -- in
14 July of '08, when you stopped managing the Fund, what
15 was the difference between the Morgan Keegan closed-end
16 funds' return and the return of the Lehman Brothers?
17        MR. FALLAS: From what start date?
18        MR. KERR: Was it when each one of them
19 was funded?
20        MR. DOBROWSKI: No, no. I'm just talking
21 about as of that date, at the end of July of 2008, how
22 did it stack up against Lehman Brothers. In other
23 words, the Lehman Brothers bond fund would have shown a
24 return as of July of 2008; and my question is: In their
25 comparison to the Fund as of that date, how they

Page 654

1  compared.
2         MR. FALLAS: You can't calculate a return
3  if you don't have a time period. You can't -- if you
4  say --
5         MR. DOBROWSKI: I understand what you're
6  saying.
7         MR. FALLAS: If you say we lost
8  50 percent, when did you lose the 50 percent?
9    Q. (BY MR. DOBROWSKI) Here's my question to you,
10 sir. Can you tell us, if you know, what was the
11 relationship between the Lehman -- Exhibit 284 -- I'll
12 make it easy. Sorry.
13        MR. DOBROWSKI: Thank you, Mr. Fallas.
14        MR. WEISS: 284?
15        MR. DOBROWSKI: Yeah, 284.
16   Q. (BY MR. DOBROWSKI) Looking at July 31 of 2008,
17 sir, can you tell the Panel what is the difference for
18 the Helios Advantage Fund and the Lehman Brothers Index
19 as of that date?
20   A. No. I mean, I don't know what I'm looking at
21 here.
22   Q. Well, it's a comparison between the NAV for the
23 Helios Advantage Fund and the Lehman Brothers Index.
24   A. You're representing that to me, but I can't
25 verify that that's what that is. I mean, I don't know

Page 655

1  what LF98TRUU Index is.
2    Q. Assume it's the Lehman Brothers Ba.
3         MR. WEISS: I don't think he can --
4    A. I can't --
5    Q. (BY MR. DOBROWSKI) Well, let me just ask you
6  this, Mr. Kelsoe. Is it true that when you left the
7  Fund, the Fund management, all four Funds were
8  dramatically below the performance of the Lehman
9  Brothers Ba Index?
10   A. For -- from 2007 forward?
11   Q. Uh-huh.
12   A. Yes.
13   Q. Okay.
14   A. From 2007 to 2008, yes, we were well below that
15 index.
16   Q. And if you look -- if the Panel can just look,
17 we have the other three Funds' comparison on the next
18 three pages behind Exhibit 284. They're called Helios
19 Funds now. The Funds are now called Helios Funds, are
20 they not, sir?
21   A. They were at one time.
22   Q. Okay. Fair enough. Let me just ask you a
23 couple of other questions so we can wrap this up. In
24 fact, one of the strategies you employed was to own
25 assets that were not in any index, true?

Page 656

1    A. Yes.
2    Q. And you wanted to purchase assets in categories
3  that are not efficiently traded and especially not in an
4  index, right?
5    A. Yes.
6    Q. Okay. And the Lehman Brothers Index is a bond
7  index, is it not?
8    A. I'm sorry. The --
9    Q. Lehman Brothers Ba High Yield Index is a bond
10 index, is it not?
11   A. It's a subset of a Lehman High Yield Index,
12 yes.
13   Q. And you believe that the Lehman Brothers High
14 Yield Bond Index was an appropriate benchmark for the
15 four closed-end funds, did you not?
16   A. Yes.
17   Q. Okay. Sir, let me just visit with you about
18 one last topic. Do you recall in late 2007, early 2008,
19 the banks that held lines of credit for the four Funds
20 had called the lines of credit?
21   A. Do I recall that in late 2007 --
22   Q. Early 2008, in that -- around that time frame,
23 that the banks had called the lines of credit for the
24 four closed-end funds?
25   A. To be more specific, we did have in 2007, what

**ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 773

1  volume was lower. That's color.
2       So, if you come back to these securities,
3  color would help you gauge the willingness of market
4  participants to make markets or to get new issue done.
5  Typically -- I tell you, that question really can go to
6  new issue as much as anything. Is the market
7  functioning? Today, for instance, one of the real
8  problems we have is there is no ability to issue bonds
9  in the asset-backed or mortgage-backed arena. So, the
10 market color is -- it's black, meaning it's very
11 negative. There's no ability to create any new issue
12 and move bonds. So, it's very depressed, if you will,
13 color. There's still no new issuance.
14      Now, in '07, the first half of '07, bonds
15 were still moving. You were still getting various
16 dealers bringing new issues to market. And, so, there
17 was some color that was able to flavor, if you will, the
18 pricing of assets during that period of time. That
19 began to erode as the year wore on and certainly by the
20 time you take Bear Stearns out and then you take the
21 banks out and you get these ratings' actions going on
22 toward the end of the year, the market color continues
23 to trade down, if you will, the color is negative.
24      MR. MARTIN: Thank you.
25      THE WITNESS: Does that help?

Page 774

1       MR. MARTIN: It helps, thank you.
2       MR. KERR: All right, sir. You had some
3  questions.
4       MR. FALLAS: Going back to that, can you
5  turn around? Thank you. You were asked several
6  different times about the description of the securities
7  and, you know, I'm looking in the middle there, it says
8  Ace Securities 2004-HE3M11. You said that does tell you
9  exactly what tranche it is; is that correct?
10      THE WITNESS: Yes.
11      MR. FALLAS: So, it doesn't just say --
12 that description with the years and the numbers and
13 everything, that's not -- that's not simply the overall
14 trust of the structured security. That's actually the
15 specific tranche. That's a unique --
16      THE WITNESS: Yes.
17      MR. FALLAS: -- code for that specific
18 tranche?
19      THE WITNESS: As a matter of fact, on that
20 particular one, if I go to Bloomberg, I can type in Ace,
21 because I know the ticker symbols I type in Ace 04-HE3
22 M11, I will get a specific -- something will pop up.
23      MR. FALLAS: But that's a full description
24 of an individual tranche, right?
25      THE WITNESS: Yes.

Page 775

1       MR. FALLAS: And is there any way -- and
2  this is basically just a more detailed version of
3  questioning you were asked just a little while ago. You
4  said before that you could not know just by looking at
5  that where that was in the credit stack, correct?
6       THE WITNESS: Yes, I did.
7       MR. FALLAS: You have to look at the trust
8  indenture.
9       THE WITNESS: Well, you know it's not A.
10 You know it's not B. I'm going to assume -- if I were
11 looking at this, I would assume there is an M1 through
12 M10 in front of it, but I don't know what's behind it.
13 There may be M15 and then B1 through B6 behind it or, as
14 counsel suggested, it might be just B1, 2 and 3 behind
15 it. You would have to have a sizable document to
16 determine exactly where it is in that.
17      MR. FALLAS: Okay. But is there any kind
18 of -- do they -- do they do -- is there a haphazard way
19 that they number these or, like, if you see a M11, could
20 that ever be the top?
21      THE WITNESS: No. I don't -- no.
22      MR. FALLAS: Would they ever start at,
23 like, J and end with J, K, L, M?
24      THE WITNESS: No.
25      MR. FALLAS: So, they would usually start

Page 776

1  at A.
2       THE WITNESS: Yes. A is always -- to my
3  knowledge, and, again, I might be checked on this, but,
4  to my knowledge, the senior classes are going to be
5  denoted with an A.
6       MR. FALLAS: Okay. So, while you could
7  not -- you couldn't tell for sure whether it was, like,
8  you know, second from the bottom or tenth from the
9  bottom, you could tell that it was somewhere in the
10 middle somewhere.
11      THE WITNESS: Yeah, it's not at the top.
12      MR. FALLAS: Okay. That was that
13 question. And then back to Tab 61.
14      THE WITNESS: Which book?
15      MR. FALLAS: That black one. Yeah, that
16 one. Tab 61.
17      THE WITNESS: Okay. Tab 61. I'm there.
18      MR. FALLAS: Okay. The back side of the
19 first page.
20      THE WITNESS: Okay.
21      MR. FALLAS: Page 2, I guess.
22      THE WITNESS: Yes.
23      MR. FALLAS: At the bottom where the
24 question is "Do you tend to invest in the lower level
25 higher risk tranches of Morgan securities?" We had an

**HANNA & HANNA, INC.**
**(713) 840-8484**

**ARBITRATION PROCEEDINGS – Day 3 – October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 777

1 expert witness yesterday who -- who, if I remember
2 correctly, had an analysis that said that at some point
3 in most of these Funds a big chunk was in the lower
4 tranches. Like I remember a number of close to
5 90 percent in some cases. Does that sound even
6 potentially that it was ever --
7        THE WITNESS: Well, now, I think the
8 question has got to be -- 90 percent of the Fund was not
9 in asset-backed or mortgage-backed securities, period.
10 Okay. So, 90 percent of the Fund couldn't have been in
11 the lower tranches. But if you take out that allocation
12 and say, well, there was, you know, somewhere around
13 two-thirds of the Fund was in asset backed or structured
14 finance product, then I would say it is probable that
15 90 percent was, in fact, in lower tranches. Counsel
16 refers to the lowest tranche, which is, meaning the very
17 bottom piece or the equity or residual piece, not
18 90 percent there, but if you take, you know, from the
19 mezzanine, you know, the middle to the bottom, yeah, I
20 would say, yeah, it was very probable that we owned -- a
21 very high majority of our holdings would have been on
22 purpose not in the senior pieces.
23        MR. FALLAS: So, to the extent that you --
24 to the extent of the structured securities in the
25 portfolio, to the extent of that -- the structured

Page 778

1 securities were contained in the portfolios, of those
2 you basically -- you tended to favor the lower tranches
3 for the structured part.
4        THE WITNESS: Yeah, we didn't purchase --
5 in fact, if I might elaborate on that, again, we're
6 talking about high yield funds. So, a senior bond
7 pricing at LIBOR plus 19 basis points, that doesn't fit.
8 So, we're going to be down the credit structure. Now,
9 we did own some pieces that were the seniormost pieces;
10 but they were from old deals that were distressed. So,
11 in fact, we owned some aircraft and credit card and
12 medical equipment receivables that were, at the time
13 that those bonds were issued in the late '90s or early
14 2000s, those were the senior pieces, but because the
15 deals themselves had gone through a great deal of
16 stress, we were able to buy those at cents on the
17 dollar. One that comes up in particular is aircraft
18 receivables. You know, after 9/11, those deals all went
19 through enormous stress and we owned the A tranches,
20 they would have been denoted as an A tranche, but they
21 were at 50 to 60 cents on the dollar. Again, they're
22 high yield situations.
23        MR. FALLAS: And it was also kind of
24 explained to us that in -- particularly in the lower
25 tranches and, you know -- you know, some of the lowest

Page 779

1 levels, that it's possible to -- before the entire trust
2 evolves, there are those lower pieces that basically
3 stop paying altogether and are essentially no good
4 anymore, worth pennies, and even though they may have a
5 nominal value, they essentially -- they've just gone
6 away. They've sort of, you know, stopped -- stopped
7 being meaningful. Is that even in the ballpark of the
8 way it works?
9        THE WITNESS: Well, yes, I think that,
10 generally speaking, that whenever you're looking at the
11 more subordinated pieces of a capital structure, you
12 certainly expect more risk at the bottom, right? And,
13 so, for example, let me give you an example. Take --
14 pick a bank of any sort, you know, name XYZ Bank, okay?
15 The very top of that capital structure is a certificate
16 of deposit. It has a government guarantee on it, for
17 that matter, right? But it has very low return, okay,
18 1 percent, maybe a half a percent. As you step down,
19 you could buy the senior debt of the bank operating
20 company. That would be secured by, you know, as you
21 step further down, you get subordinated debt and then
22 preferred stock and then common stock. The common stock
23 of a bank would be the first thing to stop paying in
24 stress, and we saw that, in fact, happen. So, the banks
25 discontinue their dividends, right? British Petroleum.

Page 780

1 It didn't quit paying their bonds, but it quit paying
2 its common stock.
3        So, the supposition that the more junior
4 pieces of a structure are subject to having the cash
5 flows interrupted first is true, yes.
6        MR. FALLAS: Okay. So, what was told to
7 us is, basically, if you're investing in, let's say the
8 third-to-the-bottom tranche, if -- if that particular
9 issue gets in trouble, then chances are very good that
10 you basically could lose your entire investment in that
11 since you had that third-to-the-last tranche, your
12 entire investment could be wiped out with a good chance.
13 Is that --
14        THE WITNESS: Well, in 2010, saying it's a
15 good chance is easy to say. There are -- over the time
16 that I've invested period of time, there are times when
17 a deal is stressed and then it recovers. Case in point
18 is manufactured housing. You know, mobile homes.
19 Stress, recover; bonds recover. So, it's not a
20 certainty that it's going to go one way or the other,
21 but it does have -- now, somewhat complicated, but the
22 very bottom pieces of -- or the bottom tranches of
23 structures are not necessarily and always more risky
24 than higher tranches. We are seeing that today whenever
25 we look at a deal that was structured back in '07 or

**ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 781

1  '06, the cash flows are allowed to flow all the way
2  through to the bottom and you've got a much higher
3  dividend or a much higher coupon at the bottom, but
4  whenever the deal begins to erode in value, the bonds
5  are affected all the way up and those bonds that came
6  out with, say, a very, very low coupon ultimately, you
7  know, whenever the deal collapses itself, there is more
8  cash flow that went through to the bottom than was to
9  the middle, does that make sense, because of the coupon.
10        MR. FALLAS: Yeah, but there seemed to be
11  a very big point made about the fact that, if you
12  understand how these things work, if you -- if you go in
13  and you buy, you know, the bottom tranche or, you know,
14  third to the bottom, that you have to go in knowing that
15  it's not -- it doesn't have to be a 100-year flood event
16  for you to lose your entire stake being in that tranche;
17  whereas, if you -- if you were in the top, you know,
18  sure, you could lose all your money in that just as
19  well, but that's the -- you know, that's not a -- that's
20  not a very common scenario.
21        THE WITNESS: So, if the question is -- is
22  there more risk of loss in the subordinate bonds at the
23  bottom than at the -- then, yes, that is certainly the
24  case.
25        MR. FALLAS: And my question really is:

Page 782

1  Is it a -- is it a nonunusual event?
2        THE WITNESS: Is it a foregone
3  conclusion --
4        MR. FALLAS: No, no, no. Is it not so
5  usual if a tranche that you were invested in in one of
6  the lower levels is wiped out or, you know, basically it
7  becomes almost worthless? Is that --
8        THE WITNESS: Well, that discussion in the
9  context of 2010 is an interesting question. I remember
10  in 2001 and '2, 2001, 2002, some of our biggest
11  performance -- our best performance came from the
12  residuals of CMOs, mortgages. We bought the equity of
13  what we called the residual of CMO deals, which is a
14  pool of mortgages. We bought the equity. We paid 25 to
15  30 cents on the dollar for those residual pieces. They
16  paid off at par. Okay? I bought the BB, which is the
17  very bottom piece of First Plus and Master's Financial
18  125 home equity loans back from the late '90s.
19        MR. DOBROWSKI: Mr. Chair, I think the
20  question was directed towards what he actually had done
21  in the Funds, not something that he's done in 2010. And
22  now we're getting into expert testimony, and he wasn't
23  designated as an expert. I'm certainly happy to have
24  him answer all of Mr. Fallas' questions. I just think
25  that the witness didn't understand.

Page 783

1        MR. FALLAS: I'm just trying to get to one
2  concept. I'm trying to think of the best way to ask it.
3        THE WITNESS: Could I finish?
4        MR. KERR: Yeah, go ahead.
5        THE WITNESS: I was going to say that
6  those bonds, those First Plus bonds paid off at par.
7  Okay. Now, as we come to 2010, we look back at -- we
8  could pick any one of those up there probably for the
9  most part -- well, not the '04, but maybe the -- if
10  there was an '05 or an '06 deal, I'm sure that that bond
11  is probably worthless at this point.
12        So, it really is more a question of, if
13  you're in a good economic environment and the
14  underwriting for loans has been good and you have some
15  appreciation in real estate, then those bottom bonds are
16  going to work. If you go through a situation that
17  happened in 2007 to 2010, those bottom bonds aren't
18  going to work.
19        MR. KERR: Depends on market conditions.
20        THE WITNESS: That's it. One more thing.
21  I want to say one more thing.
22        MR. FALLAS: That's all right.
23        THE WITNESS: One more thing.
24        MR. FALLAS: That's more than I wanted to
25  know.

Page 784

1        THE WITNESS: The same thing is true of
2  corporate debt. You know, in 2001, 2002, gone.
3        MR. FALLAS: Okay. Let me try to put it
4  in a different way. The Dow Jones 30, it's 30 stocks,
5  right? They're chosen by Dow Jones company, and they
6  have to meet criteria to be one of the 30, right? And
7  they're pretty heavy criteria. They're some of the most
8  solid companies there are at the time they're included.
9        THE WITNESS: Okay. I'll go along with
10  you, but I don't know what the criteria is.
11        MR. FALLAS: Okay. All right. Well, I'll
12  stipulate it's stated, you know, I mean, it's basically
13  widely known, as far as I know, that they're some of the
14  most solid corporations there are and that's -- that's
15  the brand. But if -- if one of the companies that's
16  currently in the Dow Jones today were to basically go
17  bankrupt and, you know, be worth, you know, 2 cents --
18        THE WITNESS: Like General Motors.
19        MR. FALLAS: Right. It does happen
20  sometimes, but it's very unusual and it's very
21  surprising when it does happen, okay? That's -- that's
22  my point. Would you -- would you concur with that?
23        THE WITNESS: Okay. Yes.
24        MR. FALLAS: It doesn't happen every day,
25  but it does happen sometimes.

## ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 785

1　　　　THE WITNESS: Right, right.
2　　　　MR. FALLAS: All right. Now, on the other
3　hand, you could have a Microsoft call, okay? Microsoft
4　is somewhere around $24 now. Let's say you had a 25
5　call expiring in December of this year, okay? In
6　December, if -- if Microsoft is $30, that call will be
7　worth $5, right? If, in December, Microsoft is below
8　$25, that call will expire worthless, correct?
9　　　　THE WITNESS: Correct.
10　　　　MR. FALLAS: And, so, my point is, that
11　options, you know, they're going to be worth what
12　they're worth, you know, depending on how they perform,
13　but when options expire worthless, it's a very common
14　occurrence and, you know, if somebody had a portfolio of
15　different long options, you know, they'll have some that
16　really pay off and some of them, you know, that expire
17　worthless and they expect that. Now, depending on how
18　they net out, you know, that whole portfolio will either
19　make money or lose money. But if you had, you know, 50
20　different options and -- and 40 -- you know, 17 of them
21　expired worthless, you're not -- you're not surprised
22　that those 17 expired worthless because you understand
23　that they're very -- you know, they're very volatile and
24　they do have extreme potential to -- to be worth zero,
25　right?

Page 786

1　　　　THE WITNESS: Okay. I'm listening.
2　　　　MR. FALLAS: So, what I'm trying to get at
3　is, as an investor in the lower tranches, is it -- is it
4　shocking whenever you get a report that one has
5　basically, you know, lost pretty much all of its value
6　or is that, like, the General Motors stock that, you
7　know --
8　　　　THE WITNESS: Well, I think it's -- I
9　think it's two different things altogether. Because
10　when you put the money in an option, if you put a
11　hundred dollars in the option, it's a 0 or a 1. In
12　other words, it has a payoff or it doesn't. When we
13　buy the bonds that we're buying here, there's a cash
14　flow associated with them. So, it's paying coupons
15　monthly. So, it's -- you know, there are many of them
16　that lost a lot of value, but a lot of them actually
17　paid a lot of cash back. So, it's not the same sort of
18　comparison. And, yes, I would be shocked to have a zero
19　return on a bond or, you know, to have a negative 100
20　percent return on a bond. I would be -- I expect to
21　have cash flows coming into the portfolio.
22　　　　MR. FALLAS: Okay. Well, would you be
23　shocked -- okay. I think you brought up something good.
24　Would you be shocked if you had, you know, a lower
25　tranche which had paid -- you know, let's say -- you --

Page 787

1　you tell me, what would be a typical price that you
2　would pay for a lower tranche? Be 50 or be 70 or what
3　was --
4　　　　THE WITNESS: It could be any variety of
5　numbers.
6　　　　MR. FALLAS: Let's say you paid 50.
7　　　　THE WITNESS: Fifty-cents on the dollar.
8　　　　MR. FALLAS: Yeah. And it paid you, you
9　know, regular coupons and it had -- you paid 50 and you
10　had taken back in 20.
11　　　　THE WITNESS: Twenty points of coupon.
12　　　　MR. FALLAS: Right. Would it shock you
13　ever to -- I mean, you have received some return there.
14　So, even if -- would it shock you if that -- at some
15　point it went from 50 down to 40 one month and then the
16　next month it went to 5?
17　　　　THE WITNESS: No, not necessarily. I
18　mean, it could.
19　　　　MR. FALLAS: Okay. I think I understand.
20　I just have one other question and it's -- are you on
21　Tab 61?
22　　　　THE WITNESS: Yes.
23　　　　MR. FALLAS: Okay. That second page at
24　the bottom. The question was "Do you tend to invest in
25　the lower level, higher risk tranches of mortgage

Page 788

1　securities?"
2　　　　And it seems like the first part of the
3　paragraph it's just explaining what structures and
4　investments are and what the difference is between
5　higher and lower. The answer to the question really is
6　at the very last sentence. "As far as our selection
7　process, the amount of risk we are willing to take
8　depends upon our view of the collateral. If we are
9　confident in the collateral, then we'd be more
10　comfortable going further down."
11　　　　Essentially, the way I interpret that is
12　basically you say that we do -- we do buy the lower
13　tranches sometimes. It depends on whether we like them
14　or not.
15　　　　THE WITNESS: Yes.
16　　　　MR. FALLAS: They ask you "Do you tend to
17　invest in the lower levels" and your answer is, it seems
18　to me, it depends. And I guess my question is: If --
19　if you tended to favor those because they enabled you to
20　get the higher income, which was kind of your objective,
21　why wasn't that answer more, you know, straightforward?
22　　　　THE WITNESS: Well, I can tell you that
23　that was -- I attempted to give a straightforward
24　answer. We -- these were high yield funds. These were
25　not investment-grade funds. So, I -- I laid out the

## HANNA & HANNA, INC.
## (713) 840-8484

**ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 861

1    Q.  Okay.  And if you look behind 73-A, which is
2  the December 2006 policy and procedure manual and go to
3  Exhibit L, you will see the valuation procedures, right,
4  sir?
5    A.  In each tab?
6         MR. KERR:  Just A.
7    Q.  (BY MR. DOBROWSKI) Just A.  Just looking at A.
8  I'm going to try and make this simple.
9    A.  Good.
10   Q.  Okay.  You're at 73-A?
11   A.  Yes, sir.
12   Q.  And the policies and procedures, Exhibit L, are
13  on the last four pages of that document, right, sir?
14   A.  Yes.
15   Q.  All right.  And if you go to 73-E, which are
16  the July 2007 policies and procedures, you will see the
17  last four pages are the valuation procedures, and you
18  can count them.  One, 2, 3, 4.  The last four pages,
19  right, sir?
20   A.  Yes, sir.
21   Q.  All right.  And then if you go to G, 73-G,
22  which are the September 2007 procedures, you will see
23  Exhibit L, the valuation procedures are one, two, three,
24  four, five pages long, right, sir?
25   A.  Agree.

Page 862

1    Q.  Okay.  And, in fact, the prior procedures were
2  actually only three-and-a-half pages long, right?
3    A.  That sounds good to me.
4    Q.  Okay.
5         MR. DOBROWSKI:  I'll pass the witness.
6         MR. KERR:  Fair enough.  Anything further?
7         MR. CARLIN:  Just one question, Mr. Chair.
8             RECROSS-EXAMINATION
9    Q.  (BY MR. CARLIN) You were shown Exhibit 285,
10  that PWC letter?
11   A.  Yes, sir.
12   Q.  Is that a qualification of an opinion, in your
13  experience and expertise as an auditor/CPA?
14   A.  It is not.
15   Q.  Is it a withdrawal of an opinion?
16   A.  It is not.
17        MR. CARLIN:  Nothing further.
18        MR. KERR:  Anything further?
19        MR. DOBROWSKI:  No.
20        MR. KERR:  Do you have anything?
21        MR. MARTIN:  No questions.
22        MR. KERR:  Do you have anything?
23        MR. FALLAS:  Just one.  To that last
24  question, how would you characterize it?  What would you
25  call it?

Page 863

1         THE WITNESS:  To me, in my experience,
2  whenever you changed accountants, you know, like if we
3  changed from KPMG to PWC, PWC would have to ask KPMG if
4  they could use their information in the future filings
5  from past years that they did an audit and oftentimes or
6  at least in my experience sometimes accountants can
7  refuse to let you do that and say, look, I have no
8  relationship with you going forward.  You need to get
9  your own people to do the audit and finish it.  And
10  that's how I viewed that letter, that they just didn't
11  want them to use their data because they had no
12  continuing relationship with Hyperion or anything about
13  those Funds.
14        MR. FALLAS:  Would you say it's more --
15  it's more of a standpoint of release of liability or
16  from the standpoint of, well, you're no longer our
17  client, so we don't want to be nice to you?
18        THE WITNESS:  Both.  I don't think you
19  want any liability associated with a future client's
20  purchases -- I mean, the non-client's future purchases,
21  if I'm saying that right.
22        MR. FALLAS:  But it doesn't mean that the
23  opinion was basically withdrawn or invalidated?
24        THE WITNESS:  I believe they stand by
25  their opinion to this day.

Page 864

1         MR. DOBROWSKI:  Can I ask just one
2  question just to follow up on that?
3         MR. KERR:  Okay.
4           FURTHER REDIRECT EXAMINATION
5    Q.  (BY MR. DOBROWSKI) Other than the fact that
6  they say specifically you can't rely on the opinions,
7  right, sir?
8         MR. CARLIN:  Objection.  The document
9  speaks for itself.
10   Q.  (BY MR. DOBROWSKI) True?  That's what it says.
11   A.  I believe they stand by their opinion.
12   Q.  The document says you cannot rely on their
13  financial statements for those years?
14        MR. FALLAS:  It says should not be relied
15  upon.
16   Q.  (BY MR. DOBROWSKI) Okay.  Fine.  That you
17  should not rely upon them for those years, true, sir?
18  That's what PWC says.
19        MR. KERR:  That's the question.  Isn't
20  that what that document says?
21        THE WITNESS:  That is what the document
22  says, but I think you have to look at what is that
23  document used for.  And it's all related to future
24  purchases.
25        MR. KERR:  Okay.

**HANNA & HANNA, INC.**
**(713) 840-8484**

**ARBITRATION PROCEEDINGS - Day 3 - October 14, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 865

1        MR. DOBROWSKI:  Thank you, sir.
2        MR. KERR:  All right.
3    Q.  (BY MR. DOBROWSKI)  Is that qualification in the
4 document --
5        MR. DOBROWSKI:  The document -- you can
6 read it.  You can read it.  Let's not waste his time.
7        MR. KERR:  We have read it.
8        MR. DOBROWSKI:  Yes.
9        MR. KERR:  All right.  This hearing is
10 adjourned for today.  Thank you very much.
11        (Proceedings recessed at 6:44 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 866

1 STATE OF TEXAS
2 COUNTY OF HARRIS
3
4        REPORTER'S CERTIFICATE
5        ARBITRATION HEARING
6        October 14, 2010
7
8    I, the undersigned Certified Shorthand Reporter in
9 and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11    I further certify that I am neither attorney or
12 counsel for, related to, nor employed by any parties to
13 the action in which this testimony is taken and,
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17    SUBSCRIBED AND SWORN TO under my hand and seal of
18 office on this the 25th day of October, 2010.
19        _Kelly Hanna_   Digitally signed by Kelly Hanna.
                          Date: 2010.10.25 09:40:40 -07:00
20                        Reason: I am the author of this document
                          Location: Houston, TX
        Kelly Hanna, CSR, RPR, CRR, CMRS
21        Texas CSR 1654
        Expiration: 12/31/2011
22        Firm Registration No. 581
        1225 North Loop West, Suite 327
23        Houston, Texas 77008
        713.840.8484 - 713.626.1966
24        www.hannareporting.com
25

**HANNA & HANNA, INC.**
**(713) 840-8484**

265f861f-a9c1-4e09-bc86-d428769f1596

## ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 867

1            BEFORE FINRA DISPUTE RESOLUTION

2 In the Matter of the Arbitration Between:

3 RICHARD R. ARISPE, JIMMY A.  )
   BURKE, PEGGY R. BURKE, TODD  )
4 B. BURKE, JOSE J. COLLADO,    )
   ADELA CHRISTINE COLLADO,     )
5 CHARLES C. COLVIN, C & C      )
   ERECTION, INC., NANCY GORDON,)
6 SUSAN W. HACKNEY, DON H.      )
   JONES, SUZANN S. JONES,      )
7 WILLIAM A. RHODES, JR., DAWN  )
   SCHUESSLER, KENNETH W. SEARS,)
8 KENNETH W. SEARS, JR., REINE  )
   M. SEARS, DANIEL J. SEARS,   )
9 KENNETH W. SEARS, III, JUDY   )
   STRICKLAND, ELIZABETH STEIN &)
10 SHANA L. STEIN,              )
         Claimants             )
11 v.                          ) FINRA CASE NO. 09-006655
                               )
12 MORGAN KEEGAN & COMPANY,     )
         Respondent            )
13

14           ARBITRATION PROCEEDINGS

15             October 15, 2010

16                  Day 4

17      ARBITRATION PROCEEDINGS was taken in the

18 above-styled and numbered cause on the 15th day of

19 October, 2010, from 9:10 a.m. to 4.54 p.m., before Kelly

20 Hanna, Certified Shorthand Reporter in and for the State

21 of Texas, reported by computerized stenotype machine at

22 the offices of Greenberg Traurig, 1000 Louisiana, Suite

23 1700, Houston, Texas, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.

Page 868

1              APPEARANCES
2
3 FOR CLAIMANTS:
4     Mr. Paul J. Dobrowski
      Mr. Bruce Kemp
5     Mr. Cody Stafford
      Dobrowski, LLP
6     4602 Washington Avenue, Suite 300
      Houston, Texas 77007
7     Telephone  713.659.2900
      Fax:  713.659.2908
8     E-mail: pdobrowski@doblaw.com
9 FOR RESPONDENTS:
10    Mr. Steve Carlin
      Ms. Jennifer Tomsen
11    Ms. Penelope Brobst Blackwell
      Greenberg Traurig
12    The Forum
      3290 Northside Parkway
13    Atlanta, Georgia 30327
      Telephone: 678.553.2100
14    Fax: 678.553.2212
      E-mail: weisstr@gtlaw.com
15
   ALSO PRESENT:
16
      Mr. Maurice Fallas, Arbitrator
17    Mr. Raymond C. Kerr, Arbitrator
      Mr. Thomas A. Martin, Arbitrator
18    Mr. Tom Barnell, Morgan Keegan
      Mr. Don H. Jones, Claimant
19    Mr. Jimmy Burke, Claimant
      Ms. Peggy Burke, Claimant
20    Mr. Todd Burke, Claimant
      Ms. Susan W. Hackney, Claimant
21    Mr. Steve Scales, Expert
      Mr. Kjel Ekdahl, Expert
22
23
24
25

Page 869

1              INDEX
2                         PAGE
3 RUSSELL STEIN
4 Cross-Examination Continued by Mr. Carlin .......873
   ReDirect Examination by Mr. Kemp ..............1027
5 ReCross-Examination by Mr. Carlin .............1040
   Further ReDirect Examination by Mr. Kemp . .....1049
6 Further Re-Cross Examination by Mr. Carlin .....1050
7 PEGGY BURKE
8 Direct Examination by Mr. Stafford....... .....1060
   Cross-Examination by Mr. Carlin ...............1061
9
   JIMMY BURKE
10
   Direct Examination by Mr. Stafford.............1076
11 Cross-Examination by Ms. Blackwell ...........1077
   ReCross-Examination by Ms Blackwell ..........1095
12
   DON H. JONES
13
   Direct Examination by Mr. Stafford.............1099
14 Cross-Examination by Mr. Weiss ................1100
   ReDirect Examination by Mr. Stafford ...........1159
15 ReCross-Examination by Mr. Weiss ..............1161
   Court Reporter's Certificate ..................1165
16
17
18
19
20
21
22
23
24
25

Page 870

1            MR. KERR:  Good morning, everybody.  This

2 is the fourth, evidently not the last day of hearings in

3 the Arispe versus Morgan Keegan case.  We have Mr. Stein

4 back in the dock.

5            Mr. Stein, I remind you, you're under

6 oath.

7      THE WITNESS:  Yes.

8            MR. KERR:  We will pick up the

9 cross-examination with Mr. Carlin.  So, you're up.

10           MR. DOBROWSKI:  Mr. Chair, a couple of

11 housekeeping matters, very briefly.

12           MR. STAFFORD:  Just so the Panel is aware,

13 we have updated your binders, as we promised before,

14 with the updated damage calculation with the

15 out-of-pocket losses on there.  That would be 291-A in

16 your last binder.  We've also tried to put in the other

17 exhibits that have come in that were not pre-done.  And

18 then also you will find, as promised again, from

19 Dr. McCann in Exhibit 296, it is the 35 nonRMK high

20 yield closed-end funds and we have attached to that the

21 slide from his presentation that address that as well.

22           MR. KERR:  Okay.  Thank you.

23           MR. STAFFORD:  We are making that

24 available to respondents as well.

25           MR. KERR:  So, did you put that in the

## ARBITRATION PROCEEDINGS – Day 4 – October 15, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 875

1  seven years.
2      Q.  Okay.  Because some of it would be shorter
3  term, things like the three and six and nine months?
4      A.  That's correct.
5      Q.  And then some of them spread out.  So, kind of
6  the zero to ten-year time frame, right?
7      A.  That's correct.
8      Q.  Okay.  Now, you spent a fair amount of time
9  talking with Mr. Kemp about -- and with me -- about the
10  Hyperion conference call.  Do you recall that?
11      A.  That's correct.
12      Q.  Now, you previously testified, sir, though,
13  just to be clear, that during that call, Hyperion did
14  not tell you that Morgan Keegan or Mr. Kelsoe had done
15  anything wrong, correct?
16      A.  That's correct.  They didn't come right out and
17  say they mismanaged.  They did say they had to make
18  drastic or they had to make major changes to the -- to
19  the portfolio because of the investment characteristics
20  of the existing portfolio.
21      Q.  Right.  And from that you had -- or you started
22  at least to come to the conclusion that there -- there
23  had been something wrong with the prior management,
24  right?
25      A.  That's -- that's correct.

Page 876

1      Q.  Right.
2      A.  Because they had reduced the -- the dividend
3  from -- overnight from 8 or 9 cents a share to 1 cent a
4  share.
5      Q.  And that was Hyperion?
6          MR. FALLAS:  Excuse me.  Could you please
7  read back the question.
8          (The record was read as requested.)
9          MR. FALLAS:  And when you said "And from
10  that" you were referring to the fact that there was a
11  new manager?
12          MR. CARLIN:  Not exactly.  What I was just
13  trying to get at was --
14      Q.  (BY MR. CARLIN) Hyperion didn't tell you in
15  that call that Morgan Keegan or Kelsoe did anything
16  wrong, correct?
17      A.  That's correct.
18      Q.  Okay.  But from what you heard in the call, you
19  concluded that something must have been wrong because of
20  the dividend reduction and because of the net asset
21  value drop, correct?
22      A.  That's correct.
23          MR. CARLIN:  Does that answer your
24  question, Mr. Fallas?
25          MR. FALLAS:  Thank you.

Page 877

1          MR. CARLIN:  Bruce, I'm looking for --
2          MR. KEMP:  The transcript?
3          MR. CARLIN:  No.  I believe that's 206,
4  right?
5          MR. KEMP:  226.
6      Q.  (BY MR. CARLIN) And if you take a look at
7  Claimants' Exhibit 226, and that's that transcript,
8  right?
9      A.  Yes, it is.
10          MR. FALLAS:  Exhibit what?
11          MR. DOBROWSKI:  Claimants' 226.
12          MR. KEMP:  Steve, do you need us to put it
13  up on the screen for you?
14          MR. CARLIN:  No, not at the moment.  I
15  sent Tom back in to get my version of these that I have
16  some tabs on.  I just didn't have -- with the Panel's
17  indulgence, I'm just getting my version so we can move
18  through it a little more quickly.
19          MR. KEMP:  I've got one with tabs.
20          MR. CARLIN:  No, I've got 226.  I've just
21  got to mark up -- because there's only a few spots that
22  I wanted to mention to him.
23          MR. KERR:  He's got his tabs.
24          MR. CARLIN:  I've got my tabs.
25          MR. KEMP:  Trying to help.

Page 878

1          MR. CARLIN:  I've got the stuff I want him
2  to focus on, okay?
3          THE WITNESS:  I'm starting to see how it
4  works..
5          MR. CARLIN:  Mr. Chair, if I could step
6  out for a minute.  I'm looking for my binder with the
7  tabs, and for some reason it's not in the stack.
8          (Recess taken from 9:20 to 9:21.)
9          MR. CARLIN:  Mr. Chair, I'll go ahead and
10  proceed.  For some reason, my copy is not here.
11          MR. DOBROWSKI:  Do you need an extra copy?
12          MR. CARLIN:  No.  I've got a copy.  What I
13  don't have is my copy that is marked and tabbed with
14  some of the things that I wanted to ask Mr. Stein about,
15  but I'm going to go ahead and proceed.
16      Q.  (BY MR. CARLIN) Mr. Stein, would you please
17  turn to Page 2 of Exhibit 226; and this is the
18  conference call, correct?
19      A.  That's correct.
20      Q.  The transcript.  Now, you were asked some
21  questions -- Mr. Kemp asked you some questions about, il
22  looks like the fourth paragraph down, starts with the
23  word "Okay," where it says "Okay.  The first key message
24  I want to deliver today is that our primary goal as
25  managers of these funds is to manage the funds towards

## ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 1023

1  divided into three, I believe you indicated that
2  represented something on the order of, like, 20 percent
3  of your business at that time; is that right?
4      **A.  I can't recall the exact percentage, but we**
5  **have a breakdown of it.  I would think 20 to 30 or**
6  **something like that.**
7          MR. FALLAS:  I'm sorry.  What was that
8  question?
9          MR. CARLIN:  I said the percentage of his
10 business that he took with him when he went to Raymond
11 James of not just these Claimants but also the prior --
12 the Garrett arbitration, because these, Mr. Fallas, had
13 started out as one.  There was a Claimant group there,
14 and then there's this Claimant group in this one.  Does
15 that make sense?
16         MR. FALLAS:  Your question is?
17     Q.  (BY MR. CARLIN) I just wanted to confirm,
18 Mr. Stein, I believe you had previously testified in
19 that other proceeding that this group of Claimants in
20 both the Arispe case and the Garrett case amounted to
21 about 20 to 25 percent of your business that you had
22 when you went to Raymond James in the spring of 2008; is
23 that right?
24     **A.  That sounds about right.**
25     Q.  Okay.

Page 1024

1      **A.  And the exact numbers could be --**
2      Q.  Fair enough.  I'm not trying to pin you down to
3  what percent.
4          MR. CARLIN:  Do you understand,
5  Mr. Fallas?
6          MR. FALLAS:  So, it has to do with the
7  percentage of clients that -- percentage -- percentage
8  that these Funds represented of his business or the
9  percentage of clients who moved with him?
10         MR. CARLIN:  Well, was with these clients.
11 percentage -- it has to do with the clients who are
12 Claimants in these two arbitrations who moved with him.
13         MR. KERR:  And that's based on some kind
14 of dollar estimate?
15         MR. CARLIN:  Yes.  It's a percentage of
16 dollar business.
17         MR. FALLAS:  So, in a large sense, you're
18 asking what portion of his overall business was in these
19 Funds?
20         MR. CARLIN:  Well, was with these clients.
21 Because these clients also had some other investments,
22 too.
23         MR. FALLAS:  Okay.  So, how much of his
24 book was represented --
25         MR. CARLIN:  There you go.  Much better

Page 1025

1  question.
2      Q.  (BY MR. CARLIN) Of the Garrett and Arispe
3  clients, how much of your book did that represent at the
4  time you went over?
5      **A.  And I think it was around 20 or 30 percent.**
6          MR. CARLIN:  Thank you for making that a
7  much clearer question.
8      Q.  (BY MR. CARLIN) So, sir, I understand these
9  kind of bonus and broker arrangements are a little bit
10 complicated because there's tax reasons and there's
11 loans and then there's pay-back schedules, right?
12     **A.  That's correct.**
13     Q.  But the bottom line is, you received an
14 up-front bonus, according to Exhibit 96, of about
15 $875,000 to go over and start that Raymond James -- or
16 to take your practice over to Raymond James, correct?
17     **A.  That's correct.**
18     Q.  And if you had left or if Raymond James had
19 terminated you for whatever reason, they could call that
20 loan and try to get that -- try to get that bonus back,
21 right?  That's the way this is structured, correct?
22     **A.  I believe so.**
23         MR. KERR:  It's an earnout.
24         THE WITNESS:  Yes, sir, it is, Your Honor.
25         MR. CARLIN:  Again, thank you very much,

Page 1026

1  Mr. Chair.
2      Q.  (BY MR. CARLIN) It's an earnout that's subject
3  to recapture, right?
4      **A.  That's correct.**
5      Q.  Okay.  So, as of the time that you went over
6  there, this group of Claimants and those in the Garrett
7  case represented a very significant book of your
8  business, correct, portion of your book of business?
9      **A.  Yes.**
10     Q.  And represented a very significant portion of
11 the bonus that you got paid to Raymond James, correct,
12 to go to Raymond James?
13     **A.  Oh, yeah.**
14     Q.  So --
15     **A.  Yes.**
16     Q.  If those -- if those clients didn't come with
17 you, you wouldn't have gotten that bonus or anywhere
18 near that size of bonus, correct?
19     **A.  If I hadn't earned out the business, that's**
20 **correct.  It's an -- it's an earnout arrangement, that**
21 **if your business and your assets equal what you had --**
22     Q.  They're estimating what your business is going
23 to be when you come over; and if you don't deliver, they
24 can capture that bonus back, right?
25     **A.  That's correct.**

## ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 1047

1   A.  I do not know that term.
2   Q.  And you've been a broker for 40 years with
3   asset-backed securities experience for the past 20,
4   right?
5   A.  That's correct.
6   Q.  And you had never heard that term until we got
7   here, right?
8   A.  Yes.
9   Q.  Now, we talked about when you left and what you
10  knew and Mr. Kemp asked you a couple of questions about
11  that. I just want to make this clear. When you were
12  with Morgan Keegan, you got tons of information, right?
13  A.  Yes.
14  Q.  From Mr. Kelsoe, from the documentation, from
15  the reports, right?
16  A.  Yes.
17  Q.  And you, sir, used your best judgment based on
18  your 40 years of experience as to what you thought was
19  going on, correct?
20  A.  Yes.
21  Q.  And you did not think that they had done
22  anything wrong despite all of these fairly terrible
23  events happening, right?
24  A.  That's correct.
25  Q.  And even after you left you didn't think

Page 1048

1   anything had been done wrong until you attended this
2   wake-up Hyperion conference call, correct?
3   A.  That's correct.
4   Q.  And by the way, you mentioned just now about
5   the banks came in and they took the good stuff and left
6   the other stuff behind, right?
7   A.  In general terms, yes.
8   Q.  Would you agree with me based on what we've
9   seen today, even the good stuff, the AAA, got hit hard
10  in this crisis, didn't it?
11  A.  Yes.
12  Q.  So, even the banks taking the good stuff, they
13  lost a lot of money, too, didn't they?
14  A.  That's correct.
15  Q.  And you're aware, sir, that a closed-end fund
16  is -- because, again, you brought up the closed-end
17  fund, closed-end funds may not have the redemption risk,
18  but they're exposed to the market risk, right?
19  A.  That's correct.
20  Q.  And we saw that chart showing these Funds
21  trading at a premium until that premium evaporated in
22  June of 2007, right?
23  A.  That's correct.
24  Q.  And after that they traded at a discount?
25  A.  That's correct.

Page 1049

1   Q.  And that's market risk, isn't it?
2   A.  Yes.
3       MR. CARLIN:  I have nothing further.
4       MR. KERR:  Are we done?
5       MR. KEMP:  Two questions.
6       MR. KERR:  Okay.  Good.
7       FURTHER REDIRECT EXAMINATION
8   Q.  (BY MR. KEMP) Mr. Carlin just talked about all
9   this information you got and how you used your 40 years
10  of experience. Having used that 40 years of experience
11  as an agent for Morgan Keegan, what was your
12  recommendation to these Claimants as it relates to the
13  investment in these Funds?
14  A.  To stay with them and reinvest the dividends
15  and wait for better times.
16  Q.  And was your -- your recommendation also on
17  their initial investment into these Funds?
18  A.  Yes.
19  Q.  And did you expect these Claimants to rely on
20  your recommendation?
21  A.  Absolutely.
22      MR. KEMP:  Pass the witness.
23      MR. KERR:  All right.  Thank you.
24      MR. CARLIN:  May I have one more question,
25  Mr. Chairman?

Page 1050

1       MR. KERR:  This is the last question.
2       MR. CARLIN:  Thank you very much.
3       FURTHER RECROSS-EXAMINATION
4   Q.  (BY MR. CARLIN) That recommendation continued
5   after you left Morgan Keegan in March of '08 and you
6   were no longer Morgan Keegan's agent. You were Raymond
7   James' agent at that point in time, right?
8   A.  That's correct.
9   Q.  And the recommendation did not change, correct?
10  A.  That's correct.
11      MR. KERR:  All right.  Do my colleagues
12  have any questions?
13      MR. MARTIN:  No questions.
14      MR. KERR:  Do you have any questions?
15      MR. FALLAS:  (Nods head affirmatively.)
16      MR. KERR:  Okay.
17      MR. FALLAS:  Mr. Stein, sometime the other
18  day, whenever that first day you testified, I remember
19  you saying something about how they, at some point, they
20  could no longer pay the full dividend and it was
21  reduced. You said it had -- it had been -- I think it
22  had been 14 cents and then they reduced it at some point
23  to a lower number, maybe 11 cents or something. My
24  question is -- you did use the phrase -- I wrote it
25  down -- you used the phrase "full dividend." What did

**ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 1051

1  you mean by that?
2        THE WITNESS:  Full dividend being the
3  announced quarterly full payment on a monthly basis.
4        MR. FALLAS:  Okay.  But it was only
5  because it was -- it was only because it was what had
6  been customary before that you called it full.
7        THE WITNESS:  Yes, declared.
8        MR. FALLAS:  But not because it was stated
9  anywhere.
10        THE WITNESS:  No, it was -- it was the
11  declared dividend that they declared on a quarterly
12  basis.
13        MR. FALLAS:  Okay.  But what I'm saying
14  is, when you say "full," you're not saying that that
15  implies that there was, like, a coupon rate or a --
16        THE WITNESS:  Oh, no.
17        MR. FALLAS:  Okay.  Essentially, it was
18  just what everybody had been used to.
19        THE WITNESS:  That's correct.
20        MR. FALLAS:  Okay.  You also said the
21  other day that Morgan Keegan had issued, you know,
22  glossies and things like that, marketing materials; and
23  I believe -- I'm not a hundred percent sure -- I believe
24  you referred to those as buy recommendations or
25  alternatively you said that they did from time to time

Page 1052

1  issue buy recommendations on the stock.
2        THE WITNESS:  I believe I called them buy
3  recommendations or marketing updates, research reports,
4  yeah.
5        MR. FALLAS:  Okay.  Did -- did -- to your
6  knowledge, did Morgan Keegan ever issue explicit buy
7  recommendations for those RMK Funds?  In other words,
8  let me give you a little bit more background.  Typically
9  on stocks, like, you know, IBM or Microsoft or, you
10  know, Exxon or something, firms will issue research
11  reports and they'll have buy, strong buy, hold, sell,
12  you know, that kind of thing.  Did they do this on the
13  RMK Funds?
14        THE WITNESS:  They didn't issue opinions
15  like that.  They did put them in their platform of -- of
16  manager program and they also recommended these Funds
17  for the Regions people on moving CD money to them,
18  things like that.  So, they were recommending them, but
19  I don't recall seeing a, quote, "research, strong buy,"
20  like you're referencing.
21        MR. FALLAS:  Okay.  And you also talked
22  about the -- you said that there -- you had noticed that
23  there was a corresponding reduction in net asset value
24  to the dividends that they had been paying.  You saw,
25  like, if they had paid a dollar in dividends, then you

Page 1053

1  went -- and the NAV had also dropped by a corresponding
2  amount.
3        THE WITNESS:  I believe that came from the
4  conference call in September of '08, and that the
5  transcript in the Hyperion conference call referred --
6  referenced a corresponding decline in net asset value to
7  the dividend.  So, it's -- it's in that transcript.
8        MR. FALLAS:  Okay.  When you say
9  corresponding value, was that a similar amount or was it
10  penny for penny?
11        THE WITNESS:  I would have to go to the
12  transcript and see what he -- the specific of his
13  reference, but it -- it wouldn't be penny for penny, I
14  don't think.
15        MR. FALLAS:  Okay.  So, it just appeared
16  that the -- if you saw a dividend and then, you know,
17  the NAV had also gone down, it appeared they were pretty
18  close.
19        THE WITNESS:  Fairly close.
20        MR. FALLAS:  It wasn't like a journal
21  entry --
22        THE WITNESS:  No.
23        MR. FALLAS:  -- where you saw, like, you
24  know, 105 on this column and 105 on that column?
25        THE WITNESS:  That's correct, no.

Page 1054

1        MR. FALLAS:  Just about three or four
2  more.
3        MR. CARLIN:  If you want to look at it,
4  it's their Exhibit 226.
5        MR. KEMP:  And I can give you the page
6  cites, if that would help.
7        MR. FALLAS:  Regarding the advantages of
8  the closed-end bond funds, you said that they're not
9  subject to redemption; and it's also already been
10  brought out that -- well, there's also market risk, too.
11  So, I'm not going to go over that again; but if you
12  have -- if you have a -- if you have certain bonds in
13  the closed-end fund and everybody else on the street is
14  dumping those bonds but your manager doesn't have to
15  sell them because he doesn't want to sell them and
16  nobody is asking him for money, isn't it still -- don't
17  you still have to suffer what everybody else is doing
18  even though you're not selling, the prices are dropping,
19  correct?
20        THE WITNESS:  That's correct.
21        MR. FALLAS:  Okay.
22        THE WITNESS:  The NAV would continue to go
23  down with the pricing.
24        MR. FALLAS:  So, it's not really the same
25  as market risk because market risk is -- is, you know,

## ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010
## ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY

Page 1055

1 basically if -- there is a discount now to the NAV.
2 This is actually true NAV going down because it's --
3 because those bonds are being sold off, so the prices
4 are falling.
5         THE WITNESS: That's correct. And it's
6 separate from the price on the New York Stock Exchange.
7         MR. FALLAS: Right. But basically,
8 it's -- I know what -- I know what you were trying to
9 say, but the -- the there still -- there still is a -- it's
10 not the same -- there's kind of like a redemption risk
11 by association sort of that -- would you tend to agree
12 with that?
13         THE WITNESS: There's -- there's not a
14 redemption risk associated with that in that in a
15 closed-end bond fund you can -- you can wade through the
16 downward pressure, just like the Lehman Brothers High
17 Yield Ba Index was down that particular year that we're
18 talking about, it was down about 2 percent; and our
19 Funds were down about 70 percent. And the other high
20 yield bond funds were able to recover closed-end, they
21 were able to recover as the crisis eventually passed.
22         MR. FALLAS: Right. But essentially, what
23 it means is the manager doesn't have to sell because
24 people are dumping it?
25         THE WITNESS: That's correct.

Page 1056

1         MR. FALLAS: But the prices are still
2 going to be depressed until they -- you know, unless and
3 until they recover.
4         THE WITNESS: That's -- that's absolutely
5 correct and that's the reason for the benefit of
6 dividend reinvestment, being able to take that cash flow
7 and reinvest at no charge and at a discount even to --
8 sometimes if the market price is below the NAV like
9 we're almost describing, you can even get a double bump,
10 not just the one Mr. Carlin talked about, which was the
11 reinvestment at no cost, no commission.
12         MR. FALLAS: Right. But, again, all of
13 that assumes that one day the market will come back or
14 the prices will come back.
15         THE WITNESS: Eventually, yes.
16         MR. FALLAS: Obviously, if the prices
17 continue to go down or like Enron, if you had Enron
18 bonds, they went down, they went one way and they were
19 gone.
20         THE WITNESS: That's right, yes.
21         MR. KERR: Anything further?
22         MR. FALLAS: About two more. You
23 mentioned, I think it was today, that for the various
24 pension funds and whatever, you said -- they asked what
25 was your role in that relationship. You said "I was the

Page 1057

1 investment consultant." When you say "the," does that
2 mean you were the only one, like you were the official
3 investment consultant for that entire pension fund?
4         THE WITNESS: That's -- that's correct.
5 They would have an actuarial firm. They would have an
6 investment consultant, which in this case was me. At
7 the Permanent School Fund, they used two different.
8 They used me, and they also used New England Pension
9 Consulting, NEPC.
10         MR FALLAS: So, the -- in one case the
11 entire -- some of those other pension funds, I think for
12 the carpenters or whatever, the entire pension fund only
13 used one broker.
14         THE WITNESS: Not one broker. The money
15 managers were in charge of how they did their business
16 with the different brokerage firms. I was the one
17 investment consultant professional at helping them with
18 their asset liability match up for future liabilities,
19 their investment policy and guideline statements. I --
20 for y'all's sake, it would be -- it's an investment
21 policy. Then thirdly, picking the managers, helping
22 select the managers. And then lastly, monitoring the
23 managers versus their respective agreed-upon benchmarks.
24         MR. FALLAS: Okay. I think this is going
25 to be my last question. There's been a lot of mention

Page 1058

1 all week long about reinvest the dividends, continue to
2 reinvest, purchase more and then -- I mean, reinvestment
3 has been a big theme and other than -- other than the
4 two reasons that you've given as far as the, you know,
5 you could buy it at NAV and that there was no commission
6 on the reinvested shares, is there any other incentive
7 for, you know, for leaving everything in the Fund and
8 then taking the cash it pays out and continue to
9 reinvest it back in the Fund constantly? Is there any
10 other special incentive or incentive credit, a broker
11 bonus or anything like that?
12         THE WITNESS: There is no 12b-1. There is
13 nothing. In fact, the third benefit that -- that we
14 really didn't talk about is that if the New York Stock
15 Exchange price gets below the NAV, then you buy the --
16 you reinvest in the market price that's below NAV so
17 that you not only get the two benefits of no commission
18 and -- and compounding that we talked about, you also,
19 if market price comes back up to NAV, you get
20 appreciation. So, it's the most riskless, cheapest,
21 inexpensive way to make your money compound; and that's
22 the reason that the example that Michael Gibbs out of
23 Morgan Keegan wrote -- it's a well-done piece.
24         MR. FALLAS: But is there any other -- any
25 other reason why, as the -- as the firm or as the agent,

**ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 1091

1  A.  Yes.
2  Q.  Okay.
3      MS. BLACKWELL: I don't think we have any
4  more questions.
5      MR. KERR: All right. Thank you.
6  Anything further.
7      MR. STAFFORD: Nothing further.
8      MR. KERR: All right. My colleague has
9  got a couple questions for you.
10     MR. FALLAS: Mr. Burke, when -- when you
11 originally made your first purchase of this -- these
12 Funds or if there were more than one, did -- did you get
13 a prospectus?
14     THE WITNESS: I'm sure I did. I don't
15 specifically remember getting it, but it seems like
16 any time anything like that happened, I would; and I
17 would get them from time to time in the mail, annual
18 reports. I remember getting that type of data. If
19 you're asking me do I remember specifically getting a
20 prospectus when -- when that happened, I don't. I feel
21 certain I did and I would have glanced over it and if I
22 would have had any questions, I would have certainly
23 referred them to Mr. Stein.
24     MR. FALLAS: Okay. Other than a
25 prospectus, do you remember being given a brochure or a

Page 1092

1  one-page summary or just, you know, an explanation of
2  the Fund or what you were buying?
3      THE WITNESS: I -- again, I am certain I
4  was. I would have expected it. I can't sit here today
5  and tell you I specifically remember getting that --
6  that piece of document.
7      MR. FALLAS: But if -- any of that stuff
8  that you would have gotten, would you have basically not
9  really relied on it but -- but asked Mr. Stein?
10     THE WITNESS: Typically what I would do
11 because of my lack of knowledge in this arena would be
12 read that, some of it thorough, certainly not
13 understanding everything I would have read. Some of it
14 I would skim. And if I had questions, I would end up
15 having to call Russell, because my area of expertise is
16 not in finance.
17     MR. FALLAS: Okay. Did you know or was it
18 explained to you before you made your first purchase of
19 these Funds that it was considered a speculative junk
20 bond, kind of risky, anything like that?
21     THE WITNESS: I don't specifically
22 remember that conversation.
23     MR. FALLAS: And not only a conversation,
24 but you don't really remember being aware of that
25 tendency.

Page 1093

1      THE WITNESS: No. No, I do not.
2      MR. FALLAS: Regarding the -- the holdings
3  that you had of when they paid dividends, did you
4  reinvest them?
5      THE WITNESS: Yes.
6      MR. FALLAS: Every month?
7      THE WITNESS: Yes.
8      MR. FALLAS: Did you ever choose to not
9  reinvest or take some of that money and put it in cash?
10     THE WITNESS: I did do that at one point
11 in time five or six years ago, I'm thinking it was,
12 pulled out, I think it was either 70 or $75,000 from --
13 from my investment fund.
14     MR. FALLAS: Okay. Was part of that your
15 principal, or was that just the dividend payment? Like
16 liquidating to buy something else.
17     THE WITNESS: I suppose that would have
18 been principal.
19     MR. FALLAS: But in terms of the monthly,
20 you know, when it paid, you know, 14 cents, 15 cents,
21 which, you know, could have been a couple thousand
22 dollars -- were you going to say something?
23     THE WITNESS: Yes. Monthly, a portion of
24 the account that's under my wife's name and a portion
25 out of the two accounts of the three that's in my name,

Page 1094

1  we -- we make a monthly withdrawal, if you will, to go
2  with the Social Security and retirement checks to
3  maintain the standard of living that we want to.
4      MR. FALLAS: Okay.
5      THE WITNESS: Now, that's in addition to
6  the roughly 70,000 we pulled out some years back.
7      MR. FALLAS: Okay. So, with respect to
8  the re -- you know, the cash that was reinvested every
9  month, what was -- what was your reason for -- for just
10 continuing to roll that over? Why did you let that
11 money continue to reinvest?
12     THE WITNESS: Well, hoped for that
13 particular account or fund to -- to grow, gain.
14     MR. FALLAS: So, you didn't really need
15 that cash for anything on a monthly basis.
16     THE WITNESS: Yeah, I need that money on a
17 monthly basis. I've lost, you know, about 35 or
18 40 percent of my retirement account over the last four
19 years. So, I need every penny I can turn back into that
20 account.
21     MR. FALLAS: I mean at the time. You
22 know, every month it paid a dividend and it was maybe a
23 few thousand dollars, depending on your -- the size of
24 your holdings.
25     THE WITNESS: Fortunately, there's enough

**ARBITRATION PROCEEDINGS - Day 4 - October 15, 2010**
**ARISPE, ET AL VS. MORGAN, KEEGAN & COMPANY**

Page 1163

1 materials will be secure.
2      MS. BLACKWELL: Yes.
3      MR. KERR: And we can leave the binders.
4 We can leave what of our stuff here we want to and take
5 what we want to.
6      MS. BLACKWELL: Anything you want to
7 leave, if you'll just leave it on your carts, the carts
8 will be in a secure area.
9      MR. KERR: Well, I had those two boxes of
10 documents and I want to leave --
11      MS. BLACKWELL: We will put those with
12 those.
13      MR. CARLIN: And, Mr. Fallas, did you have
14 any personal data on the firm's laptop?
15      MR. FALLAS: I don't think so.
16      MR. CARLIN: Okay. I just didn't know if
17 you were keeping any notes on there or anything that you
18 wanted to print or save otherwise.
19      MR. FALLAS: But I'll check.
20      MR. KERR: Go ahead, sir.
21      MR. DOBROWSKI: I just want to confirm,
22 1:30 conference call on Thursday, not 2:00.
23      MR. KERR: Yes, sir. 1:30 conference
24 call. So, everybody put that in your calendar. I'm
25 going to call Elizabeth Muldoon. We're going to set

Page 1164

1 that up. And we look forward to seeing you again and
2 hopefully as soon as possible.
3      (Proceedings recessed at 4:54 p.m.)

Page 1165

1 STATE OF TEXAS
2 COUNTY OF HARRIS
3
4      REPORTER'S CERTIFICATE
5      ARBITRATION HEARING
6      October 15, 2010
7
8      I, the undersigned Certified Shorthand Reporter in
9 and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney or
12 counsel for, related to, nor employed by any parties to
13 the action in which this testimony is taken and,
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18 office on this the 25th day of October, 2010.
19
20      Kelly Hanna, CSR, RPR, CRR, CMRS
21      Texas CSR 1654
        Expiration: 12/31/2011
22      1225 North Loop West
        Suite 327
23      Houston, Texas 77008
        713.840.8484 - 713.626.1966
24      www.hannareporting.com
25

**HANNA & HANNA, INC.**
**(713) 840-8484**

e92b5638-bb80-4258-be77-c27cd8cd352b

## ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
## ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY

Page 1166

1           BEFORE FINRA DISPUTE RESOLUTION

2 In the Matter of the Arbitration Between:

3 RICHARD R ARISPE, JIMMY A.   )
  BURKE, PEGGY E. BURKE, TODD   )
4 B. BURKE, JOSE J. COLLADO,    )
  ADELA CHRISTINE COLLADO,      )
5 CHARLES K. COLVIN, C & C       )
  ERECTION, INC., NANCY GORDON,)
6 SUSAN W. HACKNEY, DON H.      )
  JONES, SUZANN S. JONES,       )
7 WILLIAM A. RHODES, JR., DAWN )
  SCHUESSLER, KENNETH W. SEARS,)
8 KENNETH W. SEARS, JR., REINE )
  M. SEARS, DANIEL J. SEARS,    )
9 KENNETH W. SEARS, III, JUDY   )
  STRICKLAND, ELIZABETH STEIN &)
10 SHANA L. STEIN,              )
         Claimants             )
11 v.                          ) FINRA CASE NO. 09-006655
                               )
12 MORGAN KEEGAN & COMPANY,    )
         Respondent.           )
13

14           ARBITRATION PROCEEDINGS

15              January 29, 2011

16                  Day 5

17   ARBITRATION PROCEEDINGS was taken in the

18 above-styled and numbered cause on the 29th day of

19 January, 2011, from 8.56 a.m. to 4.29 p.m., before Kelly

20 Hanna, Certified Shorthand Reporter in and for the State

21 of Texas, reported by computerized stenotype machine at

22 the offices of Greenberg Traurig, 1000 Louisiana, Suite

23 1700, Houston, Texas, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.

Page 1167

1           APPEARANCES
2
3 FOR CLAIMANTS:
4     Mr. Paul J. Dobrowski
      Mr. Bruce Kemp
5     Mr. Cody Stafford
      Dobrowski, LLP
6     4602 Washington Avenue, Suite 300
      Houston, Texas 77007
7     Telephone: 713.659.2900
      Fax: 713.659.2908
8     E-mail: pdobrowski@doblaw.com
9 FOR RESPONDENTS:
10    Mr. Terry Weiss
      Mr. Steve Carlin
11    Ms. Penelope Brobst Blackwell
      Greenberg Traurig
12    The Forum
      3290 Northside Parkway
13    Atlanta, Georgia 30327
      Telephone: 678.553.2100
14    Fax: 678.553.2212
      E-mail: weisstr@gtlaw.com
15
   ALSO PRESENT:
16
      Mr. Maurice Fallas, Arbitrator
17    Mr. Raymond C Kerr, Arbitrator
      Mr. Thomas A. Martin, Arbitrator
18    Mr. Tom Barnett, Morgan Keegan
      Mr. Todd Burke, Claimant
19    Ms. Susan W. Hackney, Claimant
      Mr. Williams Rhodes, Claimant
20    Mr. Kenneth Sears, Claimant
      Ms. Shana Stein, Claimant
21    Mr. Jose Collado, Claimant
      Ms. Judy Strickland, Claimant
22    Mr. Charles Colvin, Claimant
      Mr. Richard Arispe, Claimant
23    Mr. Stephen Stein, Claimant
      Ms. Nancy Gordon, Claimant
24    Mr. Steve Scales, Expert
      Mr. Kjel Ekdahl, Expert
25

Page 1168

1                INDEX
2                          PAGE
3 WILLIAM RHODES
4 Direct Examination by Mr. Stafford ............1172
  Cross-Examination by Mr. Weiss ................1173
5 Examination by Mr. Stafford ....................1222
  Further Direct Examination by Mr. Stafford .....1228
6 Further ReDirect Examination by Mr. Weiss ......1229
7 KENNETH SEARS
8 Direct Examination by Mr. Stafford ............1234
  ReDirect Examination by Mr. Stafford ..........1259
9
10 SHANA STEIN
11 Direct Examination by Mr. Stafford ............1265
   Cross-Examination by Mr. Weiss ................1267
12
13 JOSE COLLADO
14 Direct Examination by Mr. Stafford ............1298
   Cross-Examination by Mr. Weiss ................1300
15 ReDirect Examination by Mr. Stafford ..........1316
   ReCross-Examination by Mr. Weiss ..............1316
16 ReCross Examination by Mr. Weiss ..............1319
17 JUDY STRICKLAND
18 Direct Examination by Mr. Stafford ............1323
   Cross-Examination by Mr. Weiss ................1325
19 ReDirect Examination by Mr. Stafford ..........1344
20 CHARLES COLVIN
21 Direct Examination by Mr. Stafford ............1345
   Cross-Examination by Mr. Weiss ................1347
22
23 RICHARD R. ARISPE
24 Direct Examination by Mr. Stafford ............1360
   Cross-Examination by Mr. Weiss ................1362
25 ReDirect Examination by Mr. Stafford ..........1371

Page 1169

1             INDEX (cont.)
2                          PAGE
3 SUSAN HACKNEY
4 Direct Examination by Mr. Stafford ............1372
  Cross-Examination by Mr. Weiss ................1374
5 ReDirect Examination by Mr. Stafford ..........1385
  ReCross Examination by Mr. Weiss ..............1386
6
7 TODD BURKE
8 Direct Examination by Mr. Stafford ............1388
  Cross-Examination by Mr. Weiss ................1391
9
10 STEPHEN STEIN
11 Direct Examination by Mr. Stafford ............1400
   Cross-Examination by Mr. Weiss ................1405
12
13 NANCY MARIE GORDON
14 Direct Examination by Mr. Stafford ............1415
   Cross-Examination by Mr. Weiss ................1418
15 ReDirect Examination by Mr. Stafford ..........1453
   ReCross-Examination by Mr. Weiss ..............1459
16
17 PAUL DOBROWSKI
18 Direct Examination by Mr. Stafford ............1469
   Cross-Examination by Mr. Weiss ................1474
19 Court Reporter's Certificate ...................1486
20
21
22
23
24
25

**ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY**

Page 1222

1   **A. Yes.**
2   Q.   Now, when you -- when you say that you didn't
3   have a problem with the prospectus or any of the
4   documents, are you suggesting to the Panel that you went
5   through there and looked through all of the statements
6   to determine whether or not they were accurate?
7   **A. Never.**
8   Q.   And so upon who were you relying to determine
9   whether or not the statements in there were
10  misrepresented or inaccurate?
11  **A. Mr. Stein.**
12       MR. STAFFORD: Nothing further.
13       MR. KERR: Do you have any?
14       FURTHER RECROSS-EXAMINATION
15  Q.   (BY MR. WEISS) Well, just so we're clear. When
16  Mr. Stein sent you these documents, he didn't discuss
17  each and every statement that was contained in those
18  documents with you in the first place, did he?
19  **A. No.**
20  Q.   He sent them on to you and he expected you to
21  look at them, right?
22  **A. Not necessarily.**
23  Q.   Well, he didn't send them to you expecting you
24  to throw them in the trash, did he?
25  **A. I don't know. Do you read all the prospectuses**

Page 1223

1   **you get?**
2   Q.   I'm asking you the question, Mr. Rhodes.
3   **A. No, I did not.**
4   Q.   He sent you the documents expecting you to read
5   them, right?
6   **A. I don't know what he expected.**
7       MR. WEISS: Go ahead.
8       MR. KERR: Mr. Fallas, do you have a
9   question?
10      MR. FALLAS: Yes, I have maybe one or two.
11      Mr. Rhodes, when you first got into these
12  investments, the RMK Funds, did you discuss them with
13  Mr. Stein?
14      THE WITNESS: When I made my first
15  investment, I had a certificate of deposit that had
16  matured and I was looking for somewhat better of a
17  return on it. So, I called Russell and I said "Russell,
18  do you have any suggestions where I can put the $50,000
19  that's just matured? I would like to enhance the return
20  on it."
21      He said, "Yeah, we have a fund that will
22  pay approximately 1 percent a month." And he said "It's
23  absolutely safe. There's no subprime in it or
24  anything."
25      MR. FALLAS: So, when he suggested that

Page 1224

1   you put it into this fund or this investment, did he
2   tell you very much about what you were investing in?
3       THE WITNESS: No.
4       MR. FALLAS: Did you know that it was
5   considered risky or speculative?
6       THE WITNESS: Not really. I just trusted
7   Russell.
8       MR. FALLAS: Did Mr. Stein tell you that
9   it was risky or speculative?
10      THE WITNESS: Not really, no.
11      MR. FALLAS: Did he tell you that it was
12  less than -- anything less than safe or, you know,
13  anything not comparable to a CD?
14      THE WITNESS: I don't think -- I don't
15  think that we ever fully discussed that. I mean, any
16  time you invest in something other than a treasury it's
17  got more risk than anything else.
18      MR. FALLAS: So, did you -- at that time
19  did you understand what you were buying?
20      THE WITNESS: Not really.
21      MR. FALLAS: And did you -- did you
22  understand the nature of the -- of continuing to
23  reinvest?
24      THE WITNESS: Yes.
25      MR. FALLAS: Why did you choose to keep

Page 1225

1   reinvesting as opposed to taking --
2       THE WITNESS: I didn't need the money. I
3   mean, it was an investment. It wasn't to live on. Not
4   at that time.
5       MR. FALLAS: Okay.
6       MR. KERR: Mr. Martin, do you have any
7   questions?
8       MR. MARTIN: I have a question, yes.
9       Sir, could you please pull out
10  Respondent's No. 681. Do you have it in front of you,
11  sir?
12      THE WITNESS: No. Excuse me. That's 80.
13      MR. MARTIN: I understand it's in Volume
14  No. 8.
15      THE WITNESS: Okay.
16      MR. MARTIN: Do you have it in front of
17  you now, sir?
18      THE WITNESS: Yes, I do.
19      MR. MARTIN: It's a question for
20  clarification. On Exhibit No. 681, there is a lot of
21  statements in there where you're stating that you will
22  do something or we will do something. And for the
23  Panel's clarification, how can we determine from this
24  e-mail whether you are the one making that decision in
25  that direction as a fiduciary or whether you are, as you

**ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011**
**ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY**

Page 1258

1       REDIRECT EXAMINATION
2       Q.  (BY MR. STAFFORD) Sir, do you recall Mr. Weiss
3   showing you the quote from Don Jones and asking you
4   whether or not you agreed and I think you said you did
5   not?
6       A.  No, I mean, I don't know Mr. Jones; and I can't
7   see how I could agree with someone I don't even know
8   what he's talking about.
9       Q.  I'm sorry.  Could you tell the Panel whether or
10  not your relying on Mr. Stein and your attorneys to
11  determine which documents of Morgan Keegan are
12  misleading or inaccurate?
13      A.  No.  I relied on -- if something was wrong, I
14  relied on them to tell me.
15      Q.  Okay.
16      A.  I never had anything -- no.
17          MR. STAFFORD:  Nothing further.
18          MR. KERR:  Did that raise any questions?
19          MR. WEISS:  I don't have anything further.
20          MR. KERR:  All right.  Do you have any
21  questions, Mr. Fallas?
22          MR. FALLAS:  Yeah, one.
23          When you originally invested in the RMK
24  Funds, did you know what they entailed, what they --
25  what they consisted of?

Page 1259

1          THE WITNESS:  No.  No.
2          MR. FALLAS:  Did you know anything about
3   them, like the nature of whether they were stocks or
4   bonds or --
5          THE WITNESS:  No.  This is -- if I -- if I
6   did anything, it was from basic knowledge from the
7   common public.  I know that you should have a
8   diversified -- you shouldn't put all your apples in one
9   basket, in other words; and I really didn't care where
10  it went.  If it was -- whatever he did, I would hope
11  that it was good for me.
12          MR. FALLAS:  Did Mr. Stein ever explain
13  what you were going to be investing in at the time that
14  you first started with this?
15          THE WITNESS:  Yeah, you know.  He said,
16  okay, Kenny, that's what we're going to do.  I had some
17  cash, I know --
18          MR. FALLAS:  No, no, no.  What I'm saying
19  is when -- when he said that, okay, we're going to put a
20  portion in these RMK Funds --
21          THE WITNESS:  No, no.
22          MR. FALLAS:  -- did he ever tell you what
23  the RMK Funds were?
24          THE WITNESS:  No, I don't recall that,
25  let's say.

Page 1260

1          MR. FALLAS:  And you didn't ask him?
2          THE WITNESS:  No.
3          MR. FALLAS:  It was just a choice that he
4   was making.
5          THE WITNESS:  Right.  I'm not a
6   stockbroker or -- I guess that's evident.
7          MR. FALLAS:  Did you -- did you know
8   that -- that it was risky or that it was anything, you
9   know, unusual?
10         THE WITNESS:  No.  Now, when -- like I
11  was -- when I would look online and, say, my funds'
12  total wasn't doing as well, I know it would be long
13  term.  That's what I've always heard.  Wait long term.
14  Wait.  Things go up and down.
15         MR. FALLAS:  Okay.  At the time that the
16  prices started to go down and, you know, there was a
17  time where it went down, you know, consistently --
18         THE WITNESS:  Right.
19         MR. FALLAS:  -- at that point did you --
20  did you know that it was, you know, on the risky side?
21         THE WITNESS:  No, honestly, no.
22         MR. FALLAS:  Did you think at that time
23  that you could have lost the entire -- that it could go
24  to zero or that it could go almost to zero?
25         THE WITNESS:  No.

Page 1261

1          MR. KERR:  Anything further?
2          MR. FALLAS:  No.
3          MR. MARTIN:  No questions.
4          MR. KERR:  I have no questions.
5          MR. WEISS:  I just have a couple
6   follow-ups, if I could.
7             RECROSS-EXAMINATION
8       Q.  (BY MR. WEISS) First of all, in terms of what
9   Mr. Stein told you about these investments in your
10  discussions, it would be fair to say, sitting here today
11  given all that you've gone through and the memory lapses
12  that you've testified to, that Mr. Stein may have well
13  explained the investments thoroughly to you and told you
14  about the risks, you just don't recall?
15      A.  Man -- yeah, after what I went through --
16      Q.  After what you've been through, that's possible
17  certainly, right?
18      A.  Believe me.  It's impossible to try to remember
19  that.
20      Q.  That's right.  Okay.  So, he may have told you
21  about the risks and here we are today and you've gone
22  through all of this and you don't recall.  Fair enough?
23      A.  Correct.
24      Q.  All right.  And in terms of making the
25  decisions, okay, your accounts -- you ultimately had the

**ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011**
**ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY**

Page 1294

1 agree with this statement from your father.
2       MR. WEISS: Put up Quote 10, please.
3       Q.  (BY MR. WEISS) The question was asked of him --
4 Ms. Stein, that's the statement I'm asking you about.
5 The question was asked of you -- of Mr. Stein, your
6 father, and you passed on that information to the
7 clients, referring to all the information that we've
8 talked about.  Everything that came out I believe we
9 passed on.  Okay.  I mean, you told them the good, the
10 bad and the ugly.  Okay.
11       And he said, "Right."
12       It would be fair to say that you don't
13 disagree that your father told you the good, the bad and
14 the ugly about your investments at Morgan Keegan?
15       A.  Yes.
16       Q.  You think -- he didn't tell you the good, the
17 bad --
18       A.  I'm sorry.  When you do the double negatives --
19       Q.  You agree with his statement, don't you?
20       A.  I agree with his statement.
21       Q.  Ms. Stein, after those sales that we talked
22 about earlier in 2006, where you made a profit, you
23 actually came back and bought more of one of the funds
24 when it dipped in value.  Isn't that true?
25       A.  Whatever the statements reflect.  I don't

Page 1295

1 recall all the ups and downs.
2       Q.  Well, you don't disagree that you took
3 advantage of a drop in price in the Multi-Sector Fund in
4 2007 because it looked like a good buying opportunity at
5 the time, right?
6       A.  Did it go up after that?
7       Q.  Do you recall -- do you know your purchase?  Do
8 you recall your purchase?
9       MR. KERR: That's all his question is, if
10 you remember doing that.
11       A.  I don't.  But whatever is in there, it did.
12       Q.  (BY MR. WEISS) Okay.  Now, a couple of other
13 questions, Ms. Stein.  Is there a reason why,
14 notwithstanding the order of the Chairman in this case
15 for the Claimants to turn over all their tax returns,
16 that you did not turn over your 2004 tax return in this
17 case?  Did you file your tax return in 2004?
18       A.  I guess so.  I don't know.  I didn't know that
19 I was missing anything.  I honestly didn't.  Nobody told
20 me I was missing anything.
21       MR. KERR: Well, his question was: Did
22 you file a tax return in 2004.
23       THE WITNESS: I guess I did.
24       Q.  (BY MR. WEISS) Any reason why you wouldn't
25 have?

Page 1296

1       A.  No.
2       Q.  And you don't disagree with the fact that you
3 didn't turn over to us your 2004 tax return, as ordered
4 by the Chairman?
5       A.  I -- if I did not turn it over, I'm sorry for
6 the oversight.
7       MR. WEISS: Those are all the questions I
8 have at this time.
9       MR. KERR: Anything further over here?
10       MR. STAFFORD: No.
11       MR. KERR: All right.  Do you have any new
12 question?
13       MR. FALLAS: Briefly.  Do -- do you know
14 what a High Yield Bond Fund is?
15       THE WITNESS: No, sir.
16       MR. FALLAS: That's it.
17       MR. KERR: Do you have anything else?
18       MR. MARTIN: No questions.
19       MR. KERR: I have no questions.  Thank you
20 so much.  You can take your note.
21       THE WITNESS: Okay.  Sorry.  Again, I
22 didn't mean anything by it.
23       MR. KERR: It's okay.  No problem.  Okay.
24 Do we have time for another witness?
25       MR. STAFFORD: I think so.  Plaintiffs

Page 1297

1 next call Mr. Jose Collado.
2       MR. KERR: Would you spell your name for
3 the record, please, sir.
4       THE WITNESS: C-O-L-L-A-D-O.
5       MR. KERR: I'm sorry.  Say that again.
6       THE WITNESS: C-O-L-L-A-D-O.
7       MR. KERR: All right.  Thank you, sir.
8       JOSE COLLADO,
9 having been first duly sworn, testified as follows:
10       DIRECT EXAMINATION
11       MR. KERR: All right.  Please proceed.
12       Q.  (BY MR. STAFFORD) Mr. Collado, could you please
13 introduce yourself to the Panel, sir?
14       A.  My name is Jose Collado.  I live in Miami,
15 Florida.  I am retired from a union office for the
16 carpenter's union.  I am here representing my wife,
17 also, in investments.
18       Q.  And did your wife -- it's Adela, correct?
19       A.  Adela.
20       Q.  Did she give you authority to make investment
21 decisions on her behalf?
22       A.  Yeah, we make it together.
23       Q.  And, sir, upon whom did you rely for advice
24 when making the decision to invest and reinvest in four
25 Morgan Keegan closed-end bond funds at issue?

## ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
## ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY

Page 1314

1  A. Uh-huh.
2  Q. Because some of them you had sold already at a
3  profit we saw, right?
4  A. Yes.
5  Q. And you don't disagree, do you, Mr. Collado,
6  that even with the small loss that you suffered in the
7  funds at Morgan Keegan, that overall your account at
8  Morgan Keegan was profitable, wasn't it?
9  A. Up to a point, yes.
10  MR. STAFFORD: Objection, that's
11  irrelevant.
12  MR. KERR: Overruled.
13  Q. (BY MR. WEISS) And, Mr. Collado, when Mr. Stein
14  was telling you about all the reasons why he wanted you
15  to move with him to Morgan Keegan and why he was
16  moving -- excuse me -- from Morgan Keegan to Raymond
17  James, did he at any time tell you that he stood to gain
18  about a million bucks in money from Raymond James for
19  making the move?
20  A. No, he didn't tell me that didn't concern me.
21  What concerned me was the money I was losing with Morgan
22  Keegan.
23  Q. Okay.
24  MR. WEISS: Those are all the questions I
25  have at this time.

Page 1315

1  MR. KERR: Do you have any follow-ups?
2  MR. STAFFORD: Just a very quick couple,
3  Mr. Chairman.
4  REDIRECT EXAMINATION
5  Q. (BY MR. STAFFORD) First of all, sir, you said
6  that your wife had had some contact with Mr. Stein
7  regarding investments?
8  A. Very little.
9  Q. And then after those discussions would y'all
10  make a decision regarding the -- regarding your
11  investments?
12  A. Yeah. The IRA account that she has, I believe,
13  is a very small IRA account.
14  Q. And then, sir, the funds at issue here that you
15  were invested in, did you lose money in those funds?
16  A. Where? With Morgan Keegan?
17  Q. Mr. Weiss asked you if you had made money
18  overall. Did you lose money in the funds we're talking
19  about?
20  A. Oh, yeah, I lost money in the funds.
21  MR. STAFFORD: That's it.
22  MR. KERR: Anything further?
23  MR. WEISS: I have two quick questions.
24  RECROSS-EXAMINATION
25  Q. (BY MR. WEISS) You don't disagree from the

Page 1316

1  documents you've seen that even with the funds at issue
2  you made money, too?
3  A. Well, I made money; but at the end I lost more
4  money than I made.
5  Q. Sure. But initially you made money and you
6  were happy with it, right?
7  A. Right. But I don't think that's the way I want
8  to see it, you know. You asked me if I made money. I
9  said yes. But at the end I lost more money than what I
10  made.
11  Q. And on the IRA, that's the account that --
12  referring to your wife's IRA -- that's the account that
13  Mr. Stein dealt directly with your wife on, right?
14  A. Yeah.
15  MR. WEISS: Okay.
16  MR. KERR: All right. Do you have any
17  questions?
18  MR. FALLAS: Have you ever bought standard
19  stocks other than this?
20  THE WITNESS: No. No. Everything I have
21  done has been, you know, through Russell Stein, you
22  know. I don't have any stocks with any other --
23  MR. FALLAS: No, but, I mean, have you
24  ever bought a company, let's say, you know, Exxon,
25  Coca-Cola, anything like that?

Page 1317

1  THE WITNESS: No.
2  MR. FALLAS: A mutual fund?
3  THE WITNESS: The mutual funds that I
4  probably got was dealing with American Express or Morgan
5  Keegan or Raymond James. It's part of the package, but
6  no specific that I call anybody to tell buy this stock
7  or these bonds or whatever.
8  MR. FALLAS: Okay. In the other
9  investments that you made, you know, financial, you
10  know, with a financial firm, other than these funds,
11  have you ever had one of those that -- that lost money?
12  THE WITNESS: I have some of them that
13  lost money, but you keep it there for a while and the
14  money starts coming back. That was not the case, you
15  know, that we have with Morgan Keegan.
16  MR. FALLAS: Has there ever been one that
17  did not come back?
18  THE WITNESS: To be honest with you, I
19  don't believe.
20  MR. FALLAS: That's it.
21  MR. KERR: Do you have any questions?
22  MR. MARTIN: No questions.
23  MR. WEISS: Can I just follow up just very
24  quickly after Mr. Fallas?
25  MR. KERR: All right.

31e8d925-f612-4272-9770-7c4a3a5a2053

## ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
## ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY

Page 1450

1 your boss in making that statement?
2    A. I would never set sit here in front of clients
3 and say that they were not smart. No, I do believe that
4 they are smart people, yes.
5    Q. And they're all capable of making independent
6 investment decisions, aren't they?
7    A. Based on Russell's recommendations, that's
8 correct.
9    Q. But independent, they can evaluate the
10 information and they can make a decision?
11    A. I'm sure they can.
12    Q. Whether to buy, sell or hold, right?
13    A. I don't know. I'm assuming that, yes, they're
14 smart enough to --
15    Q. And you're capable of doing that as well,
16 right?
17    A. Absolutely.
18    Q. You've been in the securities business for,
19 what, 20 years?
20    A. Absolutely.
21    Q. And at the time that you bought your RMK Funds
22 in 2004, you were aware that the Kelsoe Funds, the RMK
23 Funds, including the open-end funds, had had substantial
24 success, right?
25    A. I cannot say anything about the open-end funds.

Page 1451

1 I'm sorry. I just know that the closed-end funds, I did
2 well or were doing well.
3    Q. But at the time that you bought them, you were
4 aware that Mr. Kelsoe had a -- a very, very positive
5 track record in his investments?
6    A. That's correct.
7    Q. All right. And you were aware that Mr. Kelsoe
8 had received awards for his success?
9    A. I recall, yes, hearing that.
10    Q. And you're aware that Morningstar had favorably
11 rated all the funds, correct?
12    A. Correct.
13    Q. Okay. And all that was important in your
14 investment decision, was it not?
15    A. Yes.
16    Q. All right.
17    A. But -- but, again, I relied on Russell.
18    Q. I understand what your response is.
19    A. Okay.
20    Q. But that was all important to you, wasn't it?
21    A. Yes.
22    Q. And the fact that this fund that you bought in
23 the past had generated some 10 percent yield, that was
24 important to you, too, right?
25    A. Yes.

Page 1452

1       MR. WEISS: I think those may be all the
2 questions I have, Mr. Chairman. If I could have just a
3 minute to ask my client.
4       MR. KERR: Okay. We'll just sit tight.
5       MR. WEISS: I think those are all the
6 questions I have at this time.
7       MR. KERR: All right. Thank you.
8       Do you have any follow-ups?
9       MR. STAFFORD: I do have a few,
10 Mr. Chairman.
11       REDIRECT EXAMINATION
12    Q. (BY MR. STAFFORD) First of all, Ms. Gordon,
13 could you explain to the Panel a little bit about the
14 procedure for marketing an order solicited versus
15 unsolicited? I think there may be some confusion about
16 that.
17       MR. KERR: I don't think there is with the
18 Panel, but that's okay.
19    A. No. I marked it as Russell told me to mark the
20 trade.
21    Q. (BY MR. STAFFORD) Okay. If an order was marked
22 as unsolicited, would that mean that those clients had
23 not talked to Russell previously and sought his advice?
24    A. No. If a ticket was unsolicited, that means
25 that they talked to Russell.

Page 1453

1    Q. And then called back later?
2    A. Exactly.
3    Q. Okay.
4       MR. FALLAS: Excuse me. You say that if
5 the ticket was marked unsolicited?
6       THE WITNESS: No, I'm just saying, yeah,
7 in that case, I just -- right. If -- I was -- I thought
8 he asked me a general question, so I answered in
9 generalities.
10       MR. FALLAS: Okay. Well, let me ask you.
11       THE WITNESS: Yes, sir.
12       MR. FALLAS: I think I heard you say, if
13 it was marked unsolicited, that means that they had
14 talked to Russell. Is that what you said?
15       THE WITNESS: Right. Usually -- customers
16 would call -- or not customers -- clients would call in
17 and talk to Russell, from what I recall, and they still
18 do, and talk about what their needs are. He would ask
19 them questions. They may say they need a certain amount
20 of money monthly, et cetera; and then if we wanted to
21 do -- or if they wanted to go ahead and do a trade, it
22 was unsolicited when they called back, that's correct.
23       MR. FALLAS: Continue.
24    Q. (BY MR. STAFFORD) Could you actually turn to
25 Exhibit 517, I believe.

**ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY**

Page 1458

1 negative statement?
2    **A. I would classify that as a positive.**
3    Q. And, again, this was a representative
4 communication to the class that Russell had you send
5 out.
6    **A. Yes.**
7        MR. STAFFORD: Nothing further.
8        MR. KERR: Anything further?
9        MR. WEISS: Yeah, I just have a couple of
10 questions. I am 99.999 percent sure the Panel
11 understands this, but just because the questions were
12 there.
13        RECROSS-EXAMINATION
14    Q. (BY MR. WEISS) There's a distinction between an
15 unsolicited order and a discretionary order, right?
16    **A. Yes.**
17    Q. Okay. Now, discretion is where the broker just
18 does whatever he wants, right?
19    **A. That's correct.**
20    Q. And there's typically written discretionary
21 paperwork that allows for that, correct?
22    **A. That's correct.**
23    Q. All right. And it would be fair to say that
24 with respect to the Claimants in this case, none of them
25 had discretionary relationships with Mr. Stein, right?

Page 1459

1    **A. That's correct.**
2    Q. And it would be fair to say that these trades
3 that we discussed early, those are marked not discretion
4 versus nondiscretion, but they're marked unsolicited,
5 right?
6    **A. Yes.**
7    Q. Okay. And an unsolicited trade is where it is
8 the client's idea to do the trade after a consultation,
9 right?
10    **A. That's correct.**
11    Q. All right. Now, with respect to this document,
12 568, because you've pointed out both good, bad and ugly,
13 you would characterize this as overall balanced,
14 wouldn't you?
15        MR. FALLAS: What was that last word?
16 "Balanced"?
17        MR. WEISS: Balanced, meaning a balanced
18 presentation.
19        MR. KERR: Yeah, good and bad.
20        MR. WEISS: Yeah.
21    **A. It -- and I'm just reading it really quickly.**
22 **It sounds more positive to me.**
23    Q. (BY MR. WEISS) Okay. Fair enough. Thank you.
24        MR. KERR: All right. Anything further?
25        MR. FALLAS: I have one question.

Page 1460

1        If you -- if you had known that this
2 investment, the RMK Funds, were risky or speculative,
3 would that have changed your decision to invest?
4        THE WITNESS: If it had been disclosed
5 that they were risky and I knew it -- if I had been
6 advised that it was risky, you're right, I would not
7 have invested in them. I just -- I --
8        MR. FALLAS: Would your answer be the same
9 as to continuing to hold or to reinvest?
10        THE WITNESS: I reinvested based on
11 Russell's recommendation, and I held based on his
12 recommendation.
13        MR. FALLAS: What I'm saying, though, is,
14 the answer to the question of, if you had known it was
15 risky, would -- would that -- would you give a similar
16 answer to the question of -- would that also affect your
17 decision to -- to hold it or to reinvest, in addition to
18 investing to begin with?
19        THE WITNESS: Honestly, I only talked to
20 Russell about it; and if he said hold, I did. If he
21 said reinvest, I did. I just -- I didn't -- I don't
22 know what else to say. I mean, if that's -- for me,
23 working in -- in the office and hearing Russell on the
24 phone and knowing he was calling and knowing that there
25 were meetings -- and I'm thinking -- I'm thinking back

Page 1461

1 to when these funds were first marketed. So, see, I'm
2 sorry. That's why I'm confused.
3        MR. FALLAS: All right. This may be the
4 same question -- I'm just going to ask it one more time
5 a different way, and then that's pretty much it.
6        THE WITNESS: Okay.
7        MR. FALLAS: If -- if Russell had
8 recommended -- had recommended to hold --
9        THE WITNESS: Right.
10        MR. FALLAS: -- but you also knew that it
11 was classified as risky or speculative, would you have
12 agreed with Russell or would you have had second
13 thoughts?
14        THE WITNESS: If I had known?
15        MR. FALLAS: I'll make it a little bit
16 simpler.
17        THE WITNESS: No; I --
18        MR. FALLAS: Wait, wait, wait.
19        MR. KERR: She's answered the question.
20 What was your answer? You were about to say --
21        MR. FALLAS: Well, I wanted to scratch
22 that because it was a little confusing.
23        Imagine the idea, my trusted advisor is
24 suggesting that I hold a -- an investment that I've been
25 told is speculative.

**ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011**
**ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY**

Page 1462

1  THE WITNESS: I honestly don't recall
2  being told it was speculative.
3  MR. FALLAS: No, I understand. I'm saying
4  hypothetically.
5  THE WITNESS: Oh, gosh.
6  MR. FALLAS: If you've been told that the
7  investment is speculative, but your trusted advisor is
8  telling you to hold it, you know, would you tend to --
9  would that sway your opinion?
10  THE WITNESS: If I knew that something was
11  risky? See, my -- I don't think Russell would advise me
12  to get into anything risky. So, that's -- that's where
13  my confusion is. I don't -- if you're asking me if I
14  knew that something was risky, would I -- yes, if I know
15  something is risky. But I trust that Russell did not
16  believe that this was risky. I -- he did his homework,
17  as far as I could see. So --
18  MR. FALLAS: Okay.
19  MR. KERR: You trusted Russell.
20  THE WITNESS: So, I apologize if that's
21  not very clear, but --
22  MR. WEISS: Mr. Chairman, can I follow up
23  on that just very, very, very quickly?
24  MR. KERR: Okay.
25

Page 1463

1  CROSS-EXAMINATION (CONTINUED)
2  Q. (BY MR. WEISS) Ms. Gordon, when you said that
3  you wouldn't have invested in it had it been disclosed
4  to you that it was risky, I want to make sure that I
5  understand what kind of risk you're talking about that
6  could have been disclosed.
7  MR. KERR: It was a hypothetical question.
8  MR. WEISS: I understand it was a
9  hypothetical question.
10  Q. (BY MR. WEISS) Hypothetically, if it had been
11  disclosed to you that an investment in the fund's common
12  shares is subject to investment risk, including the
13  possible loss of the entire principal that the
14  shareholder invests, isn't that the kind of risk that
15  you're talking about, that had that been disclosed, you
16  wouldn't have bought it in the first place?
17  **A. I would not knowingly invest in something that**
18  **was risky, but I believe Russell would not let me invest**
19  **in anything risky.**
20  Q. That's all I'm asking. I'm asking in response
21  to your testimony that you said that had it been
22  disclosed to you that this investment had risk, that you
23  wouldn't have invested. And my question to you is: Had
24  it been -- in terms of trying to figure out what you
25  mean by risk -- had it been disclosed to you that an

Page 1464

1  investment in the fund's common shares is subject to
2  investment risk, including the possible loss of the
3  entire investment, that's the kind of risk you're
4  talking about, that had that been disclosed to you, you
5  wouldn't have bought, right?
6  **A. But I was trying to answer his question as**
7  **to -- and it was a hypothetical question. So, I**
8  **don't --**
9  MR. KERR: But now let's answer his
10  question.
11  **A. Okay. So, if I had known --**
12  Q. (BY MR. WEISS) If it had been disclosed to
13  you -- if Morgan Keegan had given you a piece of paper
14  on this fund and in the piece of paper it said, right
15  there, under investment risk "an investment in the
16  fund's common shares is subject to investment risk,
17  including the possible loss of the entire principal that
18  a shareholder invests --
19  **A. If I had read that --**
20  Q. You wouldn't have bought?
21  **A. Well, if Russell told me I could get it,**
22  **then -- that I should buy it, that it was okay to invest**
23  **in it based on his knowledge, I -- but those kinds of**
24  **things are usually put in everything.**
25  Q. Well, let me -- let me try something else.

Page 1465

1  What if it had been disclosed to you in writing that the
2  fund will invest a significant portion of its assets in
3  below-investment-grade securities, which are considered
4  predominantly speculative. Had that been disclosed to
5  you in writing, that's the kind of thing you're talking
6  about, had you known that in writing, you wouldn't have
7  bought the thing, right?
8  **A. If I asked Russell -- I asked Russell what I**
9  **should put my money in, and that's what I did.**
10  Q. I understand that. Could you answer my
11  question, please?
12  **A. And if I had read that, if he recommended it, I**
13  **still would have done it.**
14  Q. That's not my question.
15  **A. Because --**
16  Q. If it had been disclosed to you in writing,
17  would you have -- in terms of following up on the
18  question --
19  **A. If Russell --**
20  MR. STAFFORD: She's answered the
21  question.
22  MR. KERR: She did answer that question.
23  MR. WEISS: Okay.
24  **A. Yeah, even if I read it, I don't believe**
25  **Russell would have put me in any -- or told me to invest**

## ARBITRATION PROCEEDINGS - Day 4 - January 29, 2011
## ARISPE, ET. AL. VS. MORGAN, KEEGAN & COMPANY

Page 1482

1 MS. BLACKWELL: I think two total.
2 MR. DOBROWSKI: How long?
3 MS. BLACKWELL: Two total.
4 MR. DOBROWSKI: Two hours?
5 MS. BLACKWELL: At the most.
6 MR. KEMP: How long are you anticipating
7 for direct?
8 MS. BLACKWELL: Probably an hour, an hour
9 and 15 minutes. Yeah, probably an hour.
10 MR. KERR: Okay. So, that's four hours.
11 And then something like two hours for closing argument.
12 That's six hours.
13 MR. DOBROWSKI: I heard four-and-a-half.
14 Two-and-a-half for Mr. Ekdahl, two for the —
15 MR. WEISS: Scales isn't going to take
16 that long. He will be less would be my expectation.
17 MR. KERR: Okay. Well, where I'm headed
18 with that is to see -- now, we want to finish tomorrow.
19 We are going to finish tomorrow. Should we come at
20 9:00 o'clock, then? Or could we start later? With
21 people traveling, you might want to start at 9:00. I
22 don't know.
23 MR. DOBROWSKI: Are we going to stop now
24 or can we hear from -- I mean, I don't mind going until
25 6:00, if that's what the Panel wants. If the Panel

Page 1483

1 would prefer, though, to stop now, that's fine, too.
2 It's your decision.
3 MR. CARLIN: I actually think we might
4 benefit from starting -- because based on the way that
5 the testimony has gone today, I'm going to try to knock
6 out some of what Mr. Ekdahl has to talk about --
7 MR. KERR: Well, I think that's just fine.
8 I guess I was making an assumption --
9 MR. CARLIN: -- to try to make it shorter.
10 Mr. Chair, I don't think there's any doubt we'll finish
11 tomorrow. I think -- my preference would be, let's just
12 start at 9:00 and get it done.
13 MR. KERR: Start at 9:00. Okay. All
14 right.
15 MR. DOBROWSKI: Whatever the Panel wants
16 is fine with us.
17 MR. CARLIN: And if we finish earlier,
18 then everybody gets to go home earlier.
19 MR. KERR: Okay. We'll start at 9:00 in
20 the morning, then. Thank you very much.
21 MR. CARLIN: And we do think that because
22 of the full Marathon that's going on tomorrow --
23 MS. BLACKWELL: My understanding, yes,
24 that security is going to be -- and the Marathon will
25 probably be coming here closer to the time that we are

Page 1484

1 getting here. So, make sure you have your passes; or
2 they may not let you pass.
3 MR. KERR: We're off the record.
4 (Proceedings recessed at 4:29 p.m.)

Page 1485

1 STATE OF TEXAS
2 COUNTY OF HARRIS
3
4 REPORTER'S CERTIFICATE
5 ARBITRATION HEARING
6 January 29, 2011
7
8 I, the undersigned Certified Shorthand Reporter in
9 and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11 I further certify that I am neither attorney or
12 counsel for, related to, nor employed by any parties to
13 the action in which this testimony is taken and,
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17 SUBSCRIBED AND SWORN TO under my hand and seal of
18 office on this the _____ day of _____.
19 _____
20
   Kelly Hanna, CSR, RPR, CRR, CMRS
21 Texas CSR 1654
   Expiration: 12/31/2011
22 1225 North Loop West
   Suite 327
23 Houston, Texas 77008
   713.840.8484 - 713.626.1966
24 www.hannareporting.com
25

## HANNA & HANNA, INC.
## (713) 840-8484

## ARBITRATION PROCEEDINGS - Day 6 - January 30, 2011
## ARISPE, ET AL vs. MORGAN, KEEGAN & COMPANY

Page 1486

```
 1              BEFORE FINRA DISPUTE RESOLUTION
 2 In the Matter of the Arbitration Between:
 3 RICHARD R. ARISPE, JIMMY A.  )
   BURKE, PEGGY E. BURKE, TODD  )
 4 B. BURKE, JOSE J. COLLADO,   )
   ADELA CHRISTINE COLLADO,     )
 5 CHARLES K. COLVIN, C & C      )
   ERECTION, INC., NANCY GORDON,)
 6 SUSAN W. HACKNEY, DON H.      )
   JONES, SUZANN S  JONES,      )
 7 WILLIAM A. RHODES, JR , DAWN )
   SCHUESSLER, KENNETH W. SEARS,)
 8 KENNETH W. SEARS, JR., REINE )
   M. SEARS, DANIEL J. SEARS,   )
 9 KENNETH W. SEARS, III, JUDY  )
   STRICKLAND, ELIZABETH STEIN &)
10 SHANA L. STEIN,              )
              Claimants        )
11 v.                          ) FINRA CASE NO. 09-006655
                                )
12 MORGAN KEEGAN & COMPANY,     )
              Respondent.      )
13
14          ARBITRATION PROCEEDINGS
15             January 30, 2011
16                  Day 6
17     ARBITRATION PROCEEDINGS was taken in the
18 above-styled and numbered cause on the 30th day of
19 January, 2011, from 9:01 a.m. to 4:55 p.m., before Kelly
20 Hanna, Certified Shorthand Reporter in and for the State
21 of Texas, reported by computerized stenotype machine at
22 the offices of Greenberg Traurig, 1000 Louisiana, Suite
23 1700, Houston, Texas, pursuant to the Federal Rules of
24 Civil Procedure and the provisions stated on the record
25 or attached hereto.
```

Page 1487

```
 1                  APPEARANCES
 2
 3  FOR CLAIMANTS:
 4   Mr. Paul J. Dobrowski
     Mr. Bruce Kemp
 5   Mr Cody Stafford
     Dobrowski, LLP
 6   4602 Washington Avenue, Suite 300
     Houston, Texas 77007
 7   Telephone: 713.659.2900
     Fax: 713.659.2908
 8   E-mail: pdobrowski@doblaw.com
 9  FOR RESPONDENTS:
10   Mr. Terry Weiss
     Mr. Steve Carlin
11   Ms. Penelope Brobst Blackwell
     Greenberg Traurig
12   The Forum
     3290 Northside Parkway
13   Atlanta, Georgia 30327
     Telephone: 678.553.2100
14   Fax: 678.553.2212
     E-mail: weisstr@gtlaw.com
15
    ALSO PRESENT·
16
     Mr. Maurice Fallas, Arbitrator
17   Mr. Raymond C. Kerr, Arbitrator
     Mr. Thomas A. Martin, Arbitrator
18   Mr. Tom Barnett, Morgan Keegan
     Mr. Steve Scales, Expert
19   Mr. Kjel Ekdahl, Expert
20
21
22
23
24
25
```

Page 1488

```
 1                  INDEX
 2                                    PAGE
 3 KJEL EKDAHL
 4  Direct Examination by Mr. Carlin ...............1489
    Cross-Examination by Mr. Dobrowski .............1584
 5  ReDirect Examination by Mr. Carlin ...........1639
    ReCross-Examination by Mr. Dobrowski ..........1651
 6  Further ReDirect Examination by Mr. Carlin .....1658
    Further Re-Cross Examination by Mr. Dobrowski ..1659
 7  Further ReDirect Examination by Mr. Carlin .....1661
 8 STEVE SCALES
 9  Direct Examination by Ms. Blackwell ...........1667
    Cross-Examination by Mr. Kemp .................1712
10
   CLOSING ARGUMENTS
11
    Mr. Dobrowski.................1727
12  Mr. Carlin.....................1759
    Mr. Dobrowski....... .. ....................1796
13
   Court Reporter's Certificate ..................1806
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1489

```
 1         MR. KERR:  All right.  On the record.  The
 2 Respondents are up today.  Would you call your first
 3 witness, please, sir.
 4         MR. CARLIN:  Yes, sir, Mr. Chair.
 5 Respondents call Mr. Kjel Ekdahl.
 6         MR. KERR:  All right.  I think I've got
 7 the spelling here.
 8         MR. CARLIN:  It should be on the front of
 9 the slide deck.
10         MR. KERR:  Mr. Ekdahl, would you state
11 your name for the record?
12         THE WITNESS:  Yes, sir.  My name is Kjel
13 Ekdahl.
14             KJEL EKDAHL,
15 having been first duly sworn, testified as follows:
16          DIRECT EXAMINATION
17         MR. KERR:  All right. ·Thank you.
18      Please proceed, Mr. Carlin.
19         MR. CARLIN:  Thank you, Mr. Chair.
20      Q.  (BY MR. CARLIN) Mr. Ekdahl, I would like to
21 start, if you could please describe for the Panel, tell
22 them a little bit about yourself.
23      A.  Yes.  Starting from the beginning, I actually
24 grew up in Sweden.  I went to school there, and I
25 started my career in Sweden.  I graduated from Lund
```

**ARBITRATION PROCEEDINGS - Day 6 - January 30, 2011**
**ARISPE, ET AL vs. MORGAN, KEEGAN & COMPANY**

Page 1658

1 we could turn to 65 of Dr. McCann's report -- slide.
2 And 65, you will recall when Dr. McCann was here, he
3 noted that this change had been made to the risk
4 disclosures in the open-ended funds by Morgan Keegan but
5 not to any of the other closed-end funds until March of
6 2008, and you're familiar with that, right?
7   A.  I'm familiar with it.
8   Q.  Okay.  And that doesn't change your opinion,
9 right?
10   A.  No.
11   Q.  Okay.
12       MR. DOBROWSKI:  Pass the witness.  Thank
13 you.
14       MR. KERR:  Anything further?
15       MR. CARLIN:  Just one or two questions.
16       FURTHER REDIRECT EXAMINATION
17   Q.  (BY MR. CARLIN) To your knowledge, sir, did the
18 Federal Reserve ever do a pricing analysis of the
19 history of the pricing of the securities?
20   A.  Not to my knowledge.
21   Q.  Did the SEC?
22   A.  No.
23   Q.  Does any of this -- you've seen all of those
24 documents before, correct?
25   A.  Yes.

Page 1659

1   Q.  You did an analysis of the pricing and sale of
2 these securities, correct?
3   A.  Yes.
4   Q.  Dr. McCann did not, did he?
5   A.  He did not.
6       MR. CARLIN:  Nothing further.
7       FURTHER RECROSS-EXAMINATION
8   Q.  (BY MR. DOBROWSKI) I had forgot one question
9 before I let you go; and I apologize, Mr. Ekdahl.
10 You've testified earlier about your belief as to what
11 Mr. Stein testified to.
12       MR. DOBROWSKI:  May I approach, Mr. Chair,
13 very briefly?
14       MR. KERR:  Yes.
15   Q.  (BY MR. DOBROWSKI) On Page 961 of the
16 arbitration testimony on October 15, and it's up on the
17 board, Line 17 --
18       MR. WEISS:  I'm sorry.  Which day was that
19 of the hearing?
20       MR. DOBROWSKI:  Day 4.
21   Q.  (BY MR. DOBROWSKI), Line 17, the question
22 was asked:  In fact, sir -- and this is to Mr. Stein.
23   A.  Let me just reorient myself.
24   Q.  Yes, sir.
25   A.  This is whom again?

Page 1660

1   Q.  Mr. Carlin asking the questions of Mr. Stein.
2 Remember, you testified about Mr. Stein?
3   A.  That's right.
4   Q.  And Mr. Stein is asked the question:  In fact,
5 sir, you understood they were going pretty far down the
6 credit stack to generate the yields that they were
7 generating, correct?
8       Answer:  We had that discussion and to
9 reference it back to, like, a barrel of oil, you have
10 light sweet crude at the top of the barrel, you have the
11 asbestos at the bottom of the barrel and we thought that
12 we were getting about the middle of the barrel, not the
13 bottom.
14       Does that refresh your recollection that,
15 in fact, Mr. Stein's testimony was that he understood
16 they weren't getting the lowest of the tranches, but
17 about the middle stack?
18   A.  They weren't getting the lowest tranches.
19 There were some lowest tranches.  There were some
20 highest tranches.  There were some in between.  My
21 testimony was the bottom 25, 30 percent, that's where
22 they were.
23       MR. DOBROWSKI:  Okay.  Thank you.  Pass
24 the witness.
25

Page 1661

1       FURTHER REDIRECT EXAMINATION
2   Q.  (BY MR. CARLIN) Okay.  Let's look at the three
3 lines that weren't highlighted right after that.  Okay.
4 Line 25.  We'll take a look at the marketing pieces, but
5 you understood that to get these yields these funds were
6 investing in lower tranches, correct?
7       That's correct.
8       Did I read that correctly, Mr. Ekdahl?
9   A.  Yes.
10       MR. CARLIN:  Thank you.
11       MR. KERR:  All right.  So, you're done.
12       MR. DOBROWSKI:  I'm done.
13       MR. KERR:  Very good.
14       Does the Panel have any questions of this
15 witness?
16       MR. FALLAS:  I have one.
17       Regarding the issue, the question already
18 came up about if other prospectuses, you know, or
19 similar bond funds ever talked about where in the stack
20 the -- the tranche was located, I believe you said that
21 it's not -- it's not done that you're aware of in any
22 prospectus.
23       THE WITNESS:  I have not seen it, and I
24 have reviewed almost all -- all the high-yield bond
25 prospectuses.

## ARBITRATION PROCEEDINGS - Day 6 - January 30, 2011
## ARISPE, ET AL vs. MORGAN, KEEGAN & COMPANY

Page 1662

1       MR. FALLAS: And that's the same -- they
2  simply don't talk about it whether they happen to have
3  the highest rating or the lowest rating.
4       THE WITNESS: Typically what you see is a
5  discussion on, say, asset-backed securities, and it may
6  talk about tranches, some may and some may not, but it's
7  a pretty big-picture descriptions.
8       MR. FALLAS: What I'm saying, like, even
9  if you had a fund that, you know, had -- you know, they
10  happened to be, you know, the highest quality -- they --
11  they tended to concentrate their selections in the
12  highest levels of the -- of the structure, they still
13  don't -- they don't parse out -- when they list, you
14  know, you know, 3AA, S2A --
15       THE WITNESS: I see what you're saying.
16       MR. FALLAS: -- in other words, you said
17  basically they don't talk about the -- if -- where it
18  is, if it's low grade, but if they happen to have some
19  of the best, do they ever say, you know, this is the
20  highest?
21       THE WITNESS: No. I'm sorry. I
22  misunderstood. No, they do not. That's where you go to
23  the annual reports and the semi-annual reports to get a
24  description of what's in the fund. In the prospectus,
25  no, they do not, whether it's highest or lowest.

Page 1663

1       MR. FALLAS: I'm sorry. I misspoke. I
2  meant the annual report or the quarterly report where it
3  lists the holdings.
4       THE WITNESS: Okay. So, not the
5  prospectus but the annual reports?
6       MR. FALLAS: Right. And let me take it
7  back -- it's basically the -- where -- they showed one
8  on the screen that was basically a particular CDO or
9  something and it doesn't say anywhere on there you would
10  have to go to the Bloomberg to find out where that fit
11  in the stack. And, so, my question is, that description
12  is not -- I'm asking you if that description is ever
13  included, a detail of where it is in the sack, even if
14  it's of the highest quality.
15       THE WITNESS: That's right. So, the
16  answer is, no, I've never seen it being described this
17  is No. 1 of ten levels or some kind of description like
18  that. We are only listing, here are all the top
19  tranches, here are the third tranches and here are all
20  the bottom. Never. I have never seen anything like
21  that. It's usually by credit quality or investment
22  grade, below investment grade or by sector.
23       MR. FALLAS: Okay. So, for all of them,
24  regardless of whether they're the highest or the lowest,
25  you would still basically have to go to a Bloomberg or

Page 1664

1  something to find out exactly where it's lined up.
2       THE WITNESS: Yes, sir. Or to the
3  offering documents. But you would have to go outside of
4  the reports.
5       MR. FALLAS: Okay.
6       MR. KERR: Do you have any questions?
7       MR. MARTIN: No questions.
8       MR. KERR: I have no questions for you,
9  sir. Thank you very much for your testimony.
10       THE WITNESS: Thank you.
11       MR. KERR: You're excused.
12       THE WITNESS: Thank you, sir.
13       MR. KERR: Now, Mr. Carlin, the Panel just
14  has a question. Earlier, for Mr. McCann, we received
15  this very detailed report which analyzes the events,
16  whatever, with respect to the Claimants. Today we
17  received another very good report that takes the same
18  events and casts a different light on them, not to be
19  unexpected. So, we've heard a lot from both experts
20  about this case. The Panel is curious about the expert
21  you propose to call, what will he add to the mix of
22  information to help us make a more informed judgment?
23       MR. CARLIN: Sure. Mr. Scales -- and
24  Ms. Blackwell can fill in if I miss anything --
25  Mr. Scales is going to testify about the individual

Page 1665

1  claimants and about their losses. Mr. Ekdahl did not go
2  into Claimant by Claimant damages, losses, et cetera.
3  He's also got some other topics that he's going to talk
4  about, but it's much more focused on the individual
5  Claimants.
6       MR. WEISS: And it is focused on the
7  broker and the communications from Morgan Keegan to the
8  broker to the Claimants.
9       MR. KEMP: If I may, Mr. Chairman, and
10  perhaps this is a little premature because I don't
11  really know what they're going to try and elicit from
12  that individual, the only thing they produced to us
13  related to his damage calculations, so to the extent he
14  wants to do that, I think that's appropriate. Anything
15  else has not been properly disclosed, either in the 20
16  day or in response to discovery requests.
17       MR. WEISS: I don't know what you mean by
18  "properly disclosed."
19       MS. BLACKWELL: I'm prepared to answer
20  this question.
21       MR. WEISS: Okay. Go ahead.
22       MS. BLACKWELL: First of all, you did not
23  make a discovery request in this case to have a
24  disclosure on the topics of Mr. Scales' testimony. All
25  you -- all we have to do in this case is comply with the

## ARBITRATION PROCEEDINGS - Day 6 - January 30, 2011
## ARISPE, ET AL vs. MORGAN, KEEGAN & COMPANY

Page 1802

1        MR. CARLIN: That's the part that shocks
2  me.
3        MR. DOBROWSKI: Agreed.
4        MR. KERR: Okay. Do the parties have any
5  other issues or objections you would like to raise that
6  you have not previously raised?
7        MR. DOBROWSKI: Claimants do not.
8        MR. CARLIN: Respondents do not.
9        MR. KERR: All right. Thank you. The
10 decision will be forwarded to the parties and/or
11 counsel. In order to expedite the delivery of the
12 Panel's decision to the parties, may either execute a
13 handwritten copy of the award or each arbitrator may
14 execute a counterpart copy.
15       There is also an issue of party
16 evaluations. As I mentioned at the beginning of the
17 case, I asked that each party or representative complete
18 an evaluation of this arbitration. Your participation,
19 while it's strictly voluntary, greatly assists -- that's
20 in this evaluation process -- greatly assists FINRA
21 Dispute Resolution's ongoing effort to improve the
22 arbitration process. You can find the evaluation form
23 at www.FINRA.org/revaluation. If you do not have
24 computer access -- well, I can skip that. We're
25 surrounded by computers.

Page 1803

1        FINRA is not responsible for secure
2  disposal of any documents left with the Panel or the
3  parties following the proceeding. This hearing facility
4  will dispose of all remaining materials in its usual
5  manner. If a party wishes to retain secure control of
6  the materials, they must take them when leaving. The
7  record of this proceeding -- and this record is a term
8  of art in the arbitration practice as you-all know --
9  the record of this proceeding will remain open until the
10 Panel arrives at a decision or the Panel determines that
11 it is closed. No party will contact any member of this
12 arbitration Panel directly. All communications are to
13 be directed to the staff person assigned to this case.
14       And additionally, what I would like to
15 say -- and I'm speaking for me, not on behalf of the
16 Panel necessarily. They can certainly have their views,
17 too, but, again, I want to say that I consider this a
18 very well-tried case. I think these are probably two of
19 the finest final argument summations and materials I've
20 ever seen. And I want to compliment both parties on
21 that. Your presentations were very professional. And
22 as I said earlier, we certainly disagreed from time to
23 time, but you were able basically to do that without
24 being disagreeable, which is the professional way to do
25 it; and we appreciate it. And we have listened

Page 1804

1  carefully to everything you have had to say and your
2  exhibits. We're going to work very hard to come up with
3  what we collectively believe is the right resolution.
4  And if either one of my colleagues wants to speak up,
5  please do.
6        MR. MARTIN: From my side, it was a good
7  job by both sides. The parties were extremely well
8  represented. The arguments of counsel were very well
9  taken. And you've given us a lot to be thinking about.
10 Thank you both very, very much.
11       MR. FALLAS: I just have one question for
12 Mr. Carlin.
13       MR. KERR: A question?
14       MR. FALLAS: Yes. Just a quick question
15 on one of the things.
16       MR. KERR: Well, I don't think it's
17 appropriate if you're going to ask him about his
18 argument or some point --
19       MR. FALLAS: No, I just want a definition.
20       MR. KERR: A definition?
21       MR. FALLAS: Yes.
22       MR. KERR: Tell me what you want a
23 definition of.
24       Okay. So, we can go off the record now.
25 The hearing is closed. And -- but we need to talk about

Page 1805

1  some logistics.
2        (Proceedings concluded at 4:55 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## ARBITRATION PROCEEDINGS - Day 6 - January 30, 2011
## ARISPE, ET AL vs. MORGAN, KEEGAN & COMPANY

Page 1806

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4        REPORTER'S CERTIFICATE
5        ARBITRATION HEARING
6        January 30, 2011
7
8     I, the undersigned Certified Shorthand Reporter in
9  and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11    I further certify that I am neither attorney or
12 counsel for, related to, nor employed by any parties to
13 the action in which this testimony is taken and,
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17    SUBSCRIBED AND SWORN TO under my hand and seal of
18 office on this the 7th day of February, 20 Digitally signed by Kelly Hanna
                                             Date: 2011.02.07 11:43:18 -06:00
19      _Kelly Hanna_                         Reason: I am the author of this
20                                            document
                                             Location: Houston, TX
        Kelly Hanna, CSR, RPR, CRR, CMRS
21      Texas CSR 1654
        Expiration: 12/31/2011
22      Firm Registration No. 581
        1225 North Loop West, Suite 327
23      Houston, Texas 77008
        713.840.8484 - 713.626.1966
24      www.hannareporting.com
25

## HANNA & HANNA, INC.
## (713) 840-8484